# EXHIBIT 207

Page 1

IN THE UNITED STATES DISTRICT
FOR THE DISTRICT OF HAWAII

JOHN HOCHROTH                          :
      Plaintiff                      :
                                     :
-VS-                                   :   NO. 18-00319
                                     :   JAO/KJM
ALLY BANK, a Utah for profit           :
corporation; CENLAR FSB, a             :
federally charted bank, DOES           :
1-10                                   :
      Defendants                     :


* * * * *

THURSDAY, NOVEMBER 7, 2019

* * * * *


        Oral deposition of RAYMOND CRAWFORD, in his corporate capacity, taken pursuant to notice, held at Kaplan, Leaman & Wolfe Court Reporters, 230 South Broad Street, Suite 1303, Philadelphia, Pennsylvania, on Thursday, November 7, 2019, beginning at 12:29 p.m., before Susan L. Singlar, Professional Court Reporter and Notary Public of the Commonwealth of Pennsylvania, there being present.

        Any reproduction of this transcript is prohibited without authorization by the certifying agency.

KAPLAN, LEAMAN AND WOLFE
Registered Professional Reporters
230 South Broad Street, Suite 1303
Philadelphia, PA 19102
(215) 922-7112

```
                                                        Page 2

 1   A P P E A R A N C E S:

 2

 3        FORRESTER LEGAL, LLC
          BY:   RICHARD T. FORRESTER, ESQUIRE
 4              Alii Place, Suite 2110
                1099 Alakea Street
 5              Honolulu, Hawaii 96813
                (808)292-4324
 6              Rforrester@forresterlegal.com
                Representing the Plaintiff
 7

 8

 9
          KOBAYASHI SUGITA & GODA, LLP
10        BY:   JESSE W. SCHIEL, ESQUIRE
                999 Bishop Street, 26th Floor
11              Honolulu, Hawaii 96813
                (808)535-5700
12              Jws@ksglaw.com

13              Representing Ally Bank and CENLAR

14

15
          CENLAR
16        BY:   DAVID M. HOBSON, ASSISTANT GENERAL COUNSEL
                7 Graphics Drive, Suite 212
17              Ewing, New Jersey 08628
                (609) 883-3900, Ext. 2265
18              Dmhobson@cenlar.com

19              Representing CENLAR

20

21

22   ALSO PRESENT:

23              MIRANDA DANG

24
```

Raymond Crawford

```
                                                    Page 3

 1                     I N D E X

 2
     WITNESS                                        PAGE
 3
     RAYMOND CRAWFORD
 4
            (Witness sworn.)
 5

 6        DIRECT EXAMINATION by MR. FORRESTER         6

 7

 8                   E X H I B I T S

 9

10   NUMBER          DESCRIPTION                    PAGE

11   Exhibit-1     Notice of Deposition              15

12   Exhibit-2     Request for Reinstatement Figures  24

13   Exhibit-3     E-mail dated 11/14/17             27

14   Exhibit-4     E-mail dated 11/14/17             28

15   Exhibit-5     E-mail dated 11/14/17             29

16   Exhibit-6     E-mail dated 4/16/18              29

17   Exhibit-7     E-mail dated 11/15/17             30

18   Exhibit-8     E-mail dated 11/15/17             31

19   Exhibit-9     E-mail dated 11/15/17             31

20   Exhibit-10    Transcript of Audio Recording     35

21   Exhibit-11    E-mail dated 11/16/17             50

22   Exhibit-12    Loan Statement dated 1/17/18      53

23

24
```

Raymond Crawford

Page 4

1          E X H I B I T S (continued)
2

NUMBER          DESCRIPTION                      PAGE
3

Exhibit-13     Bates Ally 2653-2685 Conversation    59
4

Exhibit-14     Escrow Analysis                      65
5

Exhibit-15     Copy of Check                        74
6

Exhibit-16     E-mail dated 1/31/18                 77
7

Exhibit-17     Letter dated 2/26/18                 78
8

Exhibit-18     Fees Typically Charged To Borrower   80
9

Exhibit-19     Document                             81
10

Exhibit-20     Letter dated 5/22/18                 83
11

Exhibit-21     Loan Statement dated 8/18/14         83
12

Exhibit-22     Loan Statement dated 3/19/18         85
13

Exhibit-23     Letter dated 5/31/18                 89
14

Exhibit-24     Letter dated 5/31/18                 90
15

Exhibit-25     Letter dated 6/6/18                  90
16

Exhibit-26     Letter dated 6/15/18                 91
17

Exhibit-27     Letter dated 6/19/18                 93
18

Exhibit-28     Letter dated 6/20/18                 94
19

Exhibit-29     Letter dated 6/26/18                 94
20

Exhibit-30     Letter dated 6/28/18                 94
21

Exhibit-31     Letter dated 10/9/18                 95
22

Exhibit-32     Letter dated 10/26/18                95
23

Exhibit-33     E-mail dated 11/1/18                 95
24

Raymond Crawford

```
                                                    Page 5

 1
                    E X H I B I T S (continued)
 2

 3     NUMBER          DESCRIPTION                      PAGE

 4     Exhibit-34      Letter dated 11/14/18            102

 5     Exhibit-35      Loan Transaction History         105

 6     Exhibit-36      Five Brothers Property Inspection
                       Result                           110
 7
       Exhibit-37      Confidential Documents           112
 8
       Exhibit-38      Mortgage Loan History            117
 9
       Exhibit-39      Letter dated 8/7/19              145
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Raymond Crawford

Page 6

1                       *  *  *  *  *

2              RAYMOND CRAWFORD, having been duly

3       sworn, according to law, was examined and

4       testified as follows:

5                       *  *  *  *  *

6                       EXAMINATION

7                       *  *  *  *  *

8   BY MR. FORRESTER:

9        Q.    Hi.  Good afternoon.  My name is

10  Richard Forrester.  I represent John Hochroth in a

11  case that's filed against CENLAR.

12              Will you please state your full name

13  for the record?

14       A.    Raymond Crawford.

15       Q.    Raymond, I'm going to be taking your

16  deposition today.

17              Is there any reason that you cannot

18  have your deposition taken today that you know of?

19       A.    No.

20       Q.    Are you aware that you're being deposed

21  in Civil Number 18-319 of the United States District

22  Court for the District of Hawaii?

23       A.    I'm not familiar with the case number.

24       Q.    Have you been deposed before?

Raymond Crawford

Page 7

1       A.      Yes.

2       Q.      How many times have you been deposed?

3       A.      More than 50, 60 times.

4       Q.      So is it fair to say that you're

5   comfortable with the procedures of having your

6   testimony taken at a deposition?

7       A.      Yes, I am.

8       Q.      Would you like me to go over any of the

9   typical ground rules for deposition testimony, or are

10  we okay to skip this?

11      A.      That's up to you, sir.

12      Q.      The first thing I'd like to go over is

13  your background.

14              Where do you reside?

15      A.      Apollo Beach, Florida.

16      Q.      And what is your job title?

17      A.      Corporate Representative.

18      Q.      Is that for CENLAR?

19      A.      Yes.

20      Q.      And these other times that you've had

21  your deposition taken, were those also for CENLAR?

22      A.      Yes.

23      Q.      Do you travel for your job?

24      A.      Yes.

Raymond Crawford

Page 8

1       Q.      Have you ever been to Hawaii?

2       A.      No.

3       Q.      Have you ever been to California?

4       A.      Yes.

5       Q.      Have you had your deposition taken in

6   California?

7       A.      Yes.

8       Q.      When I refer to you, I want you to just

9   understand that that refers to CENLAR because this is

10  a 30(b)(6) deposition.  When I am asking you about a

11  personal question from now, I'm going to try to refer

12  to you as you, personally, just to make that

13  distinction.

14              Do you understand that?

15      A.      Yes.

16      Q.      If there's any question as to what I'm

17  asking, please don't answer and please ask me to

18  clarify.

19              Do you understand that?

20      A.      Yes.

21      Q.      Do you have any identification with

22  you?

23      A.      Yes.

24      Q.      Would you mind sharing that?

Raymond Crawford

Page 9

1           MR. SCHIEL:  Objection, vague.

2           You can ask him specifically what you

3      want.

4           You don't have to share with him.

5  BY MR. FORRESTER:

6      Q.    Does your identification list your name

7  and your location of residence in Florida that you

8  mentioned?

9      A.    Yes.

10     Q.    How often do you travel for

11  depositions?

12     A.    Whenever I'm required.

13     Q.    How often is that?

14     A.    Whenever a deposition is set.  I'm not

15  sure.  It could be a few times a month.

16     Q.    Average, over the last year, how many

17  times have you traveled to have your deposition

18  taken?

19     A.    For deposition, I'm not sure.  I don't

20  keep track of it.  But I travel every day for trials

21  and other stuff.

22     Q.    Are you a licensed attorney?

23     A.    I'm not an attorney.

24     Q.    Do you ever have your deposition taken

Raymond Crawford

Page 10

1   in Florida?

2          A.     Yes.

3          Q.     And would those depositions be in the

4   city where you reside?

5          A.     Not necessarily.

6          Q.     Have you had your deposition taken in,

7   was it Apollo, Florida?

8          A.     Yes.  No.  Yes to Apollo, no to having

9   a deposition taken in Apollo Beach.

10         Q.     So would it, then, be true to say that

11  every single time you've had your deposition taken,

12  you have traveled for that?

13              MR. SCHIEL:  Objection, the witness'

14         testimony.

15              THE WITNESS:  I travel for my job, so

16         every time a deposition is taken, I do travel.

17  BY MR. FORRESTER:

18         Q.     Have you ever had your deposition taken

19  in Apollo, Florida, where you reside?

20              MR. SCHIEL:  Objection, asked and

21         answered.

22              THE WITNESS:  No.

23  BY MR. FORRESTER:

24         Q.     Is there any reason why you would not

Raymond Crawford

                                                          Page 11

1    be able to travel to Hawaii?

2              MR. SCHIEL:  Objection, speculation,

3         relevance.  Richard --

4              MR. FORRESTER:  This is a speaking

5         objection.  I'm limited now to four hours

6         because of your tardiness.

7              MR. SCHIEL:  I have said we could go

8         for the full seven hours today, Richard.

9              MR. FORRESTER:  Speaking objections,

10        please.

11   BY MR. FORRESTER:

12        Q.   Is there any reason that you know of

13   that you are not able to travel to Hawaii?

14             MR. SCHIEL:  Objection, asks for a

15        legal conclusion.

16             THE WITNESS:  I don't know of, sir.

17             MR. FORRESTER:  I'd just like to state

18        for the record that it is past 12:30.  This

19        deposition was scheduled for nine a.m.

20        Counsel for CENLAR has indicated that he's not

21        able to stay late for the deposition that is

22        scheduled tomorrow.  And as a result of that

23        and other reasons, we will be cutting this

24        deposition short at five p.m.

Raymond Crawford

Page 12

1           MR. SCHIEL:  I'm going to object --

2           MR. FORRESTER:  I'm talking.  You can

3     wait.

4           MR. SCHIEL:  That conflicts with our

5     earlier discussion, both on the record and off

6     of it.  When we spoke this morning, shortly

7     before we went on the record, we spoke about

8     extending the deposition until seven or 8:00

9     tonight.  The witness arrived late today

10    because he missed a flight.  There's nothing

11    that could be done about that.  The court

12    reporter expressed her willingness to stay

13    until seven or eight tonight.  Everyone here

14    is willing to stay until seven or eight

15    tonight.

16          If you make the decision to cut the

17    deposition short, that is your own choice.

18          MR. FORRESTER:  You've now cut in

19    another few minutes into the time that I have

20    left.  It was never represented that this

21    deposition could go past five.  There was some

22    discussion about it and there was no

23    representation made on the record about it.

24          And in any event, there's a deposition

Raymond Crawford

Page 13

1          scheduled for 9:00 tomorrow morning that has

2          to be prepared for, and we can't stay here

3          until all hours of the night and then start

4          another deposition in the morning.  That's not

5          reasonable.

6              MR. SCHIEL:  That's your choice,

7          Richard.

8              MR. FORRESTER:  Please refrain from

9          making arguments.  All you need to do is make

10         a speaking objection.

11             MR. SCHIEL:  If you're going to talk

12         about things of this nature, I'm entitled to

13         respond on the record.  You're not asking the

14         witness questions right now.  You're making

15         speaking objections for the record and I can

16         respond to them.

17     BY MR. FORRESTER:

18         Q.    Could you describe the task that you do

19     for your job as a representative for CENLAR?

20         A.    I review loan documents, business

21     records, and testify for deposition, trials,

22     mediations and settlement conferences.

23         Q.    Do you ever review loan documents for

24     cases that are not in litigation?

Raymond Crawford

Page 14

1        A.      I don't understand your question, sir.

2        Q.      Let me rephrase that.

3                Would you say that your primary job is

4    to review documents for cases that are in conflict or

5    for cases that are not in conflict?

6                MR. SCHIEL:  Objection, vague,

7        ambiguous as to the word conflict.

8                THE WITNESS:  I handle both contested

9        and uncontested foreclosure cases, if that is

10       what you are asking.

11   BY MR. FORRESTER:

12       Q.      Yeah.  It is what I'm asking.

13               What kind of work do you do for

14   noncontested cases?

15       A.      I testify in trials.

16       Q.      And these trials over noncontested

17   matters, what is it that's noncontested and what is

18   it that's contested?

19               MR. SCHIEL:  Objection, vague and

20       ambiguous.

21   BY MR. FORRESTER:

22       Q.      I'm just trying to understand, because

23   you say that you do work for cases that are not

24   contested, but the work that you do is to prepare as

Raymond Crawford

Page 15

1    a witness.

2              So what is it that is on trial when you

3    prepare as a witness?

4              MR. SCHIEL:  Objection, calls for

5         speculation as to what's on trial.

6              THE WITNESS:  In some states, a witness

7         is needed from the bank to testify, even when

8         the case is not contested.

9    BY MR. FORRESTER:

10        Q.    I'm handing you now Exhibit-1.

11             MR. SCHIEL:  Richard, do you have extra

12        copies?

13             MR. FORRESTER:  You can read off of his

14        copy.

15             MR. SCHIEL:  No.  We spoke about this

16        before the deposition started and you assured

17        me that you would have copies for me.

18             MR. FORRESTER:  I did not assure you.

19             MR. SCHIEL:  Yes, you did.

20   BY MR. FORRESTER:

21        Q.    Do you see Exhibit-1?

22             MR. SCHIEL:  I'm going to object that I

23        don't have a copy of the exhibit to review,

24        and you promised me before the deposition that

Raymond Crawford

Page 16

1        you'd have copies of exhibits for me that you

2        were going to produce today.  I'm going to

3        request we go off the record until you can

4        make copies of the exhibits for me to also

5        review as you're going through them with the

6        witness.  That's customary, Richard, and you

7        know that.

8               MR. FORRESTER:  We can go off the

9        record for just a second.

10                      * * * * *

11              (Whereupon, a discussion was held off

12        the record.)

13                      * * * * *

14              MR. FORRESTER:  We can go back on the

15        record.

16              MR. SCHIEL:  I'd like to note for the

17        record that Mr. Forrester's provided me a copy

18        of Exhibit-1.

19              MR. FORRESTER:  Can you please stop

20        talking?  I have got a limited amount of time

21        here.

22              MR. SCHIEL:  Why don't you calm down?

23              MR. FORRESTER:  I know you like to hear

24        yourself talk, but you're not the witness.

Raymond Crawford

Page 17

1                    MR. SCHIEL:  Waste your time, if you

2          want.  I'm entitled to say what I want on the

3          record.

4                    MR. FORRESTER:  But you're eating into

5          the time, which you've already cut short by

6          not being prepared and not being here on time.

7                    MR. SCHIEL:  That's not true.  I was

8          prepared to be here on time.  That misstates

9          the record.

10                    MR. FORRESTER:  Okay.

11                    Defendant's counsel has been given a

12          copy of what's marked as Exhibit-1.

13   BY MR. FORRESTER:

14          Q.    To the witness, is it Raymond?

15                Is that what you prefer to be called?

16          A.    Raymond, Ray.

17          Q.    I'm going to call you Ray.

18                Do you see Exhibit-1?

19          A.    Yes.

20          Q.    Can you turn to page two of Exhibit-1?

21                Do you see paragraph one?

22          A.    Yes.

23          Q.    Paragraph one states that you're to be

24   qualified to speak to any and all responsibilities of

Raymond Crawford

Page 18

1    CENLAR, its employees or agents regarding any and all

2    accounts related to plaintiff, John Hochroth.

3                    Are you here today capable of

4    testifying to those topics?

5         A.    Yes.

6         Q.    Do you see the topics listed in

7    paragraph two?

8         A.    Yes.

9         Q.    Are you able to testify as to the

10   topics listed in paragraph two?

11        A.    Yes.

12        Q.    Would you please turn to the next page?

13                    Are you capable of testifying as to the

14   topics listed in paragraph three?

15                    MR. SCHIEL:  Objection as to the scope

16        of number three as being overly broad and

17        burdensome.

18                    THE WITNESS:  Yes.

19   BY MR. FORRESTER:

20        Q.    Are you able to testify today as to the

21   topics listed in paragraph four?

22                    MR. SCHIEL:  Same objection, overly

23        broad and burdensome.

24                    THE WITNESS:  Yes.

Raymond Crawford

Page 19

1   BY MR. FORRESTER:

2           Q.      Are you able to testify as to the

3   topics listed in paragraph five?

4           A.      Yes.

5           Q.      Are you able to testify as to the

6   topics listed in paragraph six?

7           A.      Yes.

8           Q.      Are you able to testify as to the

9   topics listed in paragraph seven?

10          A.      Yes.

11          Q.      Are you able to testify as to the

12  topics listed in paragraph eight?

13          A.      Yes.

14          Q.      Are you able to testify as to the

15  topics listed in paragraph nine?

16          A.      Yes.

17          Q.      Are you able to testify as to the

18  topics listed in paragraph ten?

19          A.      Yes.

20          Q.      Are you able to testify as to the

21  topics listed in paragraph 11?

22          A.      Yes.

23          Q.      Are you able to testify as to the

24  topics listed in paragraph 12?

Raymond Crawford

Page 20

1          A.      Yes.

2          Q.      Are you able to testify as to the

3     topics listed in paragraph 13?

4          A.      Yes.

5          Q.      Are you able to testify as to the

6     topics listed in paragraph 14?

7          A.      Yes.

8          Q.      To your understanding, what is this

9     dispute about?

10              MR. SCHIEL:  Objection, vague as to

11         dispute.

12              Only if you know.

13              THE WITNESS:  My understanding is

14         Hochroth sued CENLAR and Ally Bank.

15     BY MR. FORRESTER:

16         Q.      Are you familiar with any of the

17     allegations in the Complaint?

18         A.      Yes, some of them.  If you have the

19     Complaint, we go through the Complaint and stuff.

20         Q.      What is the status of Mr. Hochroth's

21     loan currently?

22              MR. SCHIEL:  Objection as to status,

23         vague and ambiguous.

24              THE WITNESS:  I don't know the history

Raymond Crawford

Page 21

1          of the loan off my head.

2    BY MR. FORRESTER:

3          Q.    What is CENLAR's involvement with Mr.

4    Hochroth's loan?

5          A.    Service of the loan.

6          Q.    And is it currently servicing Mr.

7    Hochroth's loan?

8          A.    Yes.

9          Q.    Is Mr. Hochroth currently paying his

10   loan?

11              MR. SCHIEL:  Objection as to paying his

12        loan, vague and ambiguous.

13              THE WITNESS:  I would need to look at a

14        record to update.

15   BY MR. FORRESTER:

16         Q.    Can you tell me who Ally Bank is?

17         A.    Ally Bank is the -- the holder of the

18   loan.

19         Q.    What is CENLAR's relationship to Ally

20   Bank?

21         A.    We service a loan on behalf of Ally

22   Bank.

23         Q.    Does Ally Bank have authority to

24   discharge CENLAR as a servicer and choose a different

Raymond Crawford

Page 22

1  servicer?

2          A.      I don't work for Ally, but --

3                  MR. SCHIEL:  Objection as to

4          speculation as to what Ally Bank can do.

5                  Only if you know what Ally can do and

6          not do in hiring and firing CENLAR.

7                  THE WITNESS:  You mean as far as Ally

8          removing the servicing rights to CENLAR and

9          giving them to someone else?

10 BY MR. FORRESTER:

11         Q.      That's right.

12         A.      I believe they can do that, sir.

13         Q.      Can CENLAR remove Ally Bank, then, as

14 the holder of the note and place somebody else into

15 that position?

16         A.      Not to my knowledge, sir, no.

17         Q.      What about the attorneys that are hired

18 to foreclose mortgage loans?

19                 Is that something that CENLAR handles

20 or something that Ally Bank handles?

21                 MR. SCHIEL:  Objection as to what loans

22         you're talking about, vague and ambiguous.

23 BY MR. FORRESTER:

24         Q.      Go ahead and answer.

Raymond Crawford

Page 23

1            MR. SCHIEL:  If you know.

2            THE WITNESS:  CENLAR handles

3       foreclosures, and at times, it depends on the

4       clients.

5   BY MR. FORRESTER:

6       Q.    With Mr. Hochroth's loan, was CENLAR

7   responsible for retaining foreclosure counsel in Mr.

8   Hochroth's account?

9       A.    Yes.

10      Q.    And who did CENLAR hire to foreclose

11  Mr. Hochroth's account?

12      A.    I don't remember the law firm, offhand,

13  sir.  I don't recall the law firm, name of it.

14      Q.    Do you recall, offhand, the fact that

15  law firms were changed in Mr. Hochroth's foreclosure

16  case?

17      A.    Yes, sir.

18      Q.    Do you recall the other law firm that

19  you said you can't recall who CENLAR hired?

20            Do you recall any other law firms that

21  were hired?

22      A.    Again, I seen a name in the document.

23  The specific document -- we can refer to the

24  document, I can better answer your question.  I don't

Raymond Crawford

Page 24

1    want to guess off -- I don't want to -- I don't want

2    to guess.

3         Q.    Does CENLAR have the authority to

4    discharge a law firm that it has hired and change to

5    a different law firm?

6         A.    I don't understand what you mean by

7    discharge.

8         Q.    In laymen's terms, I mean does CENLAR

9    have the authority to fire one attorney and to hire a

10   different attorney for purposes of a foreclosure

11   case?

12        A.    Yes.  I have seen that in the file --

13   from one law firm where it has taken a file from one

14   law firm and given it to another law firm, yes.

15        Q.    I'm going to hand you now what I'm

16   going to mark as Exhibit-2.

17                         *  *  *  *  *

18              (Whereupon, Exhibit-2 was marked for

19         identification.)

20                         *  *  *  *  *

21   BY MR. FORRESTER:

22        Q.    Do you recall seeing the document given

23   to you as Exhibit-2?

24        A.    No, sir.

Raymond Crawford

Page 25

1       Q.      I'd like to point your attention to the

2    first sentence in paragraph two.

3              Do you see that?

4       A.      Yes.

5       Q.      Do you recognize that as a

6    reinstatement -- request for reinstatement figures?

7              MR. SCHIEL:  Objection, the document

8         speaks for itself, asks for a legal

9         conclusion.

10              THE WITNESS:  That's what it's stating,

11         the document, sir.

12   BY MR. FORRESTER:

13       Q.      Did CENLAR ever receive a copy of this

14   document?

15       A.      I -- I don't --

16              MR. SCHIEL:  Objection, calls for

17         speculation.

18              Only if you know.

19              THE WITNESS:  I don't -- I don't know.

20   BY MR. FORRESTER:

21       Q.      Did CENLAR ever receive a request for

22   reinstatement on or around October 26 from CENLAR's

23   foreclosure counsel?

24       A.      I believe a request was received.  I

Raymond Crawford

Page 26

1    believe there was discussion around that time.

2          Q.     Around that time?

3          A.     Yeah.

4          Q.     And how was that discussion made?

5                 MR. SCHIEL:  Objection as to form of

6          question, vague and ambiguous.

7                 Only if you understand.

8                 THE WITNESS:  We had discussion between

9          the law firm and CENLAR.

10   BY MR. FORRESTER:

11         Q.     And who -- let me back up.

12                Did you provide any documents showing

13   that discussion?

14                MR. SCHIEL:  Objection as to the word

15         you.  There's no allegation for any documents

16         being provided to the witness related to that

17         question.

18   BY MR. FORRESTER:

19         Q.     Does CENLAR have any documents in its

20   possession regarding any reinstatement request made

21   by John Hochroth on or around October 26th, 2017?

22                MR. SCHIEL:  Objection as to disclosing

23         any attorney/client communications.

24                If you can answer to the extent that

Raymond Crawford

Page 27

1           you don't discuss attorney/client

2           communications.

3                    THE WITNESS:  Not that I know of, sir.

4           If you have any specific document, I can

5           better answer that.

6                              *  *  *  *  *

7                    (Whereupon, Exhibit-3 was marked for

8           identification.)

9                              *  *  *  *  *

10   BY MR. FORRESTER:

11           Q.    I'm handing you now Exhibit-3.  Please

12   read Exhibit-3 and let me know when you're done.

13           A.    Okay.

14           Q.    I'd like to point your attention to the

15   seventh paragraph that starts with:  It is still

16   mine.

17                    Do you see that paragraph?

18           A.    Yes.

19           Q.    Did CENLAR ever receive a copy of this

20   document, Exhibit-3?

21                    MR. SCHIEL:  Objection, calls for

22           speculation.

23                    Only if you know, you can answer.

24                    THE WITNESS:  I don't know offhand,

Raymond Crawford

Page 28

1          sir.

2     BY MR. FORRESTER:

3          Q.     Did CENLAR provide any reinstatement

4     figures to John Hochroth before November 14th, 2017?

5               MR. SCHIEL:  Objection, calls for

6          speculation as to what attorney/client

7          communications, as well as communications that

8          I made on behalf of CENLAR.

9               THE WITNESS:  Not offhand, sir.  If you

10         have a specific document.

11                        * * * * *

12              (Whereupon, Exhibit-4 was marked for

13         identification.)

14                        * * * * *

15    BY MR. FORRESTER:

16         Q.     I'm handing you now Exhibit-4.

17              Did CENLAR ever receive a copy of

18    Exhibit-4?

19              MR. SCHIEL:  Objection, calls for

20         speculation.

21              Only if you know, off the top of your

22         head.

23              THE WITNESS:  No.  I did not, sir.

24                        * * * * *

Raymond Crawford

Page 29

1                    (Whereupon, Exhibit-5 was marked for

2          identification.)

3                         * * * * *

4    BY MR. FORRESTER:

5          Q.    I'm handing you now Exhibit-5?

6                    Did CENLAR ever receive a copy of the

7    correspondence listed in Exhibit-5?

8                    MR. SCHIEL:  Same objection,

9          speculation.

10                   Only if you know.

11                   THE WITNESS:  I do not know, sir.

12   BY MR. FORRESTER:

13         Q.    Does Exhibit-5 contain reinstatement

14   figures?

15         A.    I do not see any figures in the

16   exhibit.

17         Q.    I'm sorry.

18                   What?

19         A.    I do not see any figures.

20         Q.    I'm handing you now Exhibit-6.

21                         * * * * *

22                   (Whereupon, Exhibit-6 was marked for

23         identification.)

24                         * * * * *

Raymond Crawford

Page 30

1   BY MR. FORRESTER:

2          Q.     Did CENLAR ever receive a copy of the

3   correspondence listed in Exhibit-6?

4                 MR. SCHIEL:  I would like to have the

5          witness hold until I have seen the document.

6                 Objection, calls for speculation.

7                 Only if you know of the document.

8                 THE WITNESS:  No.  I do not know.

9   BY MR. FORRESTER:

10         Q.     Does Exhibit-6 contain any

11  reinstatement figures?

12         A.     No.

13                       *  *  *  *  *

14                 (Whereupon, Exhibit-7 was marked for

15         identification.)

16                       *  *  *  *  *

17  BY MR. FORRESTER:

18         Q.     I'm handing you now Exhibit-7.

19                 Did CENLAR ever receive a copy of the

20  correspondence listed in Exhibit-7?

21                 MR. SCHIEL:  Same objection, calls for

22         speculation.

23                 Only if you know off the top of your

24         head.

Raymond Crawford

Page 31

1                 THE WITNESS:  No.  I do not know.

2   BY MR. FORRESTER:

3          Q.    Does Exhibit-7 contain any

4   reinstatement figures?

5          A.    No.

6                      * * * * *

7                 (Whereupon, Exhibit-8 was marked for

8          identification.)

9                      * * * * *

10         Q.    I'm handing you now Exhibit-8.

11                Did CENLAR ever receive a copy of the

12  correspondence listed in Exhibit-8?

13                MR. SCHIEL:  I'd like to object to

14         asking questions before I have been provided

15         the document.  If you could please wait until

16         I have been given a copy.  Thank you.

17                Same objection, calls for speculation.

18                Only if you know off the top of your

19         head.

20                THE WITNESS:  No.  I do not know.

21                     * * * * *

22                (Whereupon, Exhibit-9 was marked for

23         identification.)

24                     * * * * *

Raymond Crawford

Page 32

1    BY MR. FORRESTER:

2          Q.      I'm handing you now Exhibit-9.

3                  Has CENLAR ever received a copy of the

4    correspondence listed in Exhibit-9?

5                  MR. SCHIEL:  Objection to the extent

6          attorney/client communications, and also, for

7          speculation.

8                  Only if you know top of your head.

9                  THE WITNESS:  No.  I do not know.

10   BY MR. FORRESTER:

11         Q.      Are there any reinstatement figures

12   listed in Exhibit-9?

13         A.      No.

14         Q.      I'd like you to take a minute and read

15   Exhibit-9 and let me know when you're done.

16         A.      Okay.

17         Q.      Based on the communication in

18   Exhibit-9, was CENLAR -- well, first of all, let me

19   back up for a second.

20                 What is CENLAR's policy regarding

21   reinstatement?

22                 When does the borrower's right to

23   reinstate pass, in general?

24                 MR. SCHIEL:  Objection, calls for

Raymond Crawford

Page 33

1           speculation.  It varies state by state.

2                   Only if you know.

3                   THE WITNESS:  I do not know.  It varies

4           state by state, sir.

5    BY MR. FORRESTER:

6           Q.    In Hawaii, what is CENLAR's policy

7    regarding the reinstatement of foreclosed loans?

8           A.    Loans that are in foreclosure, a

9    reinstatement request will go through the law firm.

10          Q.    And at what point does the law firm

11   allow for reinstatement to happen?

12                  At what point do they stop?

13                  MR. SCHIEL:  Objection, calls for

14          speculation, foundation, vague and ambiguous.

15                  Only if you understood the question.

16                  THE WITNESS:  Do not understand the

17          question.

18   BY MR. FORRESTER:

19          Q.    Does CENLAR have a policy regarding

20   when the right to the reinstatement passes?

21                  MR. SCHIEL:  Objection, asked and

22          answered.  The witness already testified that

23          he refers to foreclosure counsel.

24                  THE WITNESS:  They vary by state.  All

Raymond Crawford

Page 34

1          requests go to the foreclosure counsel, and if

2          the counsel need the figures, they are

3          requested from CENLAR.

4    BY MR. FORRESTER:

5          Q.     Does CENLAR have a policy regarding

6    reinstatement in Hawaii?

7               MR. SCHIEL:  Objection, asked and

8          answered.  This is the third time you've asked

9          the question, asked and answered.

10               You don't need to repeat your answer.

11               You can just read it back.

12               MR. FORRESTER:  It's a different

13          question.

14               MR. SCHIEL:  It's the same question.

15               Do you want to read back the

16          transcript?

17               MR. FORRESTER:  No.  Speaking

18          objections, please.

19               MR. SCHIEL:  If you're going to ask the

20          same question three times, I'm going to object

21          as asked and answered.  The witness should not

22          have to answer the same question three times,

23          Richard.

24    BY MR. FORRESTER:

Raymond Crawford

Page 35

1          Q.     Does CENLAR have a policy in Hawaii

2     regarding reinstatement of foreclosures?

3               MR. SCHIEL:  Objection, asked and

4          answered.

5               THE WITNESS:  All reinstatement

6          requests go through the law firm.

7                         * * * * *

8               (Whereupon, Exhibit-10 was marked for

9          identification.)

10                        * * * * *

11    BY MR. FORRESTER:

12         Q.     I'm handing you now Exhibit-10.

13              Do you recognize the contents of

14    Exhibit-10?

15              MR. SCHIEL:  Objection, foundation.

16              I'd also like to object to the extent

17         that this is a transcript -- appears to be a

18         transcript of an audio recording that was

19         prepared, I believe, by Kaplan, Leaman & Wolfe

20         here in Philadelphia.  There would be no basis

21         for the witness to recognize the transcript,

22         if it was just prepared.

23              Only if you have seen it before.

24              THE WITNESS:  No, sir.

Raymond Crawford

Page 36

1    BY MR. FORRESTER:

2         Q.     Would you please turn to page six?  I'd

3    like to point your attention to line nine.  I'm going

4    to read that into the record.  It says:  CENLAR rep,

5    colon, okay, so I mean, you cannot, dash, dash, you

6    can reinstate it.  I don't know why they would tell

7    you that you can't because you can, period.  You

8    don't have to pay the loan off, period.  That

9    reinstatement, that, dash, dash, the letter that they

10   gave you, if it's a general letter, then that's

11   probably what they sent out via them.

12             Do you have any idea why a CENLAR

13   representative would have told Mr. Hochroth that he

14   can reinstate his loan on December 17th, 2017?

15             MR. SCHIEL:  Objection, calls for

16        speculation.

17             THE WITNESS:  No, sir.  Again, all

18        reinstatement requests with CENLAR goes

19        through the law firm.

20   BY MR. FORRESTER:

21        Q.     So if a representative were to tell a

22   person in foreclosure that they can reinstate, that

23   would be a mistake?

24             MR. SCHIEL:  Objection, vague and asks

Raymond Crawford

Page 37

1          for speculation.

2                    THE WITNESS:  The representative does

3          not know what is going on with the loan, as

4          far as regarding the foreclosure.  They would

5          not know the reinstatement, and that's why

6          they would need to refer the person back to

7          the law firm.

8    BY MR. FORRESTER:

9          Q.     So do CENLAR representatives have the

10   ability to reinstate loans?

11                   MR. SCHIEL:  Objection, vague, calls

12         for speculation, asked and answered.

13                   THE WITNESS:  I don't understand the

14         line of question.

15   BY MR. FORRESTER:

16         Q.     I'm asking you why a CENLAR

17   representative would represent to a borrower that

18   they could reinstate.

19                   If what you're telling me is correct,

20   that they're supposed to refer them to the

21   foreclosure attorney, why would a CENLAR

22   representative tell somebody that they can reinstate

23   their loan?

24                   MR. SCHIEL:  Objection, asked and

Raymond Crawford

Page 38

1          answered, argumentative.

2                    And note for the record that Mr.

3          Forrester is raising his voice at the witness.

4                    THE WITNESS:  The same answer, sir.

5          CENLAR can be produce a reinstatement.  The

6          homeowner would need to speak to the law firm

7          to make that request.

8    BY MR. FORRESTER:

9          Q.    Does CENLAR supervise its employees?

10                   MR. SCHIEL:  Objection, vague.

11                   THE WITNESS:  What do you mean does

12         CENLAR supervise their employees?

13   BY MR. FORRESTER:

14         Q.    I mean does CENLAR supervise the

15   representatives that answer phone calls from

16   borrowers?

17         A.    I'm not understanding what you mean by

18   supervise.

19         Q.    Does CENLAR review the actions made and

20   the statements made by its employees to borrowers to

21   ensure that they comply with the policies of CENLAR?

22                   MR. SCHIEL:  Objection, vague as to

23         review the actions.

24                   Only if you understood the question.

Raymond Crawford

Page 39

1               THE WITNESS:  I don't understand your

2         question.  It's very vague, sir.

3    BY MR. FORRESTER:

4         Q.    How does CENLAR train the employees

5    that answer phone calls from borrowers?

6         A.    They have a training class.  Some phone

7    calls are recorded and monitored; someone listen to

8    the phone calls.  If an issue is escalated to a

9    supervisor or manager, they can go back and review

10   the calls.

11        Q.    Are there written materials provided to

12   the employees?

13              MR. SCHIEL:  Objection, foundation as

14        to written materials.

15              THE WITNESS:  Written materials, as far

16        as taking a phone call?

17   BY MR. FORRESTER:

18        Q.    As part of the training that you just

19   referenced, are there written materials that are

20   provided to employees as part of their training?

21        A.    Yeah.  They sit you in a new hire

22   training class, trained into the system, yes.

23        Q.    Is there any reason why you would not

24   be able to provide those written materials?

Raymond Crawford

```
                                                          Page 40
 1                   MR. SCHIEL:  Objection, speculative,
 2           vague as to what written materials you'd want
 3           him to provide, and what relevance it would
 4           have to the foreclosure.
 5                   Only if you understand.
 6                   THE WITNESS:  I don't understand, yeah.
 7           I'm not sure what materials you mean, a new
 8           training class.
 9   BY MR. FORRESTER:
10           Q.    You stated there were materials
11   provided to employees in their training, and you
12   stated that some of those materials were written
13   down.  It's not hard to understand what I'm asking.
14                   Are you stating that there are no
15   written materials, or are you stating that there are
16   written materials?
17                   MR. SCHIEL:  Objection, compound, asked
18           and answered, and argumentative.
19                   THE WITNESS:  I think if you can better
20           word the question for me to better understand
21           it, then I may be able to better understand
22           your question.
23   BY MR. FORRESTER:
24           Q.    Okay.
```

Raymond Crawford

Page 41

1              What actions does CENLAR take to train

2    employees that are answering the phone calls from

3    borrowers?

4              MR. SCHIEL:  Objection, asked and

5         answered.

6    BY MR. FORRESTER:

7         Q.    Please be specific.

8         A.    I'm not sure, honestly what you mean by

9    what action does CENLAR take.

10        Q.    How does CENLAR train new employees

11   that are answering the phones?

12             MR. SCHIEL:  Objection, asked and

13        answered.

14             THE WITNESS:  CENLAR has a new employee

15        class on the system on the information.

16   BY MR. FORRESTER:

17        Q.    How long does a CENLAR class last?

18        A.    I don't know offhand, sir.

19        Q.    How many new employees are in one class

20   at a time?

21             MR. SCHIEL:  Objection, speculation.

22             THE WITNESS:  I do not know offhand,

23        sir.

24   BY MR. FORRESTER:

Raymond Crawford

Page 42

1        Q.      Does CENLAR review employees to ensure

2    that they're complying with CENLAR policies?

3                MR. SCHIEL:  Objection, asked and

4           answered.  Also, vague as to employees'

5           actions.

6                Only if you understood it.

7                THE WITNESS:  Calls are monitored.  If

8           someone is listening to a call, it could be

9           used as a training purpose if something wrong

10          is being done on the calls.

11   BY MR. FORRESTER:

12       Q.      How many people does CENLAR employ to

13   answer phone calls from borrowers, approximately?

14       A.      I don't know offhand, sir.

15       Q.      You don't know how many employees you

16   have to answer telephone calls from borrowers?

17                MR. SCHIEL:  Objection, argumentative.

18                THE WITNESS:  That is correct.  I do

19          not know that number, sir.

20   BY MR. FORRESTER:

21       Q.      Are you aware of how many people

22   responded to telephone calls from Mr. Hochroth?

23                MR. SCHIEL:  Objection as to people,

24          vague and ambiguous.  Also, ambiguous as to

Raymond Crawford

Page 43

1          time period.

2                    Only if you understood the question.

3                    THE WITNESS:  Do not understand the

4          question.

5    BY MR. FORRESTER:

6          Q.    How many people does CENLAR employ to

7    supervise its employees that answer telephone calls

8    from borrowers?

9                    MR. SCHIEL:  Objection, calls for

10         speculation.

11                   THE WITNESS:  I do not know that number

12         offhand, sir.

13   BY MR. FORRESTER:

14         Q.    Does CENLAR have policies in place for

15   reviewing employees' compliance with its policies?

16                   MR. SCHIEL:  Objection, confusing.

17                   Only if you understood the question.  I

18         didn't.

19                   THE WITNESS:  Employees in which

20         department, sir?  I'm not sure.

21   BY MR. FORRESTER:

22         Q.    When I say employees, I'm talking about

23   the people that CENLAR employs to answer telephone

24   calls from borrowers.

Raymond Crawford

Page 44

1                    I want to know what, if any, action

2        CENLAR takes to ensure that those people do not act

3        outside of the policy that you have told me, which is

4        that foreclosure -- borrowers in foreclosure, when

5        they ask for reinstatement, they go through the

6        attorney's office.  You've stated that several times

7        very clearly.  However, CENLAR's employees, through

8        the various phone calls that were provided, stated

9        something different.

10                    I'm asking you what CENLAR does in

11       order to monitor its own employees, if it does

12       anything?

13                    MR. SCHIEL:  Objection, asked and

14            answered.  This is about the fourth time

15            you've asked the same question.  The witness

16            already testified --

17       BY MR. FORRESTER:

18            Q.    Are you aware of anything that CENLAR

19       does to track the performance of its employees?

20                    MR. SCHIEL:  Objection, asked and

21            answered.

22                    THE WITNESS:  What do you mean track

23            the performance, sir?

24       BY MR. FORRESTER:

Raymond Crawford

Page 45

1      Q.     What part of track their performance is

2  confusing?

3             MR. SCHIEL:  Objection, argumentative.

4         If you have a -- if you want to ask a

5         different question, ask a different question.

6         But arguing with the witness about words is

7         not going to get us through this any quicker.

8  BY MR. FORRESTER:

9      Q.     You're stating that you're confused.

10  You don't understand what I mean by track their

11  performance.

12             Does CENLAR keep any records of any

13  performance reviews or administrative reports on

14  employees on what they have stated to borrowers?

15             Does CENLAR review its records?

16             MR. SCHIEL:  Objection, compound.

17             THE WITNESS:  Yes, too many different

18         things in that question, sir.  I'm not sure

19         which one you want me to answer.

20  BY MR. FORRESTER:

21      Q.     How many people are privy to a

22  conversation when a borrower calls in to talk to a

23  representative?

24             Is there anybody else on the line,

Page 46

1    besides CENLAR's representative?

2            MR. SCHIEL:  Objection, calls for

3        speculation as to who might be on a call.

4        There could be people on a call from either

5        side.  There's no specific call that we're

6        talking about.

7            Only if you understood the question and

8        could answer it.

9            THE WITNESS:  From the CENLAR side, if

10       the call is being monitored, then there could

11       be someone listening on the other end from the

12       CENLAR side.

13   BY MR. FORRESTER:

14       Q.    When you say "the other end," are you

15   talking about on CENLAR's side of the phone call?

16       A.    Yeah.  I can't speak on who is on the

17   other end of the person who is calling.

18       Q.    Is it common for those phone calls to

19   have somebody listen in?

20       A.    The folks on the phone, of course, are

21   being monitored for training purposes, so they have a

22   score card where they keep -- to see how they doing,

23   how they handling the calls, if they answering the

24   calls correctly.  So if you have someone monitoring

Raymond Crawford

Page 47

1    the call, they could be listening on the other end.

2          Q.    What is the job title for the employee

3    that picks up the telephone call from the borrower?

4                MR. SCHIEL:  Objection, calls for

5          speculation.

6                Only if you know.

7                THE WITNESS:  It depends on what

8          department they call.

9    BY MR. FORRESTER:

10         Q.    When Mr. Hochroth called in and spoke

11   to CENLAR representatives, is there a job title that

12   those people carry?

13               MR. SCHIEL:  Objection, vague as to

14         what the call is being identified in the

15         question.

16               Only if you understood.

17               THE WITNESS:  It depends on the

18         department.  You have different department

19         within the company, sir.

20   BY MR. FORRESTER:

21         Q.    So if a borrower calls in to talk to a

22   representative and they're in foreclosure, what is

23   the title of the person that picks up the telephone?

24               MR. SCHIEL:  Objection, speculation,

Raymond Crawford

Page 48

1        asked and answered.

2                THE WITNESS:  Based on the status of

3        the loan, they could speak to someone in

4        Collections.

5   BY MR. FORRESTER:

6        Q.    What is the status of -- what is the

7   title of employee number 3776?

8                MR. SCHIEL:  Objection.

9                THE WITNESS:  I don't know who is 3776,

10       sir.

11  BY MR. FORRESTER:

12       Q.    Are you aware of anything that employee

13  3776 told Mr. Hochroth?

14                MR. SCHIEL:  Objection, vague.

15                THE WITNESS:  Again, if you're

16       referring to 3776, that's -- I don't know that

17       number that means.  I just see that on the

18       paper.  I don't know who that refer to.

19  BY MR. FORRESTER:

20       Q.    You did state that you were qualified

21  to testify as to the topics listed in the Deposition

22  Notice.  Those topics include the documents related

23  to these cases and to Mr. Hochroth's account.  There

24  are six employees that have spoken to Mr. Hochroth

Raymond Crawford

Page 49

1    over the last six months prior to his reinstatement.

2              Are you familiar with those employees?

3              MR. SCHIEL:  Objection as to familiar

4         with those employees.

5              Only if you understood the question.

6              THE WITNESS:  If we have CENLAR records

7         that will list the employee identification,

8         then I could better answer that.  But looking

9         at this, I cannot answer that.  It just says:

10        CENLAR rep.

11   BY MR. FORRESTER:

12        Q.    I'd like you to turn to page two of

13   Exhibit-10.  The first line says:  This is Turnita,

14   Onicimo, spelled O-N-I-C-I-M-O.  It's a phonetic

15   spelling.

16        A.    I'm sorry.

17              Where are you?

18        Q.    The first line of page two.

19        A.    Okay.

20        Q.    My ID number is 4736 -- I'm sorry --

21   473776.

22              What is Turnita's job title?

23              MR. SCHIEL:  Objection, speculation.

24              Only if you know.  Foundation.

Raymond Crawford

Page 50

1              THE WITNESS:  I cannot answer that

2         question from this transcript, sir.

3    BY MR. FORRESTER:

4         Q.    But you did testify that you were

5    competent to answer questions about the documents and

6    communications related to Mr. Hochroth's account, and

7    it's fairly clear that you don't know anything that

8    is right in front of you.

9              MR. SCHIEL:  Objection, argumentative.

10             Richard, he's competent to testify to

11        the relevant documents in this case.  As to

12        every single title of every single employee,

13        obviously, nobody has that type of

14        recollection in their brain.

15                        * * * * *

16             (Whereupon, Exhibit-11 was marked for

17        identification.)

18                        * * * * *

19   BY MR. FORRESTER:

20        Q.    I'm handing you now Exhibit-11.  We'll

21   take a break after this since it's been over an hour.

22             Did CENLAR ever receive a copy of the

23   correspondence listed in Exhibit-11?

24             MR. SCHIEL:  Objection, calls for

Raymond Crawford

Page 51

1          speculation.

2                   Only if you know off the top of your

3          head.

4                   THE WITNESS:  No.  I do not know.

5    BY MR. FORRESTER:

6          Q.     Did CENLAR provide a copy of this

7    communication to Mr. Hochroth as part of its document

8    response?

9                   MR. SCHIEL:  Objection, calls for

10         speculation.  The record will speak for itself

11         as to what CENLAR produced.

12                  Only if you know.

13                  THE WITNESS:  I do not know, sir.

14                  MR. FORRESTER:  We can go off the

15         record.

16                       * * * * *

17         (Whereupon, a brief recess was taken.)

18                       * * * * *

19                  MR. FORRESTER:  We can go back on.

20                  MR. SCHIEL:  I'd like to note for the

21         record that I spoke with Mr. Crawford, the

22         witness, and just to confirm, his morning

23         flight, he did not miss it.  It was cancelled.

24         That's why he arrived late.  He took the next

Raymond Crawford

Page 52

1      flight that he could to get here as soon as he

2      could.

3             Secondly, Mr. Crawford has confirmed

4      that he can stay as late as need be today to

5      allow plaintiff counsel the seven-hour

6      allotment that is allowed for under the rules.

7             MR. FORRESTER:  I think we have already

8      gone over this, but there's a deposition of

9      Ally Bank scheduled tomorrow at nine.

10     Exhibits have to be prepared for that

11     deposition.  There is not enough time to go

12     into the wee hours of tonight and also be able

13     to prepare for tomorrow's deposition.  And we

14     had set aside 9:00 to 5:00 today to depose

15     CENLAR's representative at great expense to

16     Mr. Hochroth, and after protest to having to

17     travel to Philadelphia.  So we will be asking

18     the court for sanctions.

19            MR. SCHIEL:  I respond to that that the

20     wee hours, quote, unquote, of the night, as

21     Mr. Forrester says, will be either seven or

22     eight p.m. tonight, if we extend the

23     deposition to allow him seven hours.

24            MR. FORRESTER:  Okay.

Raymond Crawford

Page 53

1                        *  *  *  *  *

2                   (Whereupon, Exhibit-12 was marked for

3          identification.)

4                        *  *  *  *  *

5    BY MR. FORRESTER:

6          Q.     I'm handing you now Exhibit-12.

7                   Do you recognize Exhibit-12?

8          A.     Yes.

9          Q.     What is Exhibit-12?

10         A.     It's a loan statement.

11         Q.     I want to point your attention to the

12   paragraph of text just below the line:  Amount due,

13   $114,127.73.

14                  Do you see that paragraph?

15         A.     Yes.

16         Q.     What is your understanding of the

17   meaning of that paragraph?

18                  MR. SCHIEL:  Objection, calls for

19          speculation.

20                  THE WITNESS:  The document, what it

21          said, sir, it said amount due.

22   BY MR. FORRESTER:

23         Q.     I'm going to read the text out loud

24   into the record.  It states:  Important message,

Raymond Crawford

Page 54

1   colon, the amount due is the amount to reinstate your

2   loan as of January 17, 2018 and must be received in

3   the form of certified funds.

4               What does reinstate your loan mean?

5        A.    Paid the delinquent amount of the

6   loans.

7        Q.    What does amount due mean?

8        A.    The amount due on the loan.

9        Q.    And what is the amount due?

10       A.    That's in the document?

11       Q.    Yes.

12             MR. SCHIEL:  Objection.  Exhibit-12

13         speaks for itself.

14  BY MR. FORRESTER:

15       Q.    Go ahead and answer.

16       A.    The document speaks for itself, but the

17  amount listed there is $114,127.73.

18       Q.    And what happens if the borrower that

19  receives this notice pays the amount due?

20             MR. SCHIEL:  Objection as to the

21         borrower, vague and ambiguous.

22             Only if you understood which borrower

23         he was talking about.

24             THE WITNESS:  Which borrower are you

Raymond Crawford

Page 55

1           referring to, sir?

2    BY MR. FORRESTER:

3           Q.     I'm referring to, in this case, Mr.

4    Hochroth.  Let me back up.

5                  Does this language appear in any of

6    CENLAR's standard notice forms that go out to

7    borrowers?

8                  MR. SCHIEL:  Objection as to standard

9           notice forms.

10                 THE WITNESS:  Right.

11   BY MR. FORRESTER:

12          Q.     Was this document created by CENLAR?

13          A.     Yes.

14          Q.     When does CENLAR place that message

15   onto its loan statements?

16          A.     When does?

17          Q.     Yeah.

18          A.     I'm not understanding what you mean by

19   when does.

20          Q.     Does this message appear on every loan

21   statement that CENLAR produces?

22          A.     Not to my knowledge, no, sir, not every

23   loan statement.

24          Q.     What loan statements do contain this

Raymond Crawford

Page 56

1   type of a notice?

2          A.     The loan statement that it would

3   require for that information to be placed on it.

4                 MR. FORRESTER:  I'm sorry.

5                 Could you read that back?

6                       *  *  *  *  *

7                 (Whereupon, the requested portion of

8          the testimony was read back by the Court

9          Reporter as follows:

10                 Question.  What loan statements do

11         contain this type of a notice?

12                 Answer.  The loan statement that it

13         would require for that information to be

14         placed on it.)

15                       *  *  *  *  *

16   BY MR. FORRESTER:

17          Q.     Are you aware of the circumstances,

18   which would require this sort of a notice to be

19   placed on a statement?

20          A.     I don't know what circumstances you

21   speak of, sir.

22          Q.     You stated that some statements from

23   CENLAR contain this message and some statements do

24   not contain this message.

Raymond Crawford

Page 57

1              What is it that causes this message to

2    be stated on a statement versus not on a statement?

3         A.    Is -- this is not -- that message is

4    not a decision being made by CENLAR.  If there's a

5    requirement for that message to be put on that

6    statement, then CENLAR would follow that requirement.

7         Q.    What does reinstate your loan mean?

8              MR. SCHIEL:  Objection, calls for a

9         legal conclusion.

10   BY MR. FORRESTER:

11        Q.    It's written right there in the

12   paragraph, reinstate your loan.

13              What does that mean?

14        A.    To pay the delinquent amount on your

15   loan.

16        Q.    What happens when a loan is reinstated?

17              MR. SCHIEL:  Objection, asked and

18        answered.

19              THE WITNESS:  The delinquent amount is

20        paid.

21   BY MR. FORRESTER:

22        Q.    And does the foreclosure action proceed

23   after the reinstatement is made?

24              MR. SCHIEL:  Objection, foundation,

Raymond Crawford

Page 58

1              vague and ambiguous as to the foreclosure.

2                    If you understood the question.

3                    THE WITNESS:  No.

4                    MR. SCHIEL:  I did not.

5    BY MR. FORRESTER:

6         Q.    You don't understand that question?

7         A.    No.

8         Q.    Let's go back to Exhibit-1.  You stated

9    that you were qualified to testify as to all

10   documents generated or known by CENLAR related to all

11   accounts to plaintiff, John Hochroth.  You stated

12   that you were qualified to testify as to the names

13   and addresses of each person employed or associated

14   with CENLAR that had any dealing, whatsoever, with

15   the accounts of plaintiff, John Hochroth.

16                   Please tell me the name of each person

17   employed or associated with CENLAR that spoke with

18   John Hochroth.

19                   MR. SCHIEL:  Objection, speculation,

20         overly broad.

21                   Only if you know something like that

22         off the top of your head.

23                   THE WITNESS:  If you can provide me

24         with a CENLAR document, I can better answer

Raymond Crawford

Page 59

1          that question.

2    BY MR. FORRESTER:

3          Q.     What are the responsibilities of Mr.

4    Johnson, employee number 5822?

5                 MR. SCHIEL:  Objection, foundation.

6                 Only if you know.

7                 THE WITNESS:  I don't know.  I don't

8          know who Mr. Johnson is, sir.  And if you can

9          provide me with a document or conversation, I

10         can better answer that.

11                         *  *  *  *  *

12                 (Whereupon, Exhibit-13 was marked for

13         identification.)

14                         *  *  *  *  *

15   BY MR. FORRESTER:

16         Q.     Okay.  I'll do that.  I'm handing you

17   Exhibit-13.

18                 Exhibit-13, Bates stamped Ally 2653

19   through Bates stamp Ally 2685 is a conversation

20   between Mr. Hochroth and Mr. Johnson.  Please review

21   those pages and let me know when you are able to tell

22   me about the responsibilities of Mr. Johnson.

23         A.     You said 253 to what?

24         Q.     2685.

Raymond Crawford

Page 60

1          Q.     Are you familiar with the contents of

2    Exhibit-13?

3                 MR. SCHIEL:  Objection.  Mr. Forrester,

4          you asked him to read the contents of 30 pages

5          and he's not done reading it, as far as I can

6          tell.

7                 MR. FORRESTER:  Okay.

8    BY MR. FORRESTER:

9          Q.     I'm just going to ask you a different

10   question.

11                Have you ever seen or are you familiar

12   with Exhibit-13?

13         A.     Not -- not in this format.  I seen it

14   in a different context.

15         Q.     What context is that?

16                MR. SCHIEL:  I'm going to object and

17         note for the record, and not object, but just

18         note for the record that the transcript was

19         prepared by Ralph Rosenberg Court Reporters,

20         Inc. at our request, Kobayashi Sugita & Goda,

21         based on the audio recording that was produced

22         to our file.  And it was produced to plaintiff

23         in response.

24   BY MR. FORRESTER:

Raymond Crawford

Page 61

1      Q.      In what context are you familiar with

2   Exhibit-13?

3      A.      Well, being the servicing note loans of

4   seller.

5      Q.      Did you listen to the conversations

6   that are transcribed in Exhibit-13?

7      A.      No, sir.

8      Q.      Are you aware of Mr. Johnson's identity

9   by the first page of the Bates stamped numbers that

10  we pointed out?

11          MR. SCHIEL:  Objection, vague as to the

12      word identity.

13          Only if you understood.

14          THE WITNESS:  It just has the name

15      Johnson.

16  BY MR. FORRESTER:

17      Q.      Are you familiar with Mr. Johnson's

18  role at CENLAR?

19          MR. SCHIEL:  Objection as to the word

20      role.

21          Only if you understood.

22          THE WITNESS:  Not by looking at this

23      document, sir.

24  BY MR. FORRESTER:

Raymond Crawford

Page 62

1          Q.      What are Mr. Johnson's responsibilities

2    for CENLAR?

3          A.      I cannot identify that by looking at

4    this document, sir.  It doesn't give me that

5    information of what department he's from.

6          Q.      I'd like you to turn to page 36 of

7    Exhibit-13.  I'd like you to read the first paragraph

8    of page 36, which is lines two through five.  Let me

9    know when you're done.

10         A.      Okay.

11         Q.      What are the responsibilities of Miss

12   Rodriguez, employee number 6963?

13               MR. SCHIEL:  Objection, foundation.

14               THE WITNESS:  The same answer I had for

15         Mr. Johnson.  By looking at this document, I

16         don't have enough information to answer that.

17   BY MR. FORRESTER:

18         Q.      You don't have to just rely on this

19   document, so that we're clear.

20               Is your testimony that you do not know

21   what Ms. Rodriguez's responsibilities are?

22               MR. SCHIEL:  Objection, speculation as

23         to responsibilities are.

24               If you understood what he was asking

Raymond Crawford

Page 63

1          specifically, you can answer.

2                    THE WITNESS:  My testimony is based on

3          the document you provided me.  It's not enough

4          for me to answer.  This is not a CENLAR

5          document.  It does not have all the necessary

6          information for me to better answer your

7          question.

8    BY MR. FORRESTER:

9          Q.    What is Miss Rodriguez's first name?

10                    MR. SCHIEL:  Objection, speculation,

11          asked and answered, argumentative.

12                    THE WITNESS:  I do not see that stated

13          in this document, sir.

14   BY MR. FORRESTER:

15         Q.    I'd like you to turn to page 79 of

16   Exhibit-13.  I'd like you to read the first

17   paragraph, which is lines two through five.  Let me

18   know when you're done.

19         A.    Okay.

20         Q.    What are Ms. Lan's responsibilities at

21   CENLAR?

22                    MR. SCHIEL:  Objection, foundation.

23                    THE WITNESS:  The same answer as the

24          first two, sir.  This document is not

Raymond Crawford

Page 64

1           sufficient enough for me to answer that

2           question.

3    BY MR. FORRESTER:

4           Q.    What are the names of the CENLAR

5    employees that communicated with plaintiff, John

6    Hochroth?

7                 MR. SCHIEL:  Objection, vague.

8                 THE WITNESS:  I'm not sure which time

9           frame you're referring to to answer that, sir.

10   BY MR. FORRESTER:

11          Q.    I'm referring to all time frames.

12                What are the names of the employees of

13   CENLAR that communicated with John Hochroth?

14                MR. SCHIEL:  Objection, overly broad,

15          vague, calls for speculation.

16                THE WITNESS:  If I can be provided with

17          the proper document of the conversation, then

18          I can better answer that question.

19   BY MR. FORRESTER:

20          Q.    Who is Wolfe & Wyman, LLP?

21                MR. SCHIEL:  Objection, foundation.

22                THE WITNESS:  A law firm.

23   BY MR. FORRESTER:

24          Q.    And what is their relationship to

Raymond Crawford

Page 65

1    CENLAR?

2         A.      Relationship?

3                 MR. SCHIEL:  Objection, foundation,

4         calls for speculation.

5                 Only if you know specifically off the

6         top of your head based on the question.

7                 THE WITNESS:  They're a law firm that

8         we used at some point.

9                         *  *  *  *  *

10                (Whereupon, Exhibit-14 was marked for

11        identification.)

12                        *  *  *  *  *

13   BY MR. FORRESTER:

14        Q.      I'm handing you Exhibit-14.

15                What is Exhibit-14?  And let's focus on

16   just the first two pages.

17        A.      Escrow analysis.

18        Q.      Whose account is this an escrow

19   analysis for?

20        A.      Your client.

21        Q.      Can you tell me what the first section

22   underneath present loan payment represents?

23        A.      A breakdown of the payment.

24        Q.      Of what payment?

Raymond Crawford

Page 66

```
 1         A.      The mortgage payment.

 2         Q.      Is this a statement that's sent out

 3    every month?

 4                 MR. SCHIEL:  Objection.  The document

 5         speaks for itself.  It says:  Annual escrow

 6         account.

 7                 THE WITNESS:  No.

 8    BY MR. FORRESTER:

 9         Q.      When is this statement sent out?

10         A.      When the escrow analysis is completed

11    on the account.

12         Q.      What gets paid out of escrow?

13                 MR. SCHIEL:  Objection, vague.

14                 Only if you understood the question.

15                 THE WITNESS:  From this document, it

16         show tax, hazard insurance and another form of

17         insurance.

18    BY MR. FORRESTER:

19         Q.      And what's the other form of insurance?

20         A.      I don't want to guess, but it could be

21    mortgage insurance.

22         Q.      When you say "it could be mortgage

23    insurance," does that mean that it could be something

24    else, besides mortgage insurance?
```

Raymond Crawford

Page 67

1          A.      No.  I say it could be mortgage

2     insurance.

3          Q.      So does that refer to mortgage

4     insurance or not?

5                  MR. SCHIEL:  Objection, asked and

6             answered, argumentative.

7                  THE WITNESS:  I'm referring to he has

8             mortgage insurance and hazard insurance, has

9             home insurance.

10    BY MR. FORRESTER:

11         Q.      So what was Mr. -- does this indicate

12    something that Mr. Hochroth was billed for?

13                 MR. SCHIEL:  Objection, vague.

14                 Only if you understood the question.

15                 THE WITNESS:  It's an escrow analysis

16            of his taxes and insurance, what is due, when

17            they are due, and the balance of the escrow

18            account.

19    BY MR. FORRESTER:

20         Q.      And what kind of insurance is Mr.

21    Hochroth being charged $1,189 for?

22                 MR. SCHIEL:  Objection, foundation.

23                 THE WITNESS:  The hazard insurance.

24                 MR. SCHIEL:  If you want to identify

Raymond Crawford

Page 68

```
 1          what figure you're talking about.  It wasn't

 2          clear to me.

 3   BY MR. FORRESTER:

 4          Q.    What does the number to the right of

 5   annual disbursements represent?

 6          A.    I'm sorry.

 7                Where are you located?

 8          Q.    There's two words together, annual

 9   disbursements, on the left side of the page.

10                What does that $8,057.20 represent?

11                MR. SCHIEL:  Objection.  The document

12          speaks for itself.  I'll note for the record

13          that this section is titled Anticipated Annual

14          Disbursements.

15                THE WITNESS:  That would be the amount

16          that would be paid out for the year from the

17          escrow account.

18   BY MR. FORRESTER:

19          Q.    Moving down to the section under

20   account history, can you please tell me what the

21   column under projected represents?

22                MR. SCHIEL:  Objection, vague as to

23          where you're looking in this section.

24                Only if you can identify it.
```

Raymond Crawford

Page 69

1                    THE WITNESS:  Could you -- which one

2           are you referring to, sir?

3    BY MR. FORRESTER:

4           Q.    I'm just referring to the table

5    underneath account history.  I'd like to get an idea

6    of what these columns represent.

7                    What does the column labeled projected

8    mean?

9                    MR. SCHIEL:  Objection, misstates the

10          document.  There's no section that's titled

11          projected.

12                   THE WITNESS:  I mean, there's two

13          projected.

14                   Could you point to what you're

15          referring to?

16   BY MR. FORRESTER:

17          Q.    I'm talking about --

18          A.    I can't see what you're referring to,

19   sir.

20          Q.    I'm talking about the second column of

21   the table that's labeled projected at the top.

22                   What does that refer to?

23          A.    It's for each month.  That's a

24   projection of what needs to be in the escrow account

Raymond Crawford

Page 70

1    that payment is made.

2         Q.    And what would be included in those

3    payments?  You've already mentioned tax and

4    insurance.

5              Is there anything else that would be

6    included in escrow accounts?

7              MR. SCHIEL:  Objection, asked and

8         answered.

9              THE WITNESS:  A document has county

10        tax, hazard tax, and insurance -- I mean,

11        county tax, hazard insurance and insurance.

12   BY MR. FORRESTER:

13        Q.    Did Mr. Hochroth send CENLAR a check to

14   reinstate his mortgage?

15             MR. SCHIEL:  Objection, foundation.

16             THE WITNESS:  I believe at some point,

17        yes, sir.

18   BY MR. FORRESTER:

19        Q.    Did CENLAR accept Mr. Hochroth's check?

20             MR. SCHIEL:  Objection, foundation.

21             THE WITNESS:  Yes.

22   BY MR. FORRESTER:

23        Q.    And what was the check for?

24             How much money?

Raymond Crawford

Page 71

1              MR. SCHIEL:  Objection, speculation.

2              Only if you know off the top of your

3         head.

4              THE WITNESS:  I don't know off the top

5         of my head.  If you have a document, I can

6         better answer that.

7    BY MR. FORRESTER:

8         Q.    Who is Five Brothers?

9              MR. SCHIEL:  Objection, foundation,

10        vague.

11   BY MR. FORRESTER:

12        Q.    Go ahead.

13        A.    It's a third-party vendor used by

14   CENLAR.

15        Q.    What did you use Five Brothers for?

16        A.    For inspection and preservation of the

17   property.

18        Q.    And when did you start using Five

19   Brothers?

20              MR. SCHIEL:  Objection, vague as to the

21        question.  You haven't identified who he's

22        talking about or during what loan.

23              Only if you understood the question.

24              THE WITNESS:  I do not know, offhand,

Raymond Crawford

Page 72

1          when that business relationship starts.

2    BY MR. FORRESTER:

3          Q.    Do you recall when the business

4    relationship ended?

5                MR. SCHIEL:  Objection, same objection,

6          vague.

7                Only if you understand.

8                THE WITNESS:  We are still using Five

9          Brothers.

10   BY MR. FORRESTER:

11         Q.    Thank you.

12               Are there reports from Five Brothers

13   that have been provided to CENLAR within the last

14   year?

15               MR. SCHIEL:  Objection, vague and

16         overly broad.

17               Are you talking about the subject loan

18         or are you talking about all loans in CENLAR's

19         portfolio?

20               MR. FORRESTER:  I'm talking about Mr.

21         Hochroth's account.

22               MR. SCHIEL:  Well, that wasn't clear.

23   BY MR. FORRESTER:

24         Q.    Has Five Brothers provided any records

Raymond Crawford

Page 73

1    related to Mr. Hochroth's account within the last

2    year?

3           A.     Which time frame are you referring to,

4    sir?

5           Q.     Within the last year.

6           A.     There could be some reports.  If a work

7    order was ordered, there could be some reports.

8           Q.     Do you know if there are reports

9    because you said there could be?

10                 Is that a yes or a no?

11          A.     If -- if a work order was placed, then

12   yes, there would be a report.  That's why -- I mean,

13   you didn't give a specific time frame, so there may

14   be reports for some time.  There may not be reports

15   for some time.

16          Q.     I did give a time frame.

17                 Within the last year, are there reports

18   from Five Brothers or aren't there reports?

19          A.     There may be some reports, sir,

20   depending on the time frame.

21          Q.     Does CENLAR have any policies for

22   supervising the debt collectors that it hires to

23   pursue foreclosures?

24          A.     I don't understand the question, sir.

Raymond Crawford

Page 74

1                        * * * * *

2              (Whereupon, Exhibit-15 was marked for

3         identification.)

4                        * * * * *

5    BY MR. FORRESTER:

6         Q.    I'm handing you now Exhibit-15.

7               Do you recognize Exhibit-15?

8               MR. SCHIEL:  I'm sorry.  I don't have a

9         copy of Exhibit-15.

10              THE WITNESS:  Yes, sir.

11   BY MR. FORRESTER:

12        Q.    What is Exhibit-15?

13        A.    It's a copy of a check.

14        Q.    Did CENLAR receive this check?

15        A.    Yes.

16        Q.    Did CENLAR cash this check?

17        A.    Yes.

18        Q.    Did CENLAR reinstate Mr. Hochroth's

19   loan?

20              MR. SCHIEL:  Objection, vague as to the

21        word reinstate his loan.

22              Only if you understood the question.

23              THE WITNESS:  CENLAR applied the

24        payments of the check to the loan.

Raymond Crawford

Page 75

1   BY MR. FORRESTER:

2         Q.     Did CENLAR reinstate the loan?

3                MR. SCHIEL:  Objection, asked and

4         answered, argumentative.

5   BY MR. FORRESTER:

6         Q.     Yes or no?

7         A.     The funds were applied to the account,

8   sir.

9                MR. FORRESTER:  Can we go off the

10        record for a second?

11                        *  *  *  *  *

12               (Whereupon, a discussion was held off

13        the record.)

14                        *  *  *  *  *

15               MR. FORRESTER:  Back on.

16  BY MR. FORRESTER:

17        Q.     I'd like to point your attention back

18  to Exhibit-12.  The paragraph we were focused on

19  before states:  The amount due is the amount to

20  reinstate your loan.

21               What does reinstate your loan mean?

22               MR. SCHIEL:  Objection, asked and

23        answered.

24               THE WITNESS:  Pay the delinquent amount

Raymond Crawford

Page 76

1          of the loan.

2    BY MR. FORRESTER:

3          Q.    What is CENLAR's responsibilities to a

4    borrower when they pay the reinstatement amount

5    listed on a notice, such as Exhibit-12?

6                MR. SCHIEL:  Objection, vague as to

7          responsibilities to a borrower.

8                Only if you understood.

9                THE WITNESS:  Funds are received and

10         the necessary funds are applied towards the

11         account.

12   BY MR. FORRESTER:

13         Q.    What is the nature of Civil Number

14   16-1-313 of the Circuit Court of the First Circuit

15   State of Hawaii?

16               MR. SCHIEL:  Objection to foundation.

17               Only if you know off the top of your

18         head.

19               THE WITNESS:  No.  I do not.

20   BY MR. FORRESTER:

21         Q.    What does the nature of CAAP-17-911 of

22   the Intermediate Court of Appeals of the State of

23   Hawaii?

24               MR. SCHIEL:  Objection, foundation.

Raymond Crawford

Page 77

1               Only if you know off the top of your

2      head.

3               THE WITNESS:  Same answer.  I do not

4      know.

5  BY MR. FORRESTER:

6      Q.    Are you aware of what CENLAR's

7  involvement is with either the first suit that I

8  stated or the second suit that I stated?

9               MR. SCHIEL:  Objection, asked and

10      answered, objection, foundation.

11               THE WITNESS:  I'm not up-to-date with

12      that, sir.

13                    *  *  *  *  *

14               (Whereupon, Exhibit-16 was marked for

15      identification.)

16                    *  *  *  *  *

17  BY MR. FORRESTER:

18      Q.    I'm handing you Exhibit-16.

19               Have you ever seen this document

20  before?

21      A.    I may have seen it within exhibits.

22      Q.    Did you receive a copy of this letter

23  on or around January 31st, 2018?

24               MR. SCHIEL:  Objection, as to you.

Raymond Crawford

Page 78

1                    Do you mean CENLAR?

2                    MR. FORRESTER:  I mean CENLAR.  I

3           stated that.

4    BY MR. FORRESTER:

5           Q.    I mean CENLAR when I say you.

6                    Did CENLAR receive a copy of this on or

7    around January 31st, 2018?

8           A.    I'm not sure.  These were provided

9    through counsel.

10          Q.    Thank you.

11                    *  *  *  *  *

12                    (Whereupon, Exhibit-17 was marked for

13           identification.)

14                    *  *  *  *  *

15   BY MR. FORRESTER:

16          Q.    I'm handing you Exhibit-17.

17                    Have you ever seen Exhibit-17 before?

18          A.    Yes, sir.

19          Q.    And when did you personally see it?

20          A.    When I was provided the documents in

21   preparation for this deposition.

22          Q.    I want to talk generally about the form

23   of this document, so not specifically to this case.

24                    Is the form of the document something

Raymond Crawford

Page 79

1    that you recognize?

2          A.    I'm not sure what you mean the form of

3    the document.

4          Q.    I mean, is this a type of letter that

5    would go out to any other borrowers, besides Mr.

6    Hochroth?

7                MR. SCHIEL:  Objection, speculation,

8          vague.

9                Only if you understood.

10               THE WITNESS:  If that's what is

11         required in a borrower loan at that time, then

12         I guess I can assume, if that's what you're

13         asking, that it would go out.

14   BY MR. FORRESTER:

15         Q.    I'm not asking you to assume anything

16   or to speculate.

17               I'm asking if CENLAR sends documents

18   out to borrowers that are similar to this document in

19   that they state your reinstatement payment has been

20   received and any foreclosure action will be closed?

21               MR. SCHIEL:  Objection, speculation,

22         asked and answered, also vague.

23               THE WITNESS:  I can answer, but you say

24         you don't want me to assume.  So you're asking

Raymond Crawford

Page 80

1          a general question.  And generally, if one is

2          required, then one will go out.

3     BY MR. FORRESTER:

4          Q.    And when would one be required?

5          A.    Based on the status of the account and

6     what is received.

7          Q.    And what status would cause a letter

8     like this to be required to go out?

9          A.    If a loan is in foreclosure and funds

10    is received.

11         Q.    Did CENLAR send this statement to Mr.

12    Hochroth?

13         A.    Yes.

14                        * * * * *

15              (Whereupon, Exhibit-18 was marked for

16         identification.)

17                        * * * * *

18    BY MR. FORRESTER:

19         Q.    I'm handing you Exhibit-18.

20              Do you recognize Exhibit-18?

21         A.    No, sir.

22         Q.    Are you familiar with Exhibit-18?

23              MR. SCHIEL:  Objection, asked and

24         answered.

Raymond Crawford

Page 81

 1                 THE WITNESS:  No, sir.

 2    BY MR. FORRESTER:

 3          Q.     Are you familiar with the contents of

 4    Exhibit-18?

 5                 MR. SCHIEL:  Objection, asked and

 6          answered.

 7                 THE WITNESS:  No, sir.

 8                        *  *  *  *  *

 9                 (Whereupon, Exhibit-19 was marked for

10          identification.)

11                        *  *  *  *  *

12    BY MR. FORRESTER:

13          Q.     I'm handing you Exhibit-19.

14                 Are you familiar with Exhibit-19?

15          A.     No, sir.

16          Q.     Are you familiar with the contents of

17    Exhibit-19?

18          A.     No.  I'm not sure what it is, sir.

19          Q.     Can you read the last paragraph on

20    Exhibit-19?  Tell me when you're done.

21          A.     Okay.

22          Q.     Based on Exhibit-19, the last

23    paragraph, which you've just read, what happened with

24    the balance on Mr. Hochroth's loan?

Raymond Crawford

Page 82

1              MR. SCHIEL:  Objection, foundation,

2         asked and answered.  The witness already

3         testified that he's not familiar with this

4         document.

5              THE WITNESS:  I'm not familiar with --

6         I mean, I'm not familiar with the document.

7         But what you're asking, the document speak for

8         itself.

9    BY MR. FORRESTER:

10        Q.    Can you read the second paragraph, the

11   last paragraph of the page?

12             Can you read that out loud?

13        A.    Between March 5th, 2018 and April 5th,

14   2018, your CENLAR mortgage balance increased by

15   $4,362 from 566,940 to 571,302.

16        Q.    Did Mr. Hochroth's mortgage balance

17   increase from $4,362 -- by $4,362 between March 5th,

18   2018 and April 5th, 2018?

19             MR. SCHIEL:  Objection, asked and

20        answered, speculation.

21             THE WITNESS:  I would need to look at

22        CENLAR business record to answer that

23        question, sir.

24   BY MR. FORRESTER:

Raymond Crawford

Page 83

1          Q.     Yes or no?

2                 MR. SCHIEL:  Objection, argumentative,

3          asked and answered.

4                 THE WITNESS:  I would need to look at

5          CENLAR business record to answer that

6          question.

7                         *  *  *  *  *

8                 (Whereupon, Exhibit-20 was marked for

9          identification.)

10                        *  *  *  *  *

11   BY MR. FORRESTER:

12         Q.     I'm handing you Exhibit-20.

13                Did you ever receive a copy of

14   Exhibit-20?

15         A.     I'm not sure, sir.

16                        *  *  *  *  *

17                (Whereupon, Exhibit-21 was marked for

18         identification.)

19                        *  *  *  *  *

20                MR. FORRESTER:  I'm handing you now

21         Exhibit-21.

22                Let's go off the record.

23                        *  *  *  *  *

24                (Whereupon, a discussion was held off

Raymond Crawford

Page 84

1          the record.)

2                          * * * * *

3                  MR. FORRESTER:  Back on.

4    BY MR. FORRESTER:

5          Q.     I'm handing you Exhibit-21.

6                 Do you recognize Exhibit-21?

7          A.     The loan statement, yes.

8          Q.     I'd like to point your attention to the

9    box called past payments breakdown.

10                 Do you see that?

11         A.     Yes.

12         Q.     Do you see the row that starts with

13   fees?

14         A.     Right.

15         Q.     What does that refer to?

16                 MR. SCHIEL:  Objection, vague.

17                 THE WITNESS:  All it has is fees there.

18   BY MR. FORRESTER:

19         Q.     Right.

20                 I'm asking you:  What does that mean?

21                 Where does that come from?

22                 What kind of fees are those?

23         A.     This document is not sufficient enough

24   for me to answer that question.

Raymond Crawford

Page 85

1          Q.     But you are supposed to be qualified to

2     testify to the meaning of the document.  If it said

3     where it came from, I wouldn't need you, but it

4     doesn't.  It just says:  Fees.

5                    So do you not know what that means?

6                    MR. SCHIEL:  Objection, argumentative.

7                    I'll note for the record that Mr.

8          Forrester is raising his voice at the witness,

9          asked and answered.

10                        * * * * *

11                    (Whereupon, Exhibit-22 was marked for

12         identification.)

13                        * * * * *

14    BY MR. FORRESTER:

15         Q.     I'm handing you Exhibit Number 22.

16                Do you recognize Exhibit-22?

17         A.     Yes.

18         Q.     What is Exhibit-22?

19         A.     Loan statement.

20         Q.     Is this a loan statement for Mr.

21    Hochroth's account?

22         A.     Yes.

23         Q.     And for what period is this a loan

24    statement for Mr. Hochroth's account?

Raymond Crawford

Page 86

1                    MR. SCHIEL:  Objection.  The document

2          speaks for itself.

3                    THE WITNESS:  It has a statement date

4          of March 19th, 2018.

5    BY MR. FORRESTER:

6          Q.    I'd like to point your attention to the

7    same box as the previous exhibit that's titled past

8    payments breakdown.

9                    Do you see that?

10         A.    Yes.

11         Q.    Do you see the row titled:  Fees?

12         A.    Yes.

13         Q.    And do you see the number at the end of

14   that row, $5,505.48?

15         A.    I see it.  I see that amount.

16         Q.    What does that $5,505.48 -- what kinds

17   of fees are those?

18                    MR. SCHIEL:  Objection, speculation.

19          It's not in the -- the loan statements speak

20          for themselves, foundation.

21                    THE WITNESS:  The loan statement will

22          not have the breakdown of that, so this

23          document is not sufficient for me to answer

24          that question.

Raymond Crawford

Page 87

1   BY MR. FORRESTER:

2        Q.    Are you able to tell me what those fees

3   are, a breakdown of those fees, if you look at your

4   own document?

5        A.    If you look at the loan history, that's

6   -- that's the amount that was paid for the year, yes.

7        Q.    Can you please review your documents

8   and tell me where those fees came from?

9             MR. SCHIEL:  Objection.  If you want to

10            put documents that we produced -- CENLAR

11            produced, its loan servicing records, if you

12            want to put those -- it also produced the

13            account history.  If you want to put those

14            documents in front of him -- the witness was

15            not required to bring his own documents to the

16            deposition.

17            I'll note for the record that the

18            witness does not have the account history

19            documents or servicing records with him and

20            Mr. Forrester has not produced those records,

21            nor has he introduced any of them as an

22            exhibit in the deposition thus far.

23   BY MR. FORRESTER:

24        Q.    In order for you to tell me where those

Raymond Crawford

Page 88

1    fees came from and what the origin and what types of

2    fees they are, what is the name of the document that

3    I would have to provide you for you to tell me what

4    kinds of fees those are?

5         A.    It would be the loan history.

6         Q.    Is a loan history provided to

7    borrowers?

8              MR. SCHIEL:  Objection, vague as to

9              borrowers.

10   BY MR. FORRESTER:

11        Q.    Was a loan history provided to Mr.

12   Hochroth?

13        A.    If he requested one, one can be

14   provided to him.

15        Q.    So does that mean that if a borrower

16   does not request a loan history, that one is not

17   provided to them?

18        A.    It is now a statement that goes out

19   monthly by a certain time frame.  It's not one that

20   has to be requested.

21        Q.    Are you familiar with the types of fees

22   that would be included in this row?

23              MR. SCHIEL:  Objection, vague.

24              THE WITNESS:  I wouldn't want to

Raymond Crawford

Page 89

1          generalize, sir.  It could be a lot of

2          different fees.

3    BY MR. FORRESTER:

4          Q.     Are you able to provide me with some

5    examples of the types of fees that would be included

6    in that row?

7          A.     An example could be property

8    inspection.

9          Q.     What about late fees?

10         A.     Like I say, as an example of one of the

11   fees.

12         Q.     I'm asking you if late fees are a type

13   of fee that would be included in that column?

14         A.     It could be.  I don't -- I can't assume

15   without looking at a document, sir.  I can't say yes

16   or no to that.

17         Q.     Are attorneys' fees a type of fee that

18   would be included in that row?

19         A.     It could be.  Again, I cannot

20   specifically answer without looking at a specific

21   loan.

22                        *  *  *  *  *

23                (Whereupon, Exhibit-23 was marked for

24         identification.)

Raymond Crawford

Page 90

1                       * * * * *

2   BY MR. FORRESTER:

3           Q.     I'm handing you Exhibit-23.

4                  Are you familiar with Exhibit-23?

5           A.     No, sir.

6                       * * * * *

7                  (Whereupon, Exhibit-24 was marked for

8           identification.)

9                       * * * * *

10  BY MR. FORRESTER:

11          Q.     I'm handing you Exhibit-24.

12                 Are you familiar with Exhibit-24?

13          A.     Is it a different --

14                 MR. SCHIEL:  Same document, objection,

15          asked and answered.

16                      * * * * *

17                 (Whereupon, Exhibit-25 was marked for

18          identification.)

19                      * * * * *

20  BY MR. FORRESTER:

21          Q.     I'm handing you Exhibit-25.

22                 MR. SCHIEL:  I just want to note for

23          the record that Exhibits 23 and 24 are

24          identical.

Raymond Crawford

Page 91

1                        * * * * *

2              (Whereupon, Exhibit-26 was marked for

3         identification.)

4                        * * * * *

5              MR. FORRESTER:  Just for the record,

6         there's an attachment to Exhibit-25.  So let

7         me break that up into two questions.

8    BY MR. FORRESTER:

9         Q.    Are you familiar with the first two

10   pages of Exhibit-25?

11        A.    No, sir.

12        Q.    Are you familiar with the third page of

13   Exhibit-25?  I believe we have already discussed

14   this.

15              MR. SCHIEL:  The third page of

16         Exhibit-25 is a signature page.

17              MR. FORRESTER:  I'm sorry, the fourth

18         page.

19              THE WITNESS:  Yes.  I am familiar with

20         the fourth page.

21   BY MR. FORRESTER:

22        Q.    I'm handing you Exhibit-26.

23              Are you familiar with Exhibit-26?

24        A.    Yes.

Raymond Crawford

Page 92

1        Q.     Can you explain what Exhibit-26 is?

2        A.     Assets fund.

3        Q.     What does that mean?

4        A.     After funds were applied to the

5    account, this balance was remaining, and it was sent

6    to the homeowner.

7        Q.     Is that something that happens often or

8    is that something that only happens during

9    foreclosure cases?

10            MR. SCHIEL:  Objection, vague,

11        speculation.

12            Only if you know what happens in every

13        foreclosure case.

14            MR. FORRESTER:  Let me rephrase the

15        question.

16    BY MR. FORRESTER:

17        Q.     Is this a form document that CENLAR

18    sends out?  And by form document, I mean a document

19    that is sent in different accounts but states

20    generally the same thing with different particulars.

21        A.     I don't understand the question to

22    answer it.

23        Q.     Are you familiar with the form of

24    Exhibit-26 as being a form from CENLAR?

Raymond Crawford

Page 93

1          A.      Yes.

2          Q.      Why was this letter sent to Mr.

3     Hochroth on June 15th, 2018?

4                  MR. SCHIEL:  Objection, asked and

5          answered.  The witness already testified that

6          there are excess funds and they returned them

7          to the borrower.

8                  THE WITNESS:  Excess funds that were

9          returned.

10                          * * * * *

11                 (Whereupon, Exhibit-27 was marked for

12         identification.)

13                          * * * * *

14    BY MR. FORRESTER:

15         Q.      I'm handing you Exhibit-27.

16                 Are you familiar with Exhibit-27?

17         A.      I'm not sure, sir.

18         Q.      Is this a document that was generated

19    by CENLAR?

20         A.      No, sir.

21         Q.      Does CENLAR have a copy of this

22    document?

23         A.      I'm not sure, sir.

24                          * * * * *

Raymond Crawford

Page 94

1                    (Whereupon, Exhibit-28 was marked for

2          identification.)

3                              * * * * *

4    BY MR. FORRESTER:

5          Q.      I'm handing you Exhibit-28.

6                  Are you familiar with Exhibit-28?

7          A.      No, sir.

8          Q.      Does CENLAR have a copy of Exhibit-28

9    in its records?

10         A.      I'm not sure, sir.

11                             * * * * *

12                   (Whereupon, Exhibit-29 was marked for

13         identification.)

14                             * * * * *

15   BY MR. FORRESTER:

16         Q.      I'm handing you Exhibit-29.

17                 Are you familiar with Exhibit-29?

18         A.      No, sir.

19                             * * * * *

20                   (Whereupon, Exhibit-30 was marked for

21         identification.)

22                             * * * * *

23   BY MR. FORRESTER:

24         Q.      I'm handing you Exhibit-30.

Raymond Crawford

Page 95

1                    Are you familiar with Exhibit-30?

2          A.    No, sir.

3                         * * * * *

4                    (Whereupon, Exhibit-31 was marked for

5          identification.)

6                         * * * * *

7    BY MR. FORRESTER:

8          Q.    I'm handing you Exhibit-31.

9                    Are you familiar with Exhibit-31?

10         A.    No, sir.

11                        * * * * *

12                   (Whereupon, Exhibit-32 was marked for

13         identification.)

14                        * * * * *

15   BY MR. FORRESTER:

16         Q.    I'm handing you Exhibit-32.

17                   Are you familiar with Exhibit-32?

18         A.    No, sir.

19                        * * * * *

20                   (Whereupon, Exhibit-33 was marked for

21         identification.)

22                        * * * * *

23   BY MR. FORRESTER:

24         Q.    I'm handing you Exhibit-33.

Raymond Crawford

Page 96

1                    Are you familiar with Exhibit-33?

2          A.    No, sir.

3          Q.    I'd like you to take a second to read

4     Exhibit-33 just until the footer.

5          A.    Okay.

6          Q.    I'm going to refer to the contents of

7     Exhibit-33 as the settlement offer.

8                    Are you familiar with the terms of the

9     settlement offer?

10         A.    No, sir.

11         Q.    Do you see paragraph three,

12    subparagraph three?  It says:  Return of 75 percent

13    of the judgment collected.

14                   Do you see that?

15         A.    Yes, sir.

16         Q.    Do you know what judgment the

17    settlement offer is referring to?

18         A.    No, sir.

19              MR. SCHIEL:  Objection, foundation.

20         This is -- note for the record this is Mr.

21         Forrester's e-mail, not CENLAR's.  You're

22         asking the witness to testify as to the

23         meaning of your own words, speculation.

24    BY MR. FORRESTER:

Raymond Crawford

Page 97

1          Q.     Are you aware of whether or not there

2     was a judgment entered in the foreclosure case?

3               MR. SCHIEL:  Objection, vague.  There

4          were multiple judgements entered in the

5          foreclosure case.

6               MR. FORRESTER:  Just speaking

7          objections.  You're leading your own witness,

8          so just say vague.  You don't have to give a

9          reason.

10               MR. SCHIEL:  I understand.

11               MR. FORRESTER:  And most of your

12          objections are inappropriate, anyway, and

13          they're evidentiary objections at trial.

14     BY MR. FORRESTER:

15          Q.     Are you aware of any judgments that

16     have been entered in any of the cases that were

17     referenced in Exhibit-1?

18               MR. SCHIEL:  Objection, vague.

19               THE WITNESS:  I'm not familiar with

20          which case you're referring to from Exhibit-1,

21          sir.

22     BY MR. FORRESTER:

23          Q.     Please look back at Exhibit-1.

24               And do you see paragraph five of

Raymond Crawford

Page 98

1    Exhibit-1?

2          A.     Right.

3          Q.     The first case there listed, civil

4    number 16-1-313 of the Superior Court of the First

5    Circuit of the State of Hawaii is what I'm referring

6    to as the foreclosure case.

7                 Okay?

8          A.     Okay.

9          Q.     Are you familiar with this lawsuit?

10         A.     Yes, sir.

11         Q.     Who is the plaintiff in that lawsuit?

12         A.     In the foreclosure case?

13         Q.     Yes.

14         A.     Ally Bank.

15         Q.     And what is CENLAR's involvement with

16   that case?

17                MR. SCHIEL:  Objection, asked and

18         answered.

19                THE WITNESS:  Service of the loan.

20   BY MR. FORRESTER:

21         Q.     If a borrower reinstates his mortgage,

22   how are the attorneys' fees paid?

23                MR. SCHIEL:  Objection, vague,

24         speculation.

Raymond Crawford

Page 99

1    BY MR. FORRESTER:

2         Q.    Are you aware of any other case where a

3    borrower has reinstated his loan and the law firm

4    prosecuting the foreclosure has sought a judgment for

5    attorneys' fees after reinstatement occurred?

6              MR. SCHIEL:  Objection, vague,

7         speculation, asks for a legal opinion.

8              THE WITNESS:  Sorry.  Repeat that

9         question, sir.

10   BY MR. FORRESTER:

11        Q.    Are you aware of any other matter where

12   a borrower has reinstated his mortgage, and

13   subsequently, the law firm prosecuting the

14   foreclosure has sought a judgment for attorneys'

15   fees?

16             MR. SCHIEL:  Same objection.

17             THE WITNESS:  I haven't been part of

18        that, sir.

19   BY MR. FORRESTER:

20        Q.    I didn't ask you if you were a part of

21   it.  I asked you if you were aware of any other

22   matter --

23             MR. SCHIEL:  Objection, asked and

24        answered, argumentative.

Raymond Crawford

Page 100

 1                THE WITNESS:  You asked if I would be a

 2         part of it if a case was brought to me.  I

 3         haven't been a part of that, sir.

 4   BY MR. FORRESTER:

 5         Q.    Have you ever heard of anything like

 6   that happening?

 7                MR. SCHIEL:  Objection, vague,

 8         speculation, asked and answered and

 9         argumentative.

10                THE WITNESS:  I haven't been part of

11         that, sir.

12   BY MR. FORRESTER:

13         Q.    Yet, you are a witness for CENLAR and

14   fly all over the country handling matters of

15   significant importance; correct?

16         A.    I travel on behalf of CENLAR, correct.

17         Q.    And it's your job to speak for CENLAR;

18   is it not?

19                MR. SCHIEL:  Objection, foundation, the

20         witness' earlier testimony, and vague as to

21         speaks for CENLAR.

22   BY MR. FORRESTER:

23         Q.    Go ahead.

24         A.    So what is your question, sir?

Raymond Crawford

Page 101

 1        Q.     I want to know if you can state one

 2   other instance from your history as a witness for

 3   CENLAR where a borrower has reinstated his mortgage

 4   and the law firm prosecuting the foreclosure has

 5   thereafter sought a judgment for attorneys' fees?

 6              MR. SCHIEL:  Objection.  This is now

 7        the fourth time the question has been

 8        answered.  The witness has testified that he's

 9        not involved in that process and doesn't know.

10        Argumentative.

11              And noting for the record that Mr.

12        Forrester is now raising his voice at the

13        witness with the same question.

14              MR. FORRESTER:  I will take that as a

15        no.

16              MR. SCHIEL:  Objection, misstates the

17        witness' testimony.

18   BY MR. FORRESTER:

19        Q.     Approximately how many foreclosure

20   cases have you been involved with?

21        A.     Over 1,000.

22        Q.     What's the typical range of attorneys'

23   fees that you see?

24              MR. SCHIEL:  Objection, foundation,

Raymond Crawford

Page 102

1          speculation.  The witness has already

2          testified that he doesn't get involved in the

3          attorneys' fees.

4                  THE WITNESS:  I'd say from 2,500 up to

5          100 plus thousand, 200 plus thousand based on

6          the litigation, time of the litigation.

7   BY MR. FORRESTER:

8          Q.    Are you aware of the amount of

9   attorneys' fees that the law firm that you've hired

10  requested related to Mr. Hochroth's account?

11                 MR. SCHIEL:  Objection as to the law

12         firm that you hired, vague and ambiguous.

13                 THE WITNESS:  I'm not aware of the

14         attorneys' fees amount, sir.

15                         *  *  *  *  *

16                 (Whereupon, Exhibit-34 was marked for

17         identification.)

18                         *  *  *  *  *

19  BY MR. FORRESTER:

20         Q.    I'm handing you Exhibit-34.

21                 Have you ever seen Exhibit-34?

22         A.    I'm not sure, sir.

23         Q.    Can you read the title of Exhibit-34,

24  the subject line?

Raymond Crawford

Page 103

1          A.      Stipulation in Order to Return

2    Garnished Funds Upon Remand and Withdraw of

3    Defendant, John Hochroth, Motion to Set Supersedeas

4    Bond For Still Pending Appeal.

5          Q.      Do you have any idea what garnished

6    funds is referring to?

7                  MR. SCHIEL:  Objection, speculation.

8                  THE WITNESS:  It's a letter to the

9          Judge.  I'm not sure.  I'm not sure, sir.

10   BY MR. FORRESTER:

11         Q.      Are you aware that the law firm that

12   you hired to prosecute this foreclosure, Kobayashi,

13   Sugita & Goda, garnished Mr. Hochroth's account to

14   the tune of $55,000 --

15                 MR. SCHIEL:  Objection.

16   BY MR. FORRESTER:

17         Q.      -- after he reinstated his loan with

18   you?

19                 MR. SCHIEL:  Objection.  That's a false

20         statement.  The amount of 55,000 wasn't

21         garnished.

22   BY MR. FORRESTER:

23         Q.      Are you aware of any garnishment that

24   occurred after Mr. Hochroth reinstated his mortgage

Raymond Crawford

Page 104

1    with you?

2         A.    I am aware of garnishment did take

3    place, yes, sir.

4         Q.    Are you at all concerned about the fact

5    that you stated to Mr. Hochroth that attorneys' fees

6    would be included on his statement?

7              MR. SCHIEL:  Objection.  It assumes

8         facts not in evidence, foundation.

9              THE WITNESS:  I'm sorry.

10             What was the question?

11   BY MR. FORRESTER:

12        Q.    You can scratch that.  We'll move on.

13             How much was the law firm that you

14   hired to prosecute the foreclosure paid?

15             MR. SCHIEL:  Objection, vague, also,

16        I'm going to object on the basis that this is

17        attorney/client communications.  We produced

18        records of invoices and payments in discovery.

19        The documents speak for themselves.

20             THE WITNESS:  I would need business

21        record to answer that question, sir.

22             MR. FORRESTER:  We'll come back to it,

23        then.

24             Let's take five, and then, we're going

Raymond Crawford

Page 105

1          to get to the accounting stuff.

2                    * * * * *

3          (Whereupon, a brief recess was taken.)

4                    * * * * *

5          MR. FORRESTER:  We can go back on.

6                    * * * * *

7          (Whereupon, Exhibit-35 was marked for

8          identification.)

9                    * * * * *

10  BY MR. FORRESTER:

11          Q.    I'm handing you Exhibit-35.

12                Do you recognize Exhibit-35?

13          A.    There are several different documents.

14          Q.    Well, what is the first document?

15          A.    The document is a loan transaction

16  history.

17          Q.    Do you see the third page?

18                Do you recognize the third page?

19          A.    There's a couple of blank.

20                What page are you referring to?

21          Q.    I'm referring to the page that says:

22  Two of two, Central Loan Administration and

23  Reporting.

24          A.    Okay.

Raymond Crawford

Page 106

1        Q.      Do you recognize this page?

2        A.      Yes.

3        Q.      Do you know what this is?

4        A.      It's different transaction that took

5   place on the loan.

6        Q.      Is this the account history that you

7   were talking about?

8        A.      It could be part of it, yes, sir.

9        Q.      So this is part of an account history?

10              MR. SCHIEL:  Objection, misstates the

11              witness' testimony.  Some are produced account

12              history records.  And these are not Bates

13              stamped and some appear to be CENLAR's records

14              produced.

15              MR. FORRESTER:  Okay.

16   BY MR. FORRESTER:

17       Q.      Do you recognize the column transaction

18   description as being part of the loan history

19   statement?

20       A.      Transaction description?

21       Q.      Yes.

22       A.      Yes.

23       Q.      Is this a column that would identify

24   what types of fees are being billed to a borrower's

Raymond Crawford

Page 107

1    account?

2         A.    It would identify what has been paid.

3         Q.    And when you say "what has been paid,"

4    do you mean out of escrow?

5         A.    Out of everything.

6         Q.    Everything.

7              So based on this document, does it

8    appear that attorneys' fees have been paid?

9              MR. SCHIEL:  Objection.  It calls for

10             speculation.

11             THE WITNESS:  It shows -- it shows

12             something being paid to the attorney, yes.

13   BY MR. FORRESTER:

14        Q.    And which dates are you referring to?

15        A.    7/17.

16        Q.    Is that just transaction description,

17   attorney advance disbursement?

18        A.    Yes.

19        Q.    And what's the amount of that?

20        A.    Several different numbers there.

21        Q.    What is the amount that's been paid?

22        A.    Which one are you referring to?

23        Q.    Oh, I see the confusion.

24             Because there's several attorney

Raymond Crawford

Page 108

1    advances that are listed for the date of July 17th;

2    is that correct?

3           A.     Yes.

4                  MR. SCHIEL:  Misstates the document.

5           The document speaks for itself.

6    BY MR. FORRESTER:

7           Q.     Would these payments be for

8    foreclosure-related expenses?  Let me restate that.

9                  Would foreclosure-related expenses show

10   up on this document?

11          A.     Yes.

12          Q.     Are there any other dates that you see

13   attorneys' fees or attorney's advance listed in this

14   document, besides July 17?

15                 MR. SCHIEL:  Objection, misstates the

16          document.  Richard, you keep saying July 17th,

17          but it doesn't say July 17th.

18                 MR. FORRESTER:  I'm sorry.  You're

19          right.  July of 2017.

20                 MR. SCHIEL:  Objection.  That's not

21          what it says.  Excuse me.  There's multiple.

22          You need to be clear, if you're going to

23          reference attorney advances.

24   BY MR. FORRESTER:

Raymond Crawford

Page 109

1          Q.     Based on this document, are you able to

2     tell me how much CENLAR disbursed for attorneys'

3     fees?

4                    MR. SCHIEL:  Objection, vague as to

5           disbursed.

6                    Are you talking about this document?

7                    MR. FORRESTER:  Yeah.

8                    MR. SCHIEL:  Answer, if you understood.

9                    THE WITNESS:  Could you repeat the

10          question, sir?

11                   MR. FORRESTER:  Can you repeat the

12          question?

13                            *  *  *  *  *

14                   (Whereupon, the requested portion of

15          the testimony was read back by the Court

16          Reporter as follows:

17                   Question.  Based on this document, are

18          you able to tell me how much CENLAR disbursed

19          for attorneys' fees?.)

20                            *  *  *  *  *

21          MR. SCHIEL:  Do you want him to do the

22     math, Richard?

23                   Do you want us to get a calculator out?

24                   MR. FORRESTER:  It's a yes no answer.

Raymond Crawford

Page 110

1          It's a yes no answer.

2                    THE WITNESS:  Do you have a better copy

3          of the loan history?

4     BY MR. FORRESTER:

5          Q.    What's wrong with this copy?

6          A.    Because there's a format; the way it's

7     formatted.

8          Q.    Do you recognize this document as

9     having been produced by CENLAR?

10         A.    I'm not sure, sir.  I don't know if

11    this was produced by CENLAR.  Maybe it was put in

12    this format for you, but I'm not sure.

13         Q.    The next time we take a break I will

14    try to find a document that is in the format that

15    you're talking about that you would like to see.

16                   But for now, why don't we take a look

17    at Exhibit-36?

18                        *  *  *  *  *

19                   (Whereupon, Exhibit-36 was marked for

20         identification.)

21                        *  *  *  *  *

22    BY MR. FORRESTER:

23         Q.    Maybe you can tell me what Exhibit-36

24    is.

Raymond Crawford

Page 111

1              Do you recognize Exhibit-36?

2    A.    Yes.

3    Q.    What is Exhibit-36?

4    A.    Property inspection report.

5    Q.    What's the purpose of this type of

6  document?

7              MR. SCHIEL:  Objection, vague.

8              THE WITNESS:  These are the results

9        from the property inspection.

10 BY MR. FORRESTER:

11   Q.    Let me back up.

12             Did CENLAR order this report to be

13 made?

14   A.    Yes.

15   Q.    Why did CENLAR order this report to be

16 made?

17   A.    To check the occupancy of the property.

18   Q.    Is that the only reason?

19   A.    Yes.  It's a property inspection, yes.

20   Q.    How often did CENLAR order reports to

21 be made like this?

22   A.    It's based on the status of the loan.

23   Q.    And what status does CENLAR order a

24 report like this to be made?

Raymond Crawford

Page 112

1          A.     If the loan is more than 30 days

2     delinquent.

3          Q.     If a loan is more than 30 days

4     delinquent, how often does CENLAR order a report like

5     this to be made?

6          A.     Every month.

7          Q.     And the only reason is to determine

8     occupancy?

9               MR. SCHIEL:  Objection, asked and

10              answered twice.

11              THE WITNESS:  Yes.  It's a property

12              inspection.

13    BY MR. FORRESTER:

14         Q.     When is the last time CENLAR ordered a

15    property inspection report to be made upon Mr.

16    Hochroth's residence at 45-133 Alina Place, Kaneohe,

17    Hawaii?

18         A.     I don't know offhand, sir.

19                    * * * * *

20              (Whereupon, Exhibit-37 was marked for

21              identification.)

22                    * * * * *

23    BY MR. FORRESTER:

24         Q.     Handing you Exhibit-37.

Raymond Crawford

Page 113

1                Do you recognize any of the documents

2    in Exhibit-37?

3         A.    No, sir.

4         Q.    I'd like to point your attention to the

5    third page.

6                Do you see the word Central Loan

7    Administration and Reporting?

8         A.    Yes.

9         Q.    Is that you?

10        A.    That is CENLAR.

11        Q.    Did CENLAR instruct Five Brothers to

12   place documents in the form of page three on the door

13   of Mr. Hochroth?

14        A.    Yes, sir.  It's part of the inspection.

15        Q.    So before you stated the sole reason of

16   the inspection was to determine occupancy.  Now it

17   seems there is an additional purpose.

18                Do you want to clarify your answer?

19                MR. SCHIEL:  Objection, misstates the

20           witness' testimony, I'll finish my objection

21           real quick, as to the stated inconsistency.

22                You can answer.

23                THE WITNESS:  No, sir.  I have nothing

24           to clarify, sir.

Raymond Crawford

Page 114

1    BY MR. FORRESTER:

2         Q.    What measures does CENLAR take to

3    ensure that Five Brothers does not violate

4    homeowners' rights?

5              MR. SCHIEL:  Objection, vague as to

6         homeowners' rights, and asks for a legal

7         conclusion as to violates.

8              MR. FORRESTER:  I'll rephrase.

9    BY MR. FORRESTER:

10        Q.    Does CENLAR do anything to supervise

11   Five Brothers?

12        A.    No, sir.  They are outside vendor.

13   They are completely separate company, sir.

14        Q.    And aside from preparing the report,

15   are they obligated to CENLAR to do anything else?

16             MR. SCHIEL:  Objection, vague as to the

17        scope of the question.

18             THE WITNESS:  We -- they complete the

19        assignments that we provide to them that we

20        ask them to do.

21   BY MR. FORRESTER:

22        Q.    And what do you ask them to do?

23        A.    Inspection, preserve a property.

24        Q.    What's involved in an inspection?

Raymond Crawford

Page 115

1        A.      Going out to the property to check on

2   the occupancy of the property.

3        Q.      Are they instructed to leave documents

4   at the residence?

5        A.      Yes, sir.

6        Q.      What types of documents?

7        A.      Confidential document.

8        Q.      What do you mean by confidential

9   document?

10               What's inside of a confidential

11   document?

12       A.      It's a document that is for the

13   homeowner.  The homeowner would know what's inside

14   the document.

15       Q.      Are they instructed to make contact

16   with the resident?

17       A.      If contact is made, someone makes

18   contact -- contact with them, then yes, they identify

19   themselves.

20       Q.      That's not what I asked.

21               I asked if CENLAR instructed Five

22   Brothers to make contact with the resident?

23       A.      No, sir.  We do not instruct them to

24   make contact.  But if you knock on someone's door and

Raymond Crawford

Page 116

1    the person makes contact with you, then contact is

2    made.

3         Q.    So they're instructed to knock on the

4    door?

5         A.    To -- to leave the notice, yes, sir.

6         Q.    Are the notices provided to Five

7    Brothers to leave?

8         A.    Yes.

9         Q.    What types of documents would be left

10   by Five Brothers?

11        A.    Confidential document, like, the

12   exhibit you just presented me.

13        Q.    Can you be more specific?

14              Are you talking about loan statements?

15              Are you talking about fliers?

16              What types of confidential documents?

17        A.    Confidential document that you just

18   provided me, sir, would be something like this.

19        Q.    Are you talking about documents that

20   are, quote, unquote, confidential, or are you talking

21   about documents that state confidential on them?

22        A.    I'm stating that the document you

23   presented to me, that's what I'm referring to.

24        Q.    What types of documents would be left

Raymond Crawford

Page 117

1    there?

2                MR. SCHIEL:  Objection, asked and

3           answered, argumentative.  The witness has

4           already testified that the documents in

5           Exhibit-37 are the types of documents.

6    BY MR. FORRESTER:

7           Q.    What is the most recent report that's

8    been prepared by Five Brothers?

9                MR. SCHIEL:  Objection, asked and

10          answered.

11               THE WITNESS:  I don't have offhand

12          what's the most recent, sir.

13   BY MR. FORRESTER:

14          Q.    Have they prepared a document within

15   the last year?

16          A.    I don't know offhand if we have the

17   different inspection that was provided.  If you want

18   to go through the time frame, then we can do that,

19   but I don't know offhand.

20                          * * * * *

21               (Whereupon, Exhibit-38 was marked for

22          identification.)

23                          * * * * *

24   BY MR. FORRESTER:

Raymond Crawford

Page 118

1          Q.     I'm handing you Exhibit-38.

2                 Do you recognize Exhibit-38?

3          A.     Yes, sir.

4          Q.     What is Exhibit-38?

5          A.     A Mortgage Loan History.

6          Q.     Is this the document you were referring

7     to when I asked if you could tell me what the

8     breakdown of the fees were on the regular monthly

9     statement?

10         A.     It could be part of it, yes, sir.

11         Q.     So can you tell me how much of the fees

12    that were listed on Mr. Hochroth's monthly statements

13    were for attorneys' fees?

14                MR. SCHIEL:  Objection, vague.  I don't

15         know if he understood the question.

16                THE WITNESS:  This is just for one

17         year, sir.  This is just one year time frame.

18    BY MR. FORRESTER:

19         Q.     So can you tell me how much?

20         A.     How much what?

21         Q.     Attorneys' fees were paid out of Mr.

22    Hochroth's account for just 2017, then.

23                MR. SCHIEL:  Objection, foundation as

24         to paid out of Hochroth's account.

Raymond Crawford

Page 119

1                 THE WITNESS:  I think these are missing

2         some pages.  You have 4/15, 6 of '15, 8 of

3         '15, 10 of '15, 12, 14.

4    BY MR. FORRESTER:

5         Q.    I'd like you to read the Bates stamp

6    numbers on the bottom of the pages in order.  Out

7    loud, please.

8         A.    Okay.  It's 54 through 61.

9         Q.    Are there any gaps in those pages?

10        A.    What do you mean are there any gaps?

11        Q.    You said 54 through 61.

12                Are any pages missing?

13                Judging by the Bates stamp, is there

14   any page missing?

15        A.    No.

16        Q.    So yes or no, are you able to tell me

17   from this document how much money in attorneys' fees

18   were paid out of Mr. Hochroth's account?

19                MR. SCHIEL:  The same objection as to

20        vague, and foundation as to use of the words

21        paid out of Hochroth's account.

22                THE WITNESS:  Based on these documents,

23        the advance balance was at $13,302.11.

24                MR. FORRESTER:  Thank you.

Raymond Crawford

Page 120

1              Can we go off the record for a second?

2                    * * * * *

3              (Whereupon, a discussion was held off

4        the record.)

5                    * * * * *

6              MR. FORRESTER:  We can go back on.

7    BY MR. FORRESTER:

8        Q.    I'd like to turn your attention back to

9    Exhibit-13.  I'd like to turn your attention to the

10   conversation with Lan, which starts on page 79.  You

11   stated before that you were familiar with the

12   contents of this exhibit.

13             Are you familiar with the conversation

14   that starts on page 79 between Ms. Lan and Mr.

15   Hochroth?

16       A.    I see it in the notes, sir.  That's

17   from the transcript I recall it.

18       Q.    In your words, what does this

19   conversation represent?

20             MR. SCHIEL:  Objection, vague,

21        speculation.

22             MR. FORRESTER:  I'll rephrase.

23   BY MR. FORRESTER:

24       Q.    Let's turn to page 81, line six through

Raymond Crawford

Page 121

1    seven.  So this is Mr. Hochroth.  He states:  I'm

2    just trying to verify is it the 113, is it the 114,

3    or is it a different amount.  That's the reason for

4    the call.

5                    Do you see that?

6         A.     Yes.

7         Q.     And I would like to point your

8    attention to lines ten through 11 where Mrs. Lan says

9    that the reinstatement, it would be referred to from

10   the attorney's office, and I'm showing that's The

11   Mortgage Law Firm.

12                   Do you see that?

13        A.     Yes.

14        Q.     Was The Mortgage Law Firm CENLAR's

15   attorney at the time of this conversation?

16        A.     Yes.  That's the information that Mrs.

17   Lan provided.

18        Q.     I'd like to point your attention to the

19   end of the conversation.  This is a question I had

20   where Ms. Lan asked Mr. Hochroth what the reason for

21   his default is.  Now, this is just a question in

22   general.

23                   Is this part of the training of these

24   people?  Because I have noticed that every single

Raymond Crawford

Page 122

1    representative asked Mr. Hochroth the same question

2    and he had answered it several times.

3              Is that something that the

4    representatives are told to ask?

5         A.    Yes.

6         Q.    Do the representatives have a record of

7    previous phone conversations to refer to when talking

8    to a borrower?

9         A.    Yes.  It's within the notes.

10        Q.    Are they instructed to ask this

11   question, even if there's already an answer on the

12   record?

13        A.    Things change so you have to ask this

14   question.

15        Q.    Is there a reason you didn't provide

16   the records that the telephone operators refer to and

17   can see when they're speaking to a borrower?

18             MR. SCHIEL:  Objection, vague.

19             THE WITNESS:  I believe the servicing

20        notes were provided, sir.

21   BY MR. FORRESTER:

22        Q.    So it's in a document called servicing

23   notes; is that correct?

24        A.    Yes.  It would be the servicing notes.

Raymond Crawford

Page 123

1          Q.     Do the operators have access to any

2    other information, besides the servicing notes, when

3    speaking to a borrower?

4          A.     It depends on what department they're

5    working in, what information they're looking for.

6          Q.     Well, what department does Miss Lan

7    work in?

8          A.     As previously stated, I cannot answer

9    that question from this document.  From the servicing

10   notes I can answer the question.

11         Q.     Do you have any idea why the operators

12   that talked with Mr. Hochroth would consistently

13   inform him that he was able to reinstate his

14   mortgage, while at the same time the attorneys that

15   you hired would refuse to allow him to reinstate?

16              MR. SCHIEL:  Objection, speculation.

17              THE WITNESS:  My understanding is still

18         I refer the contact or reinstatement was go

19         through the law firm, refer the contact to law

20         firm.

21   BY MR. FORRESTER:

22         Q.     So that's a no?

23              MR. SCHIEL:  Objection.  Mr. Forrester,

24         it's not your position to provide running

Raymond Crawford

Page 124

 1          commentary of what you think the witness said.

 2                MR. FORRESTER:  Speaking objections,

 3          please.

 4                MR. SCHIEL:  No.  You need to stop

 5          throwing answers in for the witness.  When the

 6          witness answers them, you can stop trying to

 7          paraphrase in your own words what you think

 8          the witness said.

 9                MR. FORRESTER:  So in addition to the

10          time that you have cut off of the beginning of

11          this deposition, you've cut into abut

12          15 minutes more with testifying yourself.

13                MR. SCHIEL:  If you'd stop making

14          running commentaries after the witness

15          provides answers, I wouldn't have to do that.

16    BY MR. FORRESTER:

17          Q.    Let's take a look at the conversation

18    that begins on page 64.

19                Do you recognize the conversation that

20    begins on page 64?

21          A.    I see that in the document presented,

22    sir.

23          Q.    Other than what you see in front of you

24    right now, are you familiar with any of the contents

Raymond Crawford

Page 125

1    of the conversation that begins on page 64?

2         A.    Other than what in front of me, no.  I

3    did not listen to the call.

4         Q.    Was Mr. Hochroth able to apply for a

5    loan modification or reinstate his mortgage at the

6    time of this conversation?

7              MR. SCHIEL:  Objection, vague,

8         foundation, calls for speculation.

9              THE WITNESS:  Generally speaking, if he

10        was to send in a package for a loan

11        modification, then it would be reviewed.

12   BY MR. FORRESTER:

13        Q.    What is the date that this

14   communication occurred?

15             MR. SCHIEL:  Objection.  The document

16        speaks for itself for when it occurred.

17             THE WITNESS:  Which conversation, sir?

18   BY MR. FORRESTER:

19        Q.    The conversation that begins on

20   page 64.

21        A.    I don't know.  I don't see any page --

22   any date on page 64.

23             MR. SCHIEL:  I'll help you along.  I

24        think it's on page 78.

Raymond Crawford

Page 126

1            MR. FORRESTER:  I'm not asking you to

2       testify.

3            MR. SCHIEL:  If you want to ask

4       questions like that, we could be here all day.

5       It's ridiculous.

6  BY MR. FORRESTER:

7       Q.    Could you turn to the previous

8  conversation that begins on page 53?

9            Are you familiar with the contents of

10 the conversation that begins on page 53?

11      A.    The same answer, sir.  I did not listen

12 to the recording or transcript for this document.

13      Q.    I'd like you to turn to page 57.  Look

14 at lines 18 through 20 and let me know when you're

15 done.

16            Who was the attorney for CENLAR at the

17 time of this conversation?

18      A.    At this time, the representative

19 advised The Mortgage Law Firm.

20      Q.    I'd like you to turn to page 36.

21 Sorry, page three.

22      A.    You said page three?

23      Q.    Yes, page three.

24            Are you familiar with the contents of

Raymond Crawford

Page 127

1    the conversation that begins at page three?

2         A.    As previously answered, sir, I did not

3    listen to the recording for this transcript document.

4         Q.    I'd like to turn your attention to page

5    six, line 18.  Mr. Johnson says:  I do have a FAX

6    from you indicating to remove the cease and desist

7    and for us to communicate directly with you in

8    regards to that.

9              Is there -- well, first of all, what

10   was Mr. Johnson referring to when he said a cease and

11   desist?

12              MR. SCHIEL:  Objection, speculation as

13        to another person's words.

14              THE WITNESS:  Yeah.  I can't really

15        speak on what Mr. Johnson was referring to,

16        sir.

17   BY MR. FORRESTER:

18        Q.    Do you know what he was referring to

19   when he said a FAX?

20              Do you know what FAX he's talking

21   about?

22        A.    Where?

23        Q.    On line 18.  I just read it.

24              MR. SCHIEL:  Same objection,

Raymond Crawford

Page 128

1          speculating as to Mr. Johnson's words.

2                  Only if you know what Mr. Johnson was

3          thinking when he said those words.

4                  THE WITNESS:  No.  I do not.

5   BY MR. FORRESTER:

6          Q.    I'd like to turn your attention to page

7   seven, line 18.  The first line from Mr. Johnson

8   says:  In order for us to hold any foreclosure

9   proceedings, we need to have a workout in progress?

10                 Do you know what Mr. Johnson is

11  referring to when he states a workout?

12                 MR. SCHIEL:  Same objection,

13         speculation as to what Mr. Johnson's intent

14         was when he spoke these words.

15                 Only if you know what he was thinking.

16                 THE WITNESS:  Generally speaking, a

17         workout is a loan workout.

18  BY MR. FORRESTER:

19         Q.    What's a loan workout?

20         A.    Discussing loss mitigation and

21  different options.

22         Q.    What kinds of options are those?

23         A.    Loan modification, short sale, deed in

24  lieu.

Raymond Crawford

Page 129

 1          Q.     Is reinstatement one of those options,

 2   as well?

 3          A.     It could be.

 4          Q.     Are loss mitigation options available

 5   to borrowers claiming fraud?

 6                 MR. SCHIEL:  Objection, speculation,

 7          foundation, asks for a legal conclusion.

 8                 THE WITNESS:  Those are two separate

 9          things, sir.

10   BY MR. FORRESTER:

11          Q.     Does CENLAR have any policy about

12   offering loss mitigation to borrowers who are

13   alleging fraud?

14          A.     If somebody is claiming fraud, it would

15   be provided to look into.  If they have supporting

16   documents, they can send that in.

17                 As far as loss mitigation, that's a

18   separate department.

19          Q.     So just because somebody's claiming

20   fraud doesn't mean they can't also apply for a loan

21   modification, is that what you're saying?

22                 MR. SCHIEL:  Objection, asked and

23          answered.

24                 THE WITNESS:  I'm saying it's two

Raymond Crawford

Page 130

1           different departments, sir, that would do two

2           completely different things.

3    BY MR. FORRESTER:

4           Q.      Is there anything that would disqualify

5    somebody from having loss mitigation options?

6           A.      That would be determined when they

7    apply for the loss mitigation option.

8           Q.      So when they apply, are there any

9    certain situations, or circumstances, or facts that

10   would preclude someone from having loss mitigation

11   options provided to them?

12          A.      Based on the financial information

13   provided, they could qualify, not qualify, the same

14   way as applying for a loan.  You could qualify or not

15   qualify.

16          Q.      Is that strictly financial information,

17   or is there other considerations, besides financial

18   considerations?

19          A.      Strictly on what is provided in a

20   financial package.  Each situation is different.

21          Q.      Do you know why Mr. Johnson would

22   provide Mr. Hochroth with a loan modification

23   application while his -- while your attorneys are

24   claiming that he's not allowed to reinstate his

Raymond Crawford

Page 131

1    mortgage?

2                    MR. SCHIEL:  Objection, speculation as

3            to Mr. Johnson's intent.

4                    Only if you know what Mr. Johnson was

5            intending.

6                    THE WITNESS:  No.  I don't know Mr.

7            Johnson's intentions, sir.

8    BY MR. FORRESTER:

9            Q.    Does CENLAR have any policy in place to

10   keep track of what positions its attorneys are taking

11   in foreclosure cases?

12                   MR. SCHIEL:  Objection, vague.  And

13           also, attorney/client to the extent that it's

14           asking for any privileged information.

15                   THE WITNESS:  The attorney would

16           discuss any issue or concern with CENLAR.

17   BY MR. FORRESTER:

18           Q.    So there is a way for an attorney to

19   inform CENLAR not to offer mortgage assistance?

20                   MR. SCHIEL:  Objection, vague.

21                   Only if you understood the question.

22                   THE WITNESS:  No.  I don't understand

23           the question, sir.  And it is not the attorney

24           -- the attorney is not advising us not to do

Raymond Crawford

Page 132

1          things.  The attorney would present any kind

2          of issue or concern for CENLAR.

3    BY MR. FORRESTER:

4          Q.    Because CENLAR is the party that can --

5    is in control of the law firm, right, not the other

6    way around?

7          A.    The law firm is working for CENLAR,

8    right.

9          Q.    And what happens if a law firm takes a

10   position that is contrary to CENLAR's policies?

11              MR. SCHIEL:  Objection, vague.

12              THE WITNESS:  I don't know, sir.  I

13         haven't seen that -- an issue of concern would

14         be raised with CENLAR and CENLAR would discuss

15         -- they will make a decision or discuss the

16         decision with --

17   BY MR. FORRESTER:

18         Q.    Well, that happened here.  Every single

19   one of these representatives --

20         A.    Sir -- sir -- sir, I was not done.

21         Q.    Go ahead.

22         A.    Any issue would be discussed with

23   CENLAR and CENLAR would discuss it with the necessary

24   party that is involved and then advise the attorney

Raymond Crawford

Page 133

1    how to proceed.

2         Q.    Did CENLAR advice its attorneys on how

3    to proceed in this matter at the time of Mr.

4    Hochroth's reinstatement around the end of 2017,

5    beginning of 2018?

6         A.    There was issue that were discussed

7    with CENLAR at that time that -- that information

8    would be passed to the law firm.

9         Q.    If it exists, it exists.  Okay.

10             MR. SCHIEL:  Objection, argumentative.

11             I'd like to note for the record that

12        Mr. Forrester is now mocking the witness'

13        testimony.

14   BY MR. FORRESTER:

15        Q.    Every single representative that Mr.

16   Hochroth talked to told him that he was able to

17   reinstate his mortgage; is that correct?

18             MR. SCHIEL:  Objection, vague,

19        foundation.

20             THE WITNESS:  Can I answer that, sir,

21        with all the appropriate documents and seeing

22        the notes on every conversation?

23   BY MR. FORRESTER:

24        Q.    Do you have any reason to believe that

Raymond Crawford

Page 134

1    any representative from CENLAR ever told Mr. Hochroth

2    that he was not allowed to reinstate his mortgage?

3              MR. SCHIEL:  Objection, vague as to the

4         word representative of CENLAR.

5              Only if you understood that phrase.

6              THE WITNESS:  No, sir.  Any

7         representative will advise the homeowner to

8         contact the law firm for any reinstatement.

9              MR. FORRESTER:  We can take five

10        minutes and go off the record.

11                   *  *  *  *  *

12        (Whereupon, a brief recess was taken.)

13                   *  *  *  *  *

14             MR. FORRESTER:  We can go on.

15             THE WITNESS:  Before we proceed, I just

16        wanted to clarify something about the law

17        firm.

18             MR. FORRESTER:  I'm going to object.

19             MR. SCHIEL:  No.  You can't object.  He

20        can clarify his testimony, Richard, you know

21        that.  You can't object.  That's ridiculous.

22             MR. FORRESTER:  I'd like to note we

23        were on break for ten minutes and the deponent

24        has been speaking with his attorneys.

Raymond Crawford

Page 135

1              But go ahead.  Make whatever

2        clarification you like.

3              THE WITNESS:  I just want to clarify

4        that in the notes that has The Mortgage Law

5        Firm, at that time the law firm that was

6        handling the file for CENLAR was KSG.  But the

7        assistant at that time was reflecting The

8        Mortgage Law Firm as the representative

9        advised.

10  BY MR. FORRESTER:

11        Q.    Do you know why they would state The

12  Mortgage Law Firm was the attorney?

13        A.    Because that was the name that was the

14  law firm that was still within the system at that

15  time that the representative was looking at.

16        Q.    Do you know why The Mortgage Law Firm

17  was still in the system after they were no longer

18  attorneys?

19        A.    Because the system had not been updated

20  yet with the new attorney law firm.

21        Q.    What causes that system to be updated?

22              MR. SCHIEL:  Objection, foundation,

23        unless he's the tech guy for CENLAR.

24              THE WITNESS:  CENLAR has to -- once the

Raymond Crawford

Page 136

1          department is not handling the file, it has to

2          update the law firm information.  And during

3          this conversation, that had not been done.

4   BY MR. FORRESTER:

5          Q.    Mr. Hochroth corrected CENLAR's

6   representatives on a number of occasions.

7                Is there any reason why they wouldn't

8   be able to update the record themselves after talking

9   to Mr. Hochroth?

10               MR. SCHIEL:  Objection, speculation as

11         to what other people were capable of doing.

12               Only if you know.

13               THE WITNESS:  The information of

14         updated law firm record would not come from

15         the homeowner.  That would be the law firm

16         that CENLAR is working with.  CENLAR would

17         update that record, not from the homeowner.

18   BY MR. FORRESTER:

19         Q.    Does the representative have the

20   ability to update that information?

21         A.    If -- if they have the correct updated

22   information, yes, one representative can be updated.

23         Q.    And what process does CENLAR employ to

24   ensure that those changes are employed?

Raymond Crawford

Page 137

1         A.      Process, if there's a change in a law

2    firm, it's updated.

3         Q.      Do you know why it was not updated in

4    Mr. Hochroth's account?

5                 MR. SCHIEL:  Objection, asked and

6         answered, argumentative.

7                 THE WITNESS:  At that moment, no.  I do

8         not know, sir, why it was not updated at that

9         time.

10   BY MR. FORRESTER:

11        Q.      But, typically, it would be?

12                MR. SCHIEL:  Objection as to the

13        rhetorical question.

14                Do you want to ask questions?

15                THE WITNESS:  The process is to update.

16        But also, within litigation, law firm can

17        change, so there may be some delay within that

18        process.

19   BY MR. FORRESTER:

20        Q.      And how much delay?

21        A.      I don't know, sir.

22        Q.      When a borrower is put on hold for a

23   representative to make a phone call to a law firm, is

24   the borrower able to hear the conversation that the

Raymond Crawford

Page 138

1    representative makes with the law firm?

2                    MR. SCHIEL:  Objection, speculation.

3                    THE WITNESS:  I have never been on

4           hold, but I would think not, sir, unless it's

5           a three-way call.

6    BY MR. FORRESTER:

7           Q.     Are you familiar with the recording

8    system that CENLAR uses to record the phone calls?

9           A.     It's part of the servicing platform.

10          Q.     Have you ever listened to phone calls

11   before?

12          A.     Not for many, many years now.  I mean,

13   I have listened to phone calls in other cases before,

14   yes.

15          Q.     Is there any reason why you didn't

16   listen to the recordings in this case before the

17   deposition today?

18          A.     No, sir.  I went through the notes.

19          Q.     What does a borrower hear when the

20   borrower is placed on hold?

21                  MR. SCHIEL:  Objection, speculation.

22                  THE WITNESS:  I have no idea.

23   BY MR. FORRESTER:

24          Q.     Well, is it music that plays or is it

Raymond Crawford

Page 139

1    silence?

2              MR. SCHIEL:  Objection, speculation,

3         argumentative.

4              THE WITNESS:  I have no idea.

5    BY MR. FORRESTER:

6         Q.    When did CENLAR replace The Mortgage

7    Law Firm with KSG?

8              MR. SCHIEL:  Objection, speculation.

9         The foreclosure record speaks for itself.

10             Only if you know the precise date.

11             THE WITNESS:  No.  I do not know the

12        precise date.

13   BY MR. FORRESTER:

14        Q.    Do you know the year?

15             MR. SCHIEL:  Same objection.

16             THE WITNESS:  The same thing, sir.

17        Once the file was being handled by the Legal

18        Department, probably would be -- the corporate

19        legal would probably be around that time

20        frame.

21   BY MR. FORRESTER:

22        Q.    So when an attorney that is being --

23   that has been hired by CENLAR to do a foreclosure

24   wants to communicate a message to CENLAR, how is that

Raymond Crawford

Page 140

1    recorded?

2              MR. SCHIEL:  Objection, vague.  Also,

3         objection as to attorney/client privilege.

4         I'm instructing the witness not to answer to

5         the extent you'd be disclosing any

6         attorney/client privileged communications.

7              MR. FORRESTER:  I'm just asking how

8         it's communicated, not what the communication

9         is.

10   BY MR. FORRESTER:

11        Q.    Is it in writing?

12              Is it verbally?

13              MR. SCHIEL:  Objection, vague.

14         Only if you know how it's reported in

15         every single instance.

16              THE WITNESS:  Not every single

17         instance.  Some could be a phone conversation.

18         Some could be sent through the mortgage

19         servicing system.  It all depends on what it

20         is, is there a record of foreclosure, is there

21         a litigation.  It depends on what it's for.

22   BY MR. FORRESTER:

23        Q.    Does CENLAR send statements to

24   borrowers that are in foreclosure?

Raymond Crawford

Page 141

1        A.     I believe that varies by state

2    requirement or so.  I'm not sure on that.  I'm not

3    sure at what point it stops.

4                MR. FORRESTER:  Can you read that back?

5                      * * * * *

6                (Whereupon, the requested portion of

7           the testimony was read back by the Court

8           Reporter as follows:

9                Question.  Does CENLAR send statements

10          to borrowers that are in foreclosure?

11               Answer.  I believe that varies by state

12          requirement or so.  I'm not sure on that.  I'm

13          not sure at what point it stops.)

14                     * * * * *

15   BY MR. FORRESTER:

16       Q.     Can we talk about Hawaii, specifically?

17               Are you aware of whether or not CENLAR

18   sends the regular servicing statements to borrowers

19   that are in foreclosure?

20       A.     I'm not an attorney.  I don't know the

21   Hawaii requirements, sir.

22       Q.     I'm not asking if you know the

23   requirements of Hawaii.  I'm just asking if CENLAR

24   sends statements to borrowers in foreclosure.

Raymond Crawford

Page 142

1              MR. SCHIEL:  Objection.  The record

2         speaks for itself.

3   BY MR. FORRESTER:

4         Q.    Go ahead and answer.

5              MR. SCHIEL:  Asked and answered.

6              THE WITNESS:  I don't know the

7         requirement for Hawaii, sir.

8   BY MR. FORRESTER:

9         Q.    So you don't know if CENLAR was

10  supposed to send statements to Mr. Hochroth?

11             MR. SCHIEL:  Objection, asked and

12        answered, argumentative.

13             THE WITNESS:  Sir, I stated I do not

14        know, offhand, the requirements for Hawaii.

15  BY MR. FORRESTER:

16        Q.    Do you know why a representative would

17  tell Mr. Hochroth that it was unusual that he was

18  receiving his servicing statements because CENLAR

19  usually doesn't send them out to borrowers in

20  foreclosure?

21             MR. SCHIEL:  Objection, foundation,

22        speculation.

23             Only if you know who he's talking about

24        and what was in his head when he spoke.

Raymond Crawford

Page 143

1                  THE WITNESS:  Nope.  I can't answer

2        that question, sir.

3    BY MR. FORRESTER:

4        Q.    Does CENLAR ever accept reinstatement

5    payments directly?

6        A.    I'm not sure what you mean by accept

7    reinstatement directly.

8                  MR. FORRESTER:  You can read back the

9        question.

10                 THE WITNESS:  I heard the question.  I

11       just don't understand the question.

12                 MR. FORRESTER:  Can you read it back?

13       I don't want to explain it.

14                       * * * * *

15                 (Whereupon, the requested portion of

16       the testimony was read back by the Court

17       Reporter as follows:

18                 Question.  Does CENLAR ever accept

19       reinstatement payments directly?.)

20                       * * * * *

21    BY MR. FORRESTER:

22       Q.    What, specifically, about that question

23    is confusing?

24       A.    Everything.

Raymond Crawford

Page 144

1        Q.     Okay.

2               Do you understand what a reinstatement

3    payment is?

4               MR. SCHIEL:  Objection, asked and

5          answered about four times in earlier

6          testimony.

7               THE WITNESS:  Yes.

8    BY MR. FORRESTER:

9        Q.     Do you understand what the word

10   directly means?

11       A.     Yes.

12       Q.     Do you understand what the word accept

13   means?

14       A.     Sir, if you can reword the question, I

15   can answer your questions.  I'm not going to answer

16   the question I do not understand.

17               MR. SCHIEL:  The specific instruction

18         you gave him, Richard, is that if he doesn't

19         understand a question, you will rephrase it.

20               MR. FORRESTER:  Please.  I'm trying to

21         get to the bottom of the confusion here.

22   BY MR. FORRESTER:

23       Q.     I asked is there -- does CENLAR accept

24   reinstatement payments directly.  That was my

Raymond Crawford

Page 145

1    question.  You stated everything in that question is

2    confusing.  But you know what a reinstatement payment

3    is.  You know what directly means.  You know what

4    accept means.

5              So I'm just trying to understand how

6    you're confused about the question.  It's a very

7    simple question.

8              Does CENLAR accept reinstatement

9    payments from borrowers?

10         A.    Yes.

11                        * * * * *

12             (Whereupon, Exhibit-39 was marked for

13         identification.)

14                        * * * * *

15   BY MR. FORRESTER:

16         Q.    I'm handing you now what I'd like

17   marked as Exhibit-39.

18             Does CENLAR have a copy of Exhibit-39

19   in its records?

20         A.    I'm not sure, sir.

21         Q.    Are you familiar with the contents of

22   Exhibit-39?

23         A.    No, sir.

24         Q.    Are you aware of any complaints to the

Raymond Crawford

Page 146

1    Office of Disciplinary Counsel made against your

2    counsel of record, KSG, related to the underlying

3    foreclosure case?

4              MR. SCHIEL:  Objection.  This is so out

5         of bounds, Richard.  For one, there are none,

6         except for you.

7              Secondly, it's irrelevant and I'm

8         instructing him not to answer.  This is

9         ridiculous.  You want to show how it's

10        relevant to your Complaint and move a Motion

11        to Compel, then go ahead.  This is stupid.

12   BY MR. FORRESTER:

13        Q.   I'd like you to take a second and read

14   Exhibit-39 and let know when you're done.

15        A.   You want me to sit here and read this

16   entire document?

17        Q.   Please.

18             Do you have any reason to dispute any

19   of the representations made in Exhibit-39?

20             MR. SCHIEL:  Objection, vague,

21        foundation.

22             Only if you understood the question.

23             THE WITNESS:  I don't understand that

24        question.  I read the document, sir, but I

Raymond Crawford

Page 147

1           don't understand what is being stated in the

2           document.

3     BY MR. FORRESTER:

4           Q.    Is a quote, sale date, something that

5     is significant to CENLAR?

6                 MR. SCHIEL:  Objection, vague,

7           foundation.

8                 THE WITNESS:  A what?

9     BY MR. FORRESTER:

10          Q.    A sale date.

11                Have you ever heard of a sale date?

12          A.    Yes.

13          Q.    Is that significant for any reason?

14                MR. SCHIEL:  Objection, foundation.

15                THE WITNESS:  If there's a sale date

16          coming up.

17    BY MR. FORRESTER:

18          Q.    Is that significant for the borrower,

19    in any way, as far as what CENLAR can do for them?

20                MR. SCHIEL:  Objection, vague.

21                Only if you understand what

22          circumstance he's talking about.

23                THE WITNESS:  It could, at times, if

24          there's a sale date coming up.

Raymond Crawford

Page 148

1    BY MR. FORRESTER:

2         Q.    Like, what could change?

3         A.    There might not -- depending on what

4    the homeowner is looking to do.

5         Q.    They might not be available after the

6    sale date; is that correct?

7         A.    I mean --

8              MR. SCHIEL:  Objection, vague,

9         speculation.

10             THE WITNESS:  It's a general question,

11        sir.  I can only speculate, so . . .

12   BY MR. FORRESTER:

13        Q.    Was the sale date significant in Mr.

14   Hochroth's case?

15             MR. SCHIEL:  Objection, assumes facts

16        not in evidence.  There's nothing about a sale

17        date that I have seen.

18             Only if you know what he's talking

19        about.

20             THE WITNESS:  No, sir.  Generally

21        speaking, if a foreclosure sale date is set,

22        it may limit your options, if you called in a

23        day before the sale.

24   BY MR. FORRESTER:

Raymond Crawford

Page 149

1        Q.      What kind of options would be affected

2    by a sale date?

3                MR. SCHIEL:  Objection, vague,

4         speculation.

5                THE WITNESS:  It could be loss

6         mitigation, not enough time to complete a loss

7         mitigation.

8    BY MR. FORRESTER:

9        Q.      Would that loss mitigation include

10   reinstatement?

11       A.      Loss mitigation could include any kind

12   of workout.

13       Q.      How many recordings of phone

14   conversations did you provide --

15                MR. SCHIEL:  Objection.  The document

16        production speaks for itself.

17                Only if you know off the top of your

18        head.

19                THE WITNESS:  No.  I don't know how

20        many was provided to you, sir.

21   BY MR. FORRESTER:

22       Q.      How many phone conversations did you

23   review preparing for this deposition?

24       A.      I previously stated I did not listen to

Raymond Crawford

Page 150

1    the phone conversation.  I went through the notes.

2            Q.     Right.

3                   So for how many phone conversations did

4    you review notes?

5                   MR. SCHIEL:  Objection, speculation.

6                   Only if you remember exactly how many

7            phone conversations were in the servicing

8            records.

9                   THE WITNESS:  No.  Every phone

10           conversation is a call.  I don't recall how

11           many.

12   BY MR. FORRESTER:

13           Q.     Is there any reason that a phone call

14   would be made and there would not be a recording of

15   it?

16           A.     The recording says some call may or may

17   not be recorded.  I'm not sure if every call is

18   recorded.

19           Q.     You're not sure?

20                  What's the name of the document that

21   you reviewed that has the notes of the phone

22   conversations?

23                  MR. SCHIEL:  Objection, vague.

24                  Only if you know this document.

Raymond Crawford

Page 151

1              THE WITNESS:  Referring to the

2         servicing notes.

3    BY MR. FORRESTER:

4         Q.    Is that the name -- is there a title on

5    the document called servicing notes?

6         A.    The one I reviewed, yes, sir.

7              MR. FORRESTER:  I'd like to note a few

8         things for the record.  It's after 5:00.  We

9         were prepared to go from nine to five, which

10        would have covered the seven hours, plus an

11        hour for break.  I have a fair amount of work

12        to do, more than a fair amount of work to do,

13        to prepare for tomorrow's deposition.  I have

14        more questions for CENLAR that I'm not able to

15        ask.

16             MR. SCHIEL:  Are you done?

17             MR. FORRESTER:  No, I'm not.

18             MR. SCHIEL:  Once you're done, let me

19        know because I'll respond.

20             MR. FORRESTER:  I'm sure you will.

21             We have had several communications

22        regarding the scheduling of this deposition,

23        and the threats that were made against me if I

24        did not show up ready to do this deposition at

Raymond Crawford

Page 152

1     9:00, and Ally Bank's deposition tomorrow at

2     9:00 where fees and costs.

3          And I'd like to ask CENLAR if there's

4     any reason why CENLAR would not be available

5     to continue this deposition by telephone at a

6     later date?

7          MR. SCHIEL:  Objection, asks for

8     attorney/client communicates on this, unless

9     you know what your foreclosure counsel would

10    respond to that with.

11         THE WITNESS:  Oh, I don't know, sir.  I

12    didn't know that was a question for me.  I

13    thought you was putting something on the

14    record.

15         MR. SCHIEL:  You said you were just

16    going to go on the record.

17         MR. FORRESTER:  No.  I'm done.

18         MR. SCHIEL:  Okay.

19         I'm going to note for the record this

20    is the third time I have noted this.  The

21    witness' flight was cancelled this morning

22    coming from Charlotte, North Carolina --

23         THE WITNESS:  Last night it was

24    cancelled.

Raymond Crawford

Page 153

1          MR. SCHIEL:  So he had to reschedule

2     the flight, arrived here at 11:30 into

3     Philadelphia.  The deposition started sometime

4     between 12:15 and 12:30.  We immediately

5     offered, both prior to, before and during this

6     deposition, all of us, myself, the witness,

7     the court reporter, to stay here until seven

8     or eight to allow Mr. Forrester the full seven

9     hours, and Mr. Forrester refused each time,

10    except for the first time when he indicated a

11    willingness to proceed until seven or eight.

12    It's his own choice, if he wants to terminate

13    the deposition at five.

14          I'll also note that we're here in

15    Philadelphia based on the law that requires

16    taking 30(b)(6) depositions at the principle

17    place of business of the witness.  And I'll

18    also note that we're here based on the Notices

19    of Deposition that Mr. Forrester served on our

20    office.

21          MR. FORRESTER:  I'll make one final

22    note for the record, and that's that I have to

23    get my assistant home to Villanova before it

24    gets too much darker outside.

Raymond Crawford

Page 154

1          MR. SCHIEL:  I'll note for the record

2     that it's pitch black and dark outside right

3     now.

4          MR. FORRESTER:  We go can off.

5

6                    * * * * *

7

8          (Whereupon, the deposition was

9     adjourned at 5:04 p.m. and Raymond Crawford

10    was excused.)

11

12                   * * * * *

13

14

15

16

17

18

19

20

21

22

23

24

Raymond Crawford

Page 155

1                    C E R T I F I C A T I O N

2

3          I hereby certify that the proceedings and

4     evidence noted are contained fully and accurately in

5     the stenographic notes taken by me upon the foregoing

6     matter on Thursday, November 7, 2019, and that this

7     is a correct transcript of the testimony given by the

8     witness of the same.

9

10

11     _____

       Susan L. Singlar
12     Registered Professional Reporter
       and Notary Public
13     My Commission Expires:
       November 20, 2022
14

15

16     (The foregoing certification of this transcript

17     does not apply to any reproduction of the same by any

18     means, unless under the direct control and/or

19     supervision of the certifying reporter.)

20

21

22

23

24

Raymond Crawford

Page 156

| A | | | | |
|---|---|---|---|---|
| **a.m** 11:19 | 41:1 42:5 | 59:18,19 98:14 | 123:10 126:11 | 129:20 130:7,8 |
| **ability** 37:10 | **addition** 124:9 | 152:1 | 133:20 140:4 | 155:17 |
| 136:20 | **additional** | **ambiguous** 14:7 | 141:11 142:4 | **applying** 130:14 |
| **able** 11:1,13,21 | 113:17 | 14:20 20:23 | 143:1 144:15 | **appropriate** |
| 18:9,20 19:2,5 | **addresses** 58:13 | 21:12 22:22 | 144:15 146:8 | 133:21 |
| 19:8,11,14,17 | **adjourned** 154:9 | 26:6 33:14 | **answered** 10:21 | **approximately** |
| 19:20,23 20:2 | **Administration** | 42:24,24 54:21 | 33:22 34:8,9 | 42:13 101:19 |
| 20:5 39:24 | 105:22 113:7 | 58:1 102:12 | 34:21 35:4 | **April** 82:13,18 |
| 40:21 52:12 | **administrative** | **amount** 16:20 | 37:12 38:1 | **arguing** 45:6 |
| 59:21 87:2 | 45:13 | 53:12,21 54:1 | 40:18 41:5,13 | **argumentative** |
| 89:4 109:1,18 | **advance** 107:17 | 54:1,5,7,8,9,17 | 42:4 44:14,21 | 38:1 40:18 |
| 119:16 123:13 | 108:13 119:23 | 54:19 57:14,19 | 48:1 57:18 | 42:17 45:3 |
| 125:4 133:16 | **advances** 108:1 | 68:15 75:19,19 | 63:11 67:6 | 50:9 63:11 |
| 136:8 137:24 | 108:23 | 75:24 76:4 | 70:8 75:4,23 | 67:6 75:4 83:2 |
| 151:14 | **advice** 133:2 | 86:15 87:6 | 77:10 79:22 | 85:6 99:24 |
| **abut** 124:11 | **advise** 132:24 | 102:8,14 | 80:24 81:6 | 100:9 101:10 |
| **accept** 70:19 | 134:7 | 103:20 107:19 | 82:2,20 83:3 | 117:3 133:10 |
| 143:4,6,18 | **advised** 126:19 | 107:21 121:3 | 85:9 90:15 | 137:6 139:3 |
| 144:12,23 | 135:9 | 151:11,12 | 93:5 98:18 | 142:12 |
| 145:4,8 | **advising** 131:24 | **analysis** 4:4 | 99:24 100:8 | **arguments** 13:9 |
| **access** 123:1 | **afternoon** 6:9 | 65:17,19 66:10 | 101:8 112:10 | **arrived** 12:9 |
| **account** 23:8,11 | **agency** 1:18 | 67:15 | 117:3,10 122:2 | 51:24 153:2 |
| 48:23 50:6 | **agents** 18:1 | **and/or** 155:18 | 127:2 129:23 | **aside** 52:14 |
| 65:18 66:6,11 | **ahead** 22:24 | **annual** 66:5 | 137:6 142:5,12 | 114:14 |
| 67:18 68:17,20 | 54:15 71:12 | 68:5,8,13 | 144:5 | **asked** 10:20 |
| 69:5,24 72:21 | 100:23 132:21 | **answer** 8:17 | **answering** 41:2 | 33:21 34:7,8,9 |
| 73:1 75:7 | 135:1 142:4 | 22:24 23:24 | 41:11 46:23 | 34:21 35:3 |
| 76:11 80:5 | 146:11 | 26:24 27:5,23 | **answers** 124:5,6 | 37:12,24 40:17 |
| 85:21,24 87:13 | **Alakea** 2:4 | 34:10,22 38:4 | 124:15 | 41:4,12 42:3 |
| 87:18 92:5 | **Alii** 2:4 | 38:15 39:5 | **Anticipated** | 44:13,15,20 |
| 102:10 103:13 | **Alina** 112:16 | 42:13,16 43:7 | 68:13 | 48:1 57:17 |
| 106:6,9,11 | **allegation** 26:15 | 43:23 45:19 | **anybody** 45:24 | 60:4 63:11 |
| 107:1 118:22 | **allegations** | 46:8 49:8,9 | **anyway** 97:12 | 67:5 70:7 75:3 |
| 118:24 119:18 | 20:17 | 50:1,5 54:15 | **Apollo** 7:15 10:7 | 75:22 77:9 |
| 119:21 137:4 | **alleging** 129:13 | 56:12 58:24 | 10:8,9,19 | 79:22 80:23 |
| **accounting** | **allotment** 52:6 | 59:10 62:14,16 | **Appeal** 103:4 | 81:5 82:2,19 |
| 105:1 | **allow** 33:11 52:5 | 63:1,4,6,23 | **Appeals** 76:22 | 83:3 85:9 |
| **accounts** 18:2 | 52:23 123:15 | 64:1,9,18 71:6 | **appear** 55:5,20 | 90:15 93:4 |
| 58:11,15 70:6 | 153:8 | 77:3 79:23 | 106:13 107:8 | 98:17 99:21,23 |
| 92:19 | **allowed** 52:6 | 82:22 83:5 | **appears** 35:17 | 100:1,8 112:9 |
| **accurately** 155:4 | 130:24 134:2 | 84:24 86:23 | **application** | 115:20,21 |
| **act** 44:2 | **Ally** 1:5 2:13 4:3 | 89:20 92:22 | 130:23 | 117:2,9 118:7 |
| **action** 41:9 44:1 | 20:14 21:16,17 | 104:21 109:8 | **applied** 74:23 | 121:20 122:1 |
| 57:22 79:20 | 21:19,21,23 | 109:24 110:1 | 75:7 76:10 | 129:22 137:5 |
| **actions** 38:19,23 | 22:2,4,5,7,13 | 113:18,22 | 92:4 | 142:5,11 144:4 |
| | 22:20 52:9 | 122:11 123:8 | **apply** 125:4 | 144:23 |

Raymond Crawford

Page 157

**asking** 8:10,17
  13:13 14:10,12
  31:14 37:16
  40:13 44:10
  52:17 62:24
  79:13,15,17,24
  82:7 84:20
  89:12 96:22
  126:1 131:14
  140:7 141:22
  141:23
**asks** 11:14 25:8
  36:24 99:7
  114:6 129:7
  152:7
**Assets** 92:2
**assignments**
  114:19
**assistance**
  131:19
**assistant** 2:16
  135:7 153:23
**associated** 58:13
  58:17
**assume** 79:12,15
  79:24 89:14
**assumes** 104:7
  148:15
**assure** 15:18
**assured** 15:16
**attachment** 91:6
**attention** 25:1
  27:14 36:3
  53:11 75:17
  84:8 86:6
  113:4 120:8,9
  121:8,18 127:4
  128:6
**attorney** 9:22,23
  24:9,10 37:21
  107:12,17,24
  108:23 121:15
  126:16 131:15
  131:18,23,24
  132:1,24
  135:12,20

139:22 141:20
**attorney's** 44:6
  108:13 121:10
**attorney/client**
  26:23 27:1
  28:6 32:6
  104:17 131:13
  140:3,6 152:8
**attorneys** 22:17
  123:14 130:23
  131:10 133:2
  134:24 135:18
**attorneys'** 89:17
  98:22 99:5,14
  101:5,22 102:3
  102:9,14 104:5
  107:8 108:13
  109:2,19
  118:13,21
  119:17
**audio** 3:20 35:18
  60:21
**authority** 21:23
  24:3,9
**authorization**
  1:18
**available** 129:4
  148:5 152:4
**Average** 9:16
**aware** 6:20
  42:21 44:18
  48:12 56:17
  61:8 77:6 97:1
  97:15 99:2,11
  99:21 102:8,13
  103:11,23
  104:2 141:17
  145:24

---
**B**

**B** 3:8 4:1 5:1
**back** 16:14
  26:11 32:19
  34:11,15 37:6
  39:9 51:19
  55:4 56:5,8

58:8 75:15,17
  84:3 97:23
  104:22 105:5
  109:15 111:11
  120:6,8 141:4
  141:7 143:8,12
  143:16
**background**
  7:13
**balance** 67:17
  81:24 82:14,16
  92:5 119:23
**bank** 1:5,6 2:13
  15:7 20:14
  21:16,17,20,22
  21:23 22:4,13
  22:20 52:9
  98:14
**Bank's** 152:1
**based** 32:17
  48:2 60:21
  63:2 65:6 80:5
  81:22 102:5
  107:7 109:1,17
  111:22 119:22
  130:12 153:15
  153:18
**basis** 35:20
  104:16
**Bates** 4:3 59:18
  59:19 61:9
  106:12 119:5
  119:13
**Beach** 7:15 10:9
**beginning** 1:15
  124:10 133:5
**begins** 124:18
  124:20 125:1
  125:19 126:8
  126:10 127:1
**behalf** 21:21
  28:8 100:16
**believe** 22:12
  25:24 26:1
  35:19 70:16
  91:13 122:19

133:24 141:1
  141:11
**better** 23:24
  27:5 40:19,20
  40:21 49:8
  58:24 59:10
  63:6 64:18
  71:6 110:2
**billed** 67:12
  106:24
**Bishop** 2:10
**black** 154:2
**blank** 119:23
**Bond** 103:4
**borrower** 4:8
  37:17 45:22
  47:3,21 54:18
  54:21,22,24
  76:4,7 79:11
  88:15 93:7
  98:21 99:3,12
  101:3 122:8,17
  123:3 137:22
  137:24 138:19
  138:20 147:18
**borrower's**
  32:22 106:24
**borrowers** 38:16
  38:20 39:5
  41:3 42:13,16
  43:8,24 44:4
  45:14 55:7
  79:5,18 88:7,9
  129:5,12
  140:24 141:10
  141:18,24
  142:19 145:9
**bottom** 119:6
  144:21
**bounds** 146:5
**box** 84:9 86:7
**brain** 50:24
**break** 50:21
  91:7 110:13
  134:23 151:11
**breakdown**

65:23 84:9
  86:8,22 87:3
  118:8
**brief** 51:17
  105:3 134:12
**bring** 87:15
**broad** 1:14,23
  18:16,23 58:20
  64:14 72:16
**Brothers** 5:6
  71:8,15,19
  72:9,12,24
  73:18 113:11
  114:3,11
  115:22 116:7
  116:10 117:8
**brought** 100:2
**burdensome**
  18:17,23
**business** 13:20
  72:1,3 82:22
  83:5 104:20
  153:17

---
**C**

**C** 2:1 155:1,1
**CAAP-17-911**
  76:21
**calculator**
  109:23
**California** 8:3,6
**call** 17:17 39:16
  42:8 46:3,4,5
  46:10,15 47:1
  47:3,8,14
  121:4 125:3
  137:23 138:5
  150:10,13,16
  150:17
**called** 17:15
  47:10 84:9
  122:22 148:22
  151:5
**calling** 46:17
**calls** 15:4 25:16
  27:21 28:5,19

30:6,21 31:17
32:24 33:13
36:15 37:11
38:15 39:5,7,8
39:10 41:2
42:7,10,13,16
42:22 43:7,9
43:24 44:8
45:22 46:2,18
46:23,24 47:4
47:21 50:24
51:9 53:18
57:8 64:15
65:4 107:9
125:8 138:8,10
138:13
calm 16:22
cancelled 51:23
152:21,24
capable 18:3,13
136:11
capacity 1:13
card 46:22
Carolina 152:22
carry 47:12
case 6:11,23
15:8 23:16
24:11 50:11
55:3 78:23
92:13 97:2,5
97:20 98:3,6
98:12,16 99:2
100:2 138:16
146:3 148:14
cases 13:24 14:4
14:5,9,14,23
48:23 92:9
97:16 101:20
131:11 138:13
cash 74:16
cause 80:7
causes 57:1
135:21
cease 127:6,10
CENLAR 1:5
2:13,15,19

6:11 7:18,21
8:9 11:20
13:19 18:1
20:14 21:24
22:6,8,13,19
23:2,6,10,19
24:3,8 25:13
25:21 26:9,19
27:19 28:3,8
28:17 29:6
30:2,19 31:11
32:3,18 33:19
34:3,5 35:1
36:4,12,18
37:9,16,21
38:5,9,12,14
38:19,21 39:4
41:1,9,10,14
41:17 42:1,2
42:12 43:6,14
43:23 44:2,10
44:18 45:12,15
46:9,12 47:11
49:6,10 50:22
51:6,11 55:12
55:14,21 56:23
57:4,6 58:10
58:14,17,24
61:18 62:2
63:4,21 64:4
64:13 65:1
70:13,19 71:14
72:13 73:21
74:14,16,18,23
75:2 78:1,2,5,6
79:17 80:11
82:14,22 83:5
87:10 92:17,24
93:19,21 94:8
100:13,16,17
100:21 101:3
109:2,18 110:9
110:11 111:12
111:15,20,23
112:4,14
113:10,11

114:2,10,15
115:21 126:16
129:11 131:9
131:16,19
132:2,4,7,14
132:14,23,23
133:2,7 134:1
134:4 135:6,23
135:24 136:16
136:16,23
138:8 139:6,23
139:24 140:23
141:9,17,23
142:9,18 143:4
143:18 144:23
145:8,18 147:5
147:19 151:14
152:3,4
CENLAR's 21:3
21:19 25:22
32:20 33:6
44:7 46:1,15
52:15 55:6
72:18 76:3
77:6 96:21
98:15 106:13
121:14 132:10
136:5
Central 105:22
113:6
certain 88:19
130:9
certification
155:16
certified 54:3
certify 155:3
certifying 1:18
155:19
change 24:4
122:13 137:1
137:17 148:2
changed 23:15
changes 136:24
charged 4:8
67:21
Charlotte

152:22
charted 1:6
check 4:5 70:13
70:19,23 74:13
74:14,16,24
111:17 115:1
choice 12:17
13:6 153:12
choose 21:24
Circuit 76:14,14
98:5
circumstance
147:22
circumstances
56:17,20 130:9
city 10:4
civil 6:21 76:13
98:3
claiming 129:5
129:14,19
130:24
clarification
135:2
clarify 8:18
113:18,24
134:16,20
135:3
class 39:6,22
40:8 41:15,17
41:19
clear 50:7 62:19
68:2 72:22
108:22
clearly 44:7
client 65:20
clients 23:4
closed 79:20
collected 96:13
Collections 48:4
collectors 73:22
colon 36:5 54:1
column 68:21
69:7,20 89:13
106:17,23
columns 69:6
come 84:21

104:22 136:14
comfortable 7:5
coming 147:16
147:24 152:22
commentaries
124:14
commentary
124:1
Commission
155:13
common 46:18
Commonwealth
1:16
communicate
127:7 139:24
communicated
64:5,13 140:8
communicates
152:8
communication
32:17 51:7
125:14 140:8
communicatio...
26:23 27:2
28:7,7 32:6
50:6 104:17
140:6 151:21
company 47:19
114:13
Compel 146:11
competent 50:5
50:10
Complaint
20:17,19,19
146:10
complaints
145:24
complete 114:18
149:6
completed 66:10
completely
114:13 130:2
compliance
43:15
comply 38:21
complying 42:2

**compound**
40:17 45:16
**concern** 131:16
132:2,13
**concerned** 104:4
**conclusion**
11:15 25:9
57:9 114:7
129:7
**conferences**
13:22
**confidential** 5:7
115:7,8,10
116:11,16,17
116:20,21
**confirm** 51:22
**confirmed** 52:3
**conflict** 14:4,5,7
**conflicts** 12:4
**confused** 45:9
145:6
**confusing** 43:16
45:2 143:23
145:2
**confusion**
107:23 144:21
**considerations**
130:17,18
**consistently**
123:12
**contact** 115:15
115:17,18,18
115:22,24
116:1,1 123:18
123:19 134:8
**contain** 29:13
30:10 31:3
55:24 56:11,23
56:24
**contained** 155:4
**contents** 35:13
60:1,4 81:3,16
96:6 120:12
124:24 126:9
126:24 145:21
**contested** 14:8

14:18,24 15:8
**context** 60:14,15
61:1
**continue** 152:5
**continued** 4:1
5:1
**contrary** 132:10
**control** 132:5
155:18
**conversation** 4:3
45:22 59:9,19
64:17 120:10
120:13,19
121:15,19
124:17,19
125:1,6,17,19
126:8,10,17
127:1 133:22
136:3 137:24
140:17 150:1
150:10
**conversations**
61:5 122:7
149:14,22
150:3,7,22
**copies** 15:12,17
16:1,4
**copy** 4:5 15:14
15:23 16:17
17:12 25:13
27:19 28:17
29:6 30:2,19
31:11,16 32:3
50:22 51:6
74:9,13 77:22
78:6 83:13
93:21 94:8
110:2,5 145:18
**corporate** 1:13
7:17 139:18
**corporation** 1:5
**correct** 37:19
42:18 100:15
100:16 108:2
122:23 133:17
136:21 148:6

155:7
**corrected** 136:5
**correctly** 46:24
**correspondence**
29:7 30:3,20
31:12 32:4
50:23
**costs** 152:2
**counsel** 2:16
11:20 17:11
23:7 25:23
33:23 34:1,2
52:5 78:9
146:1,2 152:9
**country** 100:14
**county** 70:9,11
**couple** 105:19
**course** 46:20
**court** 1:14,16
6:22 12:11
52:18 56:8
60:19 76:14,22
98:4 109:15
141:7 143:16
153:7
**covered** 151:10
**Crawford** 1:13
3:3 6:2,14
51:21 52:3
154:9
**created** 55:12
**currently** 20:21
21:6,9
**customary** 16:6
**cut** 12:16,18
17:5 124:10,11
**cutting** 11:23

     **D**
**D** 3:1
**DANG** 2:23
**dark** 154:2
**darker** 153:24
**dash** 36:5,5,9,9
**date** 86:3 108:1
125:13,22

139:10,12
147:4,10,11,15
147:24 148:6
148:13,17,21
149:2 152:6
**dated** 3:13,14,15
3:16,17,18,19
3:21,22 4:6,7
4:10,11,12,13
4:14,15,16,17
4:18,19,20,21
4:22,23 5:4,9
**dates** 107:14
108:12
**DAVID** 2:16
**day** 9:20 126:4
148:23
**days** 112:1,3
**dealing** 58:14
**debt** 73:22
**December** 36:14
**decision** 12:16
57:4 132:15,16
**deed** 128:23
**default** 121:21
**Defendant** 103:3
**Defendant's**
17:11
**Defendants** 1:7
**delay** 137:17,20
**delinquent** 54:5
57:14,19 75:24
112:2,4
**department**
43:20 47:8,18
47:18 62:5
123:4,6 129:18
136:1 139:18
**departments**
130:1
**depending**
73:20 148:3
**depends** 23:3
47:7,17 123:4
140:19,21
**deponent** 134:23

**depose** 52:14
**deposed** 6:20,24
7:2
**deposition** 1:13
3:11 6:16,18
7:6,9,21 8:5,10
9:14,17,19,24
10:6,9,11,16
10:18 11:19,21
11:24 12:8,17
12:21,24 13:4
13:21 15:16,24
48:21 52:8,11
52:13,23 78:21
87:16,22
124:11 138:17
149:23 151:13
151:22,24
152:1,5 153:3
153:6,13,19
154:8
**depositions** 9:11
10:3 153:16
**describe** 13:18
**description** 3:10
4:2 5:3 106:18
106:20 107:16
**desist** 127:6,11
**determine** 112:7
113:16
**determined**
130:6
**different** 21:24
24:5,10 34:12
44:9 45:5,5,17
47:18 60:9,14
89:2 90:13
92:19,20
105:13 106:4
107:20 117:17
121:3 128:21
130:1,2,20
**direct** 3:6
155:18
**directly** 127:7
143:5,7,19

144:10,24
145:3
**disbursed** 109:2
109:5,18
**disbursement**
107:17
**disbursements**
68:5,9,14
**discharge** 21:24
24:4,7
**Disciplinary**
146:1
**disclosing** 26:22
140:5
**discovery**
104:18
**discuss** 27:1
131:16 132:14
132:15,23
**discussed** 91:13
132:22 133:6
**Discussing**
128:20
**discussion** 12:5
12:22 16:11
26:1,4,8,13
75:12 83:24
120:3
**dispute** 20:9,11
146:18
**disqualify** 130:4
**distinction** 8:13
**District** 1:1,1
6:21,22
**Dmhobson@c...**
2:18
**document** 4:9
23:22,23,24
24:22 25:7,11
25:14 27:4,20
28:10 30:5,7
31:15 51:7
53:20 54:10,16
55:12 58:24
59:9 61:23
62:4,15,19

63:3,5,13,24
64:17 66:4,15
68:11 69:10
70:9 71:5
77:19 78:23,24
79:3,18 82:4,6
82:7 84:23
85:2 86:1,23
87:4 88:2
89:15 90:14
92:17,18,18
93:18,22
105:14,15
107:7 108:4,5
108:10,14,16
109:1,6,17
110:8,14 111:6
115:7,9,11,12
115:14 116:11
116:17,22
117:14 118:6
119:17 122:22
123:9 124:21
125:15 126:12
127:3 146:16
146:24 147:2
149:15 150:20
150:24 151:5
**documents** 5:7
13:20,23 14:4
26:12,15,19
48:22 50:5,11
58:10 78:20
79:17 87:7,10
87:14,15,19
104:19 105:13
113:1,12 115:3
115:6 116:9,16
116:19,21,24
117:4,5 119:22
129:16 133:21
**doing** 46:22
136:11
**door** 113:12
115:24 116:4
**Drive** 2:16

**due** 53:12,21
54:1,7,8,9,19
67:16,17 75:19
**duly** 6:2

---

**E**

E 2:1,1 3:1,8 4:1
5:1 155:1
**e-mail** 3:13,14
3:15,16,17,18
3:19,21 4:6,23
96:21
**earlier** 12:5
100:20 144:5
**eating** 17:4
**eight** 12:13,14
19:12 52:22
153:8,11
**either** 46:4
52:21 77:7
**employ** 42:12
43:6 136:23
**employed** 58:13
58:17 136:24
**employee** 41:14
47:2 48:7,12
49:7 50:12
59:4 62:12
**employees** 18:1
38:9,12,20
39:4,12,20
40:11 41:2,10
41:19 42:1,15
43:7,19,22
44:7,11,19
45:14 48:24
49:2,4 64:5,12
**employees'** 42:4
43:15
**employs** 43:23
**ended** 72:4
**ensure** 38:21
42:1 44:2
114:3 136:24
**entered** 97:2,4
97:16

**entire** 146:16
**entitled** 13:12
17:2
**escalated** 39:8
**escrow** 4:4
65:17,18 66:5
66:10,12 67:15
67:17 68:17
69:24 70:6
107:4
**ESQUIRE** 2:3
2:10
**event** 12:24
**evidence** 104:8
148:16 155:4
**evidentiary**
97:13
**Ewing** 2:17
**exactly** 150:6
**EXAMINATI...**
3:6 6:6
**examined** 6:3
**example** 89:7,10
**examples** 89:5
**excess** 93:6,8
**Excuse** 108:21
**excused** 154:10
**exhibit** 15:23
29:16 85:15
86:7 87:22
116:12 120:12
**Exhibit-1** 3:11
15:10,21 16:18
17:12,18,20
58:8 97:17,20
97:23 98:1
**Exhibit-10** 3:20
35:8,12,14
49:13
**Exhibit-11** 3:21
50:16,20,23
**Exhibit-12** 3:22
53:2,6,7,9
54:12 75:18
76:5
**Exhibit-13** 4:3

59:12,17,18
60:2,12 61:2,6
62:7 63:16
120:9
**Exhibit-14** 4:4
65:10,14,15
**Exhibit-15** 4:5
74:2,6,7,9,12
**Exhibit-16** 4:6
77:14,18
**Exhibit-17** 4:7
78:12,16,17
**Exhibit-18** 4:8
80:15,19,20,22
81:4
**Exhibit-19** 4:9
81:9,13,14,17
81:20,22
**Exhibit-2** 3:12
24:16,18,23
**Exhibit-20** 4:10
83:8,12,14
**Exhibit-21** 4:11
83:17,21 84:5
84:6
**Exhibit-22** 4:12
85:11,16,18
**Exhibit-23** 4:13
89:23 90:3,4
**Exhibit-24** 4:14
90:7,11,12
**Exhibit-25** 4:15
90:17,21 91:6
91:10,13,16
**Exhibit-26** 4:16
91:2,22,23
92:1,24
**Exhibit-27** 4:17
93:11,15,16
**Exhibit-28** 4:18
94:1,5,6,8
**Exhibit-29** 4:19
94:12,16,17
**Exhibit-3** 3:13
27:7,11,12,20
**Exhibit-30** 4:20

94:20,24 95:1
**Exhibit-31** 4:21
95:4,8,9
**Exhibit-32** 4:22
95:12,16,17
**Exhibit-33** 4:23
95:20,24 96:1
96:4,7
**Exhibit-34** 5:4
102:16,20,21
102:23
**Exhibit-35** 5:5
105:7,11,12
**Exhibit-36** 5:6
110:17,19,23
111:1,3
**Exhibit-37** 5:7
112:20,24
113:2 117:5
**Exhibit-38** 5:8
117:21 118:1,2
118:4
**Exhibit-39** 5:9
145:12,17,18
145:22 146:14
146:19
**Exhibit-4** 3:14
28:12,16,18
**Exhibit-5** 3:15
29:1,5,7,13
**Exhibit-6** 3:16
29:20,22 30:3
30:10
**Exhibit-7** 3:17
30:14,18,20
31:3
**Exhibit-8** 3:18
31:7,10,12
**Exhibit-9** 3:19
31:22 32:2,4
32:12,15,18
**exhibits** 16:1,4
52:10 77:21
90:23
**exists** 133:9,9
**expense** 52:15

**expenses** 108:8
108:9
**Expires** 155:13
**explain** 92:1
143:13
**expressed** 12:12
**Ext** 2:17
**extend** 52:22
**extending** 12:8
**extent** 26:24
32:5 35:16
131:13 140:5
**extra** 15:11

_____

**F**

**F** 155:1
**fact** 23:14 104:4
**facts** 104:8
130:9 148:15
**fair** 7:4 151:11
151:12
**fairly** 50:7
**false** 103:19
**familiar** 6:23
20:16 49:2,3
60:1,11 61:1
61:17 80:22
81:3,14,16
82:3,5,6 88:21
90:4,12 91:9
91:12,19,23
92:23 93:16
94:6,17 95:1,9
95:17 96:1,8
97:19 98:9
120:11,13
124:24 126:9
126:24 138:7
145:21
**far** 22:7 37:4
39:15 60:5
87:22 129:17
147:19
**FAX** 127:5,19
127:20
**federally** 1:6

**fee** 89:13,17
**fees** 4:8 84:13,17
84:22 85:4
86:11,17 87:2
87:3,8 88:1,2,4
88:21 89:2,5,9
89:11,12,17
98:22 99:5,15
101:5,23 102:3
102:9,14 104:5
106:24 107:8
108:13 109:3
109:19 118:8
118:11,13,21
119:17 152:2
**figure** 68:1
**figures** 3:12
25:6 28:4
29:14,15,19
30:11 31:4
32:11 34:2
**file** 24:12,13
60:22 135:6
136:1 139:17
**filed** 6:11
**final** 153:21
**financial** 130:12
130:16,17,20
**find** 110:14
**finish** 113:20
**fire** 24:9
**firing** 22:6
**firm** 23:12,13,18
24:4,5,13,14
24:14 26:9
33:9,10 35:6
36:19 37:7
38:6 64:22
65:7 99:3,13
101:4 102:9,12
103:11 104:13
121:11,14
123:19,20
126:19 132:5,7
132:9 133:8
134:8,17 135:5

135:5,8,12,14
135:16,20
136:2,14,15
137:2,16,23
138:1 139:7
**firms** 23:15,20
**first** 7:12 25:2
32:18 49:13,18
61:9 62:7 63:9
63:16,24 65:16
65:21 76:14
77:7 91:9 98:3
98:4 105:14
127:9 128:7
153:10
**five** 5:6 11:24
12:21 19:3
62:8 63:17
71:8,15,18
72:8,12,24
73:18 97:24
104:24 113:11
114:3,11
115:21 116:6
116:10 117:8
134:9 151:9
153:13
**fliers** 116:15
**flight** 12:10
51:23 52:1
152:21 153:2
**Floor** 2:10
**Florida** 7:15 9:7
10:1,7,19
**fly** 100:14
**focus** 65:15
**focused** 75:18
**folks** 46:20
**follow** 57:6
**follows** 6:4 56:9
109:16 141:8
143:17
**footer** 96:4
**foreclose** 22:18
23:10
**foreclosed** 33:7

**foreclosure** 14:9
23:7,15 24:10
25:23 33:8,23
34:1 36:22
37:4,21 40:4
44:4,4 47:22
57:22 58:1
79:20 80:9
92:9,13 97:2,5
98:6,12 99:4
99:14 101:4,19
103:12 104:14
128:8 131:11
139:9,23
140:20,24
141:10,19,24
142:20 146:3
148:21 152:9
**foreclosure-re...**
108:8,9
**foreclosures**
23:3 35:2
73:23
**foregoing** 155:5
155:16
**form** 26:5 54:3
66:16,19 78:22
78:24 79:2
92:17,18,23,24
113:12
**format** 60:13
110:6,12,14
**formatted** 110:7
**forms** 55:6,9
**Forrester** 2:3,3
3:6 6:8,10 9:5
10:17,23 11:4
11:9,11,17
12:2,18 13:8
13:17 14:11,21
15:9,13,18,20
16:8,14,19,23
17:4,10,13
18:19 19:1
20:15 21:2,15
22:10,23 23:5

24:21 25:12,20
26:10,18 27:10
28:2,15 29:4
29:12 30:1,9
30:17 31:2
32:1,10 33:5
33:18 34:4,12
34:17,24 35:11
36:1,20 37:8
37:15 38:3,8
38:13 39:3,17
40:9,23 41:6
41:16,24 42:11
42:20 43:5,13
43:21 44:17,24
45:8,20 46:13
47:9,20 48:5
48:11,19 49:11
50:3,19 51:5
51:14,19 52:7
52:21,24 53:5
53:22 54:14
55:2,11 56:4
56:16 57:10,21
58:5 59:2,15
60:3,7,8,24
61:16,24 62:17
63:8,14 64:3
64:10,19,23
65:13 66:8,18
67:10,19 68:3
68:18 69:3,16
70:12,18,22
71:7,11 72:2
72:10,20,23
74:5,11 75:1,5
75:9,15,16
76:2,12,20
77:5,17 78:2,4
78:15 79:14
80:3,18 81:2
81:12 82:9,24
83:11,20 84:3
84:4,18 85:8
85:14 86:5
87:1,20,23

88:10 89:3
90:2,10,20
91:5,8,17,21
92:14,16 93:14
94:4,15,23
95:7,15,23
96:24 97:6,11
97:14,22 98:20
99:1,10,19
100:4,12,22
101:12,14,18
102:7,19
103:10,16,22
104:11,22
105:5,10
106:15,16
107:13 108:6
108:18,24
109:7,11,24
110:4,22
111:10 112:13
112:23 114:1,8
114:9,21 117:6
117:13,24
118:18 119:4
119:24 120:6,7
120:22,23
122:21 123:21
123:23 124:2,9
124:16 125:12
125:18 126:1,6
127:17 128:5
128:18 129:10
130:3 131:8,17
132:3,17
133:12,14,23
134:9,14,18,22
135:10 136:4
136:18 137:10
137:19 138:6
138:23 139:5
139:13,21
140:7,10,22
141:4,15 142:3
142:8,15 143:3
143:8,12,21

144:8,20,22
145:15 146:12
147:3,9,17
148:1,12,24
149:8,21
150:12 151:3,7
151:17,20
152:17 153:8,9
153:19,21
154:4
**Forrester's**
16:17 96:21
**foundation**
33:14 35:15
39:13 49:24
57:24 59:5
62:13 63:22
64:21 65:3
67:22 70:15,20
71:9 76:16,24
77:10 82:1
86:20 96:19
100:19 101:24
104:8 118:23
119:20 125:8
129:7 133:19
135:22 142:21
146:21 147:7
147:14
**four** 11:5 18:21
144:5
**fourth** 44:14
91:17,20 101:7
**frame** 64:9 73:3
73:13,16,20
88:19 117:18
118:17 139:20
**frames** 64:11
**fraud** 129:5,13
129:14,20
**front** 50:8 87:14
124:23 125:2
**FSB** 1:5
**full** 6:12 11:8
153:8
**fully** 155:4

**fund** 92:2
**funds** 54:3 75:7
76:9,10 80:9
92:4 93:6,8
103:2,6

— G —
**gaps** 119:9,10
**garnished** 103:2
103:5,13,21
**garnishment**
103:23 104:2
**general** 2:16
32:23 36:10
80:1 121:22
148:10
**generalize** 89:1
**generally** 78:22
80:1 92:20
125:9 128:16
148:20
**generated** 58:10
93:18
**give** 62:4 73:13
73:16 97:8
**given** 17:11
24:14,22 31:16
155:7
**giving** 22:9
**go** 7:8,12 11:7
12:21 16:3,8
16:14 20:19
22:24 33:9
34:1 35:6 39:9
44:5 51:14,19
52:11 54:15
55:6 58:8
71:12 75:9
79:5,13 80:2,8
83:22 100:23
105:5 117:18
120:1,6 123:18
132:21 134:10
134:14 135:1
142:4 146:11
151:9 152:16

154:4
**Goda** 2:9 60:20
103:13
**goes** 36:18 88:18
**going** 6:15 8:11
12:1 13:11
15:22 16:2,2,5
17:17 24:15,16
34:19,20 36:3
37:3 45:7
53:23 60:9,16
96:6 104:16,24
108:22 115:1
134:18 144:15
152:16,19
**Good** 6:9
**Graphics** 2:16
**great** 52:15
**ground** 7:9
**guess** 24:1,2
66:20 79:12
**guy** 135:23

— H —
**H** 3:8 4:1 5:1
**hand** 24:15
**handing** 15:10
27:11 28:16
29:5,20 30:18
31:10 32:2
35:12 50:20
53:6 59:16
65:14 74:6
77:18 78:16
80:19 81:13
83:12,20 84:5
85:15 90:3,11
90:21 91:22
93:15 94:5,16
94:24 95:8,16
95:24 102:20
105:11 112:24
118:1 145:16
**handle** 14:8
**handled** 139:17
**handles** 22:19

22:20 23:2
**handling** 46:23
  100:14 135:6
  136:1
**happen** 33:11
**happened** 81:23
  132:18
**happening**
  100:6
**happens** 54:18
  57:16 92:7,8
  92:12 132:9
**hard** 40:13
**Hawaii** 1:1 2:5
  2:11 6:22 8:1
  11:1,13 33:6
  34:6 35:1
  76:15,23 98:5
  112:17 141:16
  141:21,23
  142:7,14
**hazard** 66:16
  67:8,23 70:10
  70:11
**head** 21:1 28:22
  30:24 31:19
  32:8 51:3
  58:22 65:6
  71:3,5 76:18
  77:2 142:24
  149:18
**hear** 16:23
  137:24 138:19
**heard** 100:5
  143:10 147:11
**held** 1:14 16:11
  75:12 83:24
  120:3
**help** 125:23
**Hi** 6:9
**hire** 23:10 24:9
  39:21
**hired** 22:17
  23:19,21 24:4
  102:9,12
  103:12 104:14

123:15 139:23
**hires** 73:22
**hiring** 22:6
**history** 5:5,8
  20:24 68:20
  69:5 87:5,13
  87:18 88:5,6
  88:11,16 101:2
  105:16 106:6,9
  106:12,18
  110:3 118:5
**HOBSON** 2:16
**Hochroth** 1:2
  6:10 18:2
  20:14 21:9
  26:21 28:4
  36:13 42:22
  47:10 48:13,24
  51:7 52:16
  55:4 58:11,15
  58:18 59:20
  64:6,13 67:12
  67:21 70:13
  79:6 80:12
  88:12 93:3
  103:3,24 104:5
  113:13 120:15
  121:1,20 122:1
  123:12 125:4
  130:22 133:16
  134:1 136:5,9
  142:10,17
**Hochroth's**
  20:20 21:4,7
  23:6,8,11,15
  48:23 50:6
  70:19 72:21
  73:1 74:18
  81:24 82:16
  85:21,24
  102:10 103:13
  112:16 118:12
  118:22,24
  119:18,21
  133:4 137:4
  148:14

**hold** 30:5 128:8
  137:22 138:4
  138:20
**holder** 21:17
  22:14
**home** 67:9
  153:23
**homeowner**
  38:6 92:6
  115:13,13
  134:7 136:15
  136:17 148:4
**homeowners'**
  114:4,6
**honestly** 41:8
**Honolulu** 2:5,11
**hour** 50:21
  151:11
**hours** 11:5,8
  13:3 52:12,20
  52:23 151:10
  153:9

_____
**I**
**ID** 49:20
**idea** 36:12 69:5
  103:5 123:11
  138:22 139:4
**identical** 90:24
**identification**
  8:21 9:6 24:19
  27:8 28:13
  29:2,23 30:15
  31:8,23 35:9
  49:7 50:17
  53:3 59:13
  65:11 74:3
  77:15 78:13
  80:16 81:10
  83:9,18 85:12
  89:24 90:8,18
  91:3 93:12
  94:2,13,21
  95:5,13,21
  102:17 105:8
  110:20 112:21

117:22 145:13
**identified** 47:14
  71:21
**identify** 62:3
  67:24 68:24
  106:23 107:2
  115:18
**identity** 61:8,12
**immediately**
  153:4
**importance**
  100:15
**Important** 53:24
**inappropriate**
  97:12
**include** 48:22
  149:9,11
**included** 70:2,6
  88:22 89:5,13
  89:18 104:6
**inconsistency**
  113:21
**increase** 82:17
**increased** 82:14
**indicate** 67:11
**indicated** 11:20
  153:10
**indicating** 127:6
**inform** 123:13
  131:19
**information**
  41:15 56:3,13
  62:5,16 63:6
  121:16 123:2,5
  130:12,16
  131:14 133:7
  136:2,13,20,22
**inside** 115:10,13
**inspection** 5:6
  71:16 89:8
  111:4,9,19
  112:12,15
  113:14,16
  114:23,24
  117:17
**instance** 101:2

140:15,17
**instruct** 113:11
  115:23
**instructed** 115:3
  115:15,21
  116:3 122:10
**instructing**
  140:4 146:8
**instruction**
  144:17
**insurance** 66:16
  66:17,19,21,23
  66:24 67:2,4,8
  67:8,9,16,20
  67:23 70:4,10
  70:11,11
**intending** 131:5
**intent** 128:13
  131:3
**intentions** 131:7
**Intermediate**
  76:22
**introduced**
  87:21
**invoices** 104:18
**involved** 101:9
  101:20 102:2
  114:24 132:24
**involvement**
  21:3 77:7
  98:15
**irrelevant** 146:7
**issue** 39:8
  131:16 132:2
  132:13,22
  133:6

_____
**J**
**January** 54:2
  77:23 78:7
**JAO/KJM** 1:4
**Jersey** 2:17
**JESSE** 2:10
**job** 7:16,23
  10:15 13:19
  14:3 47:2,11

Raymond Crawford

Page 164

49:22 100:17
**John** 1:2 6:10
18:2 26:21
28:4 58:11,15
58:18 64:5,13
103:3
**Johnson** 59:4,8
59:20,22 61:15
62:15 127:5,10
127:15 128:2,7
128:10 130:21
131:4
**Johnson's** 61:8
61:17 62:1
128:1,13 131:3
131:7
**Judge** 103:9
**judgements** 97:4
**Judging** 119:13
**judgment** 96:13
96:16 97:2
99:4,14 101:5
**judgments**
97:15
**July** 108:1,14,16
108:17,19
**June** 93:3
**Jws@ksglaw....**
2:12

**K**
**Kaneohe** 112:16
**Kaplan** 1:14,22
35:19
**keep** 9:20 45:12
46:22 108:16
131:10
**kind** 14:13
67:20 84:22
132:1 149:1,11
**kinds** 86:16 88:4
128:22
**knock** 115:24
116:3
**know** 6:18 11:12
11:16 16:7,23

20:12,24 22:5
23:1 25:18,19
27:3,12,23,24
28:21 29:10,11
30:7,8,23 31:1
31:18,20 32:8
32:9,15 33:2,3
36:6 37:3,5
41:18,22 42:14
42:15,19 43:11
44:1 47:6 48:9
48:16,18 49:24
50:7 51:2,4,12
51:13 56:20
58:21 59:6,7,8
59:21 62:9,20
63:18 65:5
71:2,4,24 73:8
76:17 77:1,4
85:5 92:12
96:16 101:1,9
106:3 110:10
112:18 115:13
117:16,19
118:15 125:21
126:14 127:18
127:20 128:2
128:10,15
130:21 131:4,6
132:12 134:20
135:11,16
136:12 137:3,8
137:21 139:10
139:11,14
140:14 141:20
141:22 142:6,9
142:14,16,23
145:2,3,3
146:14 148:18
149:17,19
150:24 151:19
152:9,11,12
**knowledge**
22:16 55:22
**known** 58:10
**Kobayashi** 2:9

60:20 103:12
**KSG** 135:6
139:7 146:2

**L**
**L** 1:15 155:11
**labeled** 69:7,21
**Lan** 120:10,14
121:8,17,20
123:6
**Lan's** 63:20
**language** 55:5
**late** 11:21 12:9
51:24 52:4
89:9,12
**law** 6:3 23:12,13
23:15,18,20
24:4,5,13,14
24:14 26:9
33:9,10 35:6
36:19 37:7
38:6 64:22
65:7 99:3,13
101:4 102:9,11
103:11 104:13
121:11,14
123:19,19
126:19 132:5,7
132:9 133:8
134:8,16 135:4
135:5,8,12,14
135:16,20
136:2,14,15
137:1,16,23
138:1 139:7
153:15
**lawsuit** 98:9,11
**laymen's** 24:8
**leading** 97:7
**Leaman** 1:14,22
35:19
**leave** 115:3
116:5,7
**left** 12:20 68:9
116:9,24
**legal** 2:3 11:15

25:8 57:9 99:7
114:6 129:7
139:17,19
**let's** 58:8 65:15
83:22 104:24
120:24 124:17
**letter** 4:7,10,13
4:14,15,16,17
4:18,19,20,21
4:22 5:4,9 36:9
36:10 77:22
79:4 80:7 93:2
103:8
**licensed** 9:22
**lieu** 128:24
**limit** 148:22
**limited** 11:5
16:20
**line** 36:3 37:14
45:24 49:13,18
53:12 102:24
120:24 127:5
127:23 128:7,7
**lines** 62:8 63:17
121:8 126:14
**list** 9:6 49:7
**listed** 18:6,10,14
18:21 19:3,6,9
19:12,15,18,21
19:24 20:3,6
29:7 30:3,20
31:12 32:4,12
48:21 50:23
54:17 76:5
98:3 108:1,13
118:12
**listen** 39:7 46:19
61:5 125:3
126:11 127:3
138:16 149:24
**listened** 138:10
138:13
**listening** 42:8
46:11 47:1
**litigation** 13:24
102:6,6 137:16

140:21
**LLC** 2:3
**LLP** 2:9 64:20
**loan** 3:22 4:11
4:12 5:5,8
13:20,23 20:21
21:1,4,5,7,10
21:12,18,21
23:6 36:8,14
37:3,23 48:3
53:10 54:2,4,8
55:15,20,23,24
56:2,10,12
57:7,12,15,16
65:22 71:22
72:17 74:19,21
74:24 75:2,20
75:21 76:1
79:11 80:9
81:24 84:7
85:19,20,23
86:19,21 87:5
87:11 88:5,6
88:11,16 89:21
98:19 99:3
103:17 105:15
105:22 106:5
106:18 110:3
111:22 112:1,3
113:6 116:14
118:5 125:5,10
128:17,19,23
129:20 130:14
130:22
**loans** 22:18,21
33:7,8 37:10
54:6 61:3
72:18
**located** 68:7
**location** 9:7
**long** 41:17
**longer** 135:17
**look** 21:13 82:21
83:4 87:3,5
97:23 110:16
124:17 126:13

129:15
**looking** 49:8
61:22 62:3,15
68:23 89:15,20
123:5 135:15
148:4
**loss** 128:20
129:4,12,17
130:5,7,10
149:5,6,9,11
**lot** 89:1
**loud** 53:23 82:12
119:7

**M**

**M** 2:16
**making** 13:9,14
124:13
**manager** 39:9
**March** 82:13,17
86:4
**mark** 24:16
**marked** 17:12
24:18 27:7
28:12 29:1,22
30:14 31:7,22
35:8 50:16
53:2 59:12
65:10 74:2
77:14 78:12
80:15 81:9
83:8,17 85:11
89:23 90:7,17
91:2 93:11
94:1,12,20
95:4,12,20
102:16 105:7
110:19 112:20
117:21 145:12
145:17
**materials** 39:11
39:14,15,19,24
40:2,7,10,12
40:15,16
**math** 109:22
**matter** 99:11,22

**matters** 14:17
100:14
**mean** 22:7 24:6
24:8 36:5
38:11,14,17
40:7 41:8
44:22 45:10
54:4,7 55:18
57:7,13 66:23
69:8,12 70:10
73:12 75:21
78:1,2,5 79:2,4
82:6 84:20
88:15 92:3,18
107:4 115:8
119:10 129:20
138:12 143:6
148:7
**meaning** 53:17
85:2 96:23
**means** 48:17
85:5 144:10,13
145:3,4 155:18
**measures** 114:2
**mediations**
13:22
**mentioned** 9:8
70:3
**message** 53:24
55:14,20 56:23
56:24 57:1,3,5
139:24
**mind** 8:24
**mine** 27:16
**minute** 32:14
**minutes** 12:19
124:12 134:10
134:23
**MIRANDA** 2:23
**missed** 12:10
**missing** 119:1
119:12,14
**misstates** 17:8
69:9 101:16
106:10 108:4

**mistake** 36:23
**mitigation**
128:20 129:4
129:12,17
130:5,7,10
149:6,7,9,11
**mocking** 133:12
**modification**
125:5,11
128:23 129:21
130:22
**moment** 137:7
**money** 70:24
119:17
**monitor** 44:11
**monitored** 39:7
42:7 46:10,21
**monitoring**
46:24
**month** 9:15 66:3
69:23 112:6
**monthly** 88:19
118:8,12
**months** 49:1
**morning** 12:6
13:1,4 51:22
152:21
**mortgage** 5:8
22:18 66:1,21
66:22,24 67:1
67:3,8 70:14
82:14,16 98:21
99:12 101:3
103:24 118:5
121:11,14
123:14 125:5
126:19 131:1
131:19 133:17
134:2 135:4,8
135:12,16
139:6 140:18
**Motion** 103:3
146:10
**move** 104:12
146:10

**Moving** 68:19
**multiple** 97:4
108:21
**music** 138:24

**N**

**N** 2:1 3:1 155:1
**name** 6:9,12 9:6
23:13,22 58:16
61:14 63:9
88:2 135:13
150:20 151:4
**names** 58:12
64:4,12
**nature** 13:12
76:13,21
**necessarily** 10:5
**necessary** 63:5
76:10 132:23
**need** 13:9 21:13
34:2,10 37:6
38:6 52:4
82:21 83:4
85:3 104:20
108:22 124:4
128:9
**needed** 15:7
**needs** 69:24
**never** 12:20
138:3
**new** 2:17 39:21
40:7 41:10,14
41:19 135:20
**night** 13:3 52:20
152:23
**nine** 11:19 19:15
36:3 52:9
151:9
**noncontested**
14:14,16,17
**Nope** 143:1
**North** 152:22
**Notary** 1:16
155:12
**note** 16:16 22:14
38:2 51:20

60:17,18 61:3
68:12 85:7
87:17 90:22
96:20 133:11
134:22 151:7
152:19 153:14
153:18,22
154:1
**noted** 152:20
155:4
**notes** 120:16
122:9,20,23,24
123:2,10
133:22 135:4
138:18 150:1,4
150:21 151:2,5
155:5
**notice** 1:13 3:11
48:22 54:19
55:6,9 56:1,11
56:18 76:5
116:5
**noticed** 121:24
**notices** 116:6
153:18
**noting** 101:11
**November** 1:10
1:15 28:4
155:6,13
**number** 3:10 4:2
5:3 6:21,23
18:16 42:19
43:11 48:7,17
49:20 59:4
62:12 68:4
76:13 85:15
86:13 98:4
136:6
**numbers** 61:9
107:20 119:6

**O**

**O** 155:1
**O-N-I-C-I-M-O**
49:14
**object** 12:1

Raymond Crawford

Page 166

15:22 31:13
34:20 35:16
60:16,17
104:16 134:18
134:19,21
**objection** 9:1
10:13,20 11:2
11:5,14 13:10
14:6,19 15:4
18:15,22 20:10
20:22 21:11
22:3,21 25:7
25:16 26:5,14
26:22 27:21
28:5,19 29:8
30:6,21 31:17
32:5,24 33:13
33:21 34:7
35:3,15 36:15
36:24 37:11,24
38:10,22 39:13
40:1,17 41:4
41:12,21 42:3
42:17,23 43:9
43:16 44:13,20
45:3,16 46:2
47:4,13,24
48:8,14 49:3
49:23 50:9,24
51:9 53:18
54:12,20 55:8
57:8,17,24
58:19 59:5
60:3 61:11,19
62:13,22 63:10
63:22 64:7,14
64:21 65:3
66:4,13 67:5
67:13,22 68:11
68:22 69:9
70:7,15,20
71:1,9,20 72:5
72:5,15 74:20
75:3,22 76:6
76:16,24 77:9
77:10,24 79:7

79:21 80:23
81:5 82:1,19
83:2 84:16
85:6 86:1,18
87:9 88:8,23
90:14 92:10
93:4 96:19
97:3,18 98:17
98:23 99:6,16
99:23 100:7,19
101:6,16,24
102:11 103:7
103:15,19
104:7,15
106:10 107:9
108:15,20
109:4 111:7
112:9 113:19
113:20 114:5
114:16 117:2,9
118:14,23
119:19 120:20
122:18 123:16
123:23 125:7
125:15 127:12
127:24 128:12
129:6,22 131:2
131:12,20
132:11 133:10
133:18 134:3
135:22 136:10
137:5,12 138:2
138:21 139:2,8
139:15 140:2,3
140:13 142:1
142:11,21
144:4 146:4,20
147:6,14,20
148:8,15 149:3
149:15 150:5
150:23 152:7
**objections** 11:9
13:15 34:18
97:7,12,13
124:2
**obligated** 114:15

**obviously** 50:13
**occasions** 136:6
**occupancy**
111:17 112:8
113:16 115:2
**occurred** 99:5
103:24 125:14
125:16
**October** 25:22
26:21
**offer** 96:7,9,17
131:19
**offered** 153:5
**offering** 129:12
**offhand** 23:12
23:14 27:24
28:9 41:18,22
42:14 43:12
71:24 112:18
117:11,16,19
142:14
**office** 44:6
121:10 146:1
153:20
**Oh** 107:23
152:11
**okay** 7:10 17:10
27:13 32:16
36:5 40:24
49:19 52:24
59:16 60:7
62:10 63:19
81:21 96:5
98:7,8 105:24
106:15 119:8
133:9 144:1
152:18
**once** 135:24
139:17 151:18
**Onicimo** 49:14
**operators**
122:16 123:1
123:11
**opinion** 99:7
**option** 130:7
**options** 128:21

128:22 129:1,4
130:5,11
148:22 149:1
**Oral** 1:13
**order** 44:11 73:7
73:11 87:24
103:1 111:12
111:15,20,23
112:4 119:6
128:8
**ordered** 73:7
112:14
**origin** 88:1
**outside** 44:3
114:12 153:24
154:2
**overly** 18:16,22
58:20 64:14
72:16

———————
**P**
**P** 2:1,1
**p.m** 1:15 11:24
52:22 154:9
**PA** 1:23
**package** 125:10
130:20
**page** 3:2,10 4:2
5:3 17:20
18:12 36:2
49:12,18 61:9
62:6,8 63:15
68:9 82:11
91:12,15,16,18
91:20 105:17
105:18,20,21
106:1 113:5,12
119:14 120:10
120:14,24
124:18,20
125:1,20,21,22
125:24 126:8
126:10,13,20
126:21,22,23
127:1,4 128:6
**pages** 59:21 60:4

65:16 91:10
119:2,6,9,12
**paid** 54:5 57:20
66:12 68:16
87:6 98:22
104:14 107:2,3
107:8,12,21
118:21,24
119:18,21
**paper** 48:18
**paragraph**
17:21,23 18:7
18:10,14,21
19:3,6,9,12,15
19:18,21,24
20:3,6 25:2
27:15,17 53:12
53:14,17 57:12
62:7 63:17
75:18 81:19,23
82:10,11 96:11
97:24
**paraphrase**
124:7
**part** 39:18,20
45:1 51:7
99:17,20 100:2
100:3,10 106:8
106:9,18
113:14 118:10
121:23 138:9
**particulars**
92:20
**party** 132:4,24
**pass** 32:23
**passed** 133:8
**passes** 33:20
**pay** 36:8 57:14
75:24 76:4
**paying** 21:9,11
**payment** 65:22
65:23,24 66:1
70:1 79:19
144:3 145:2
**payments** 70:3
74:24 84:9

86:8 104:18
108:7 143:5,19
144:24 145:9
**pays** 54:19
**Pending** 103:4
**Pennsylvania**
1:15,16
**people** 42:12,21
42:23 43:6,23
44:2 45:21
46:4 47:12
121:24 136:11
**percent** 96:12
**performance**
44:19,23 45:1
45:11,13
**period** 36:7,8
43:1 85:23
**person** 36:22
37:6 46:17
47:23 58:13,16
116:1
**person's** 127:13
**personal** 8:11
**personally** 8:12
78:19
**Philadelphia**
1:14,23 35:20
52:17 153:3,15
**phone** 38:15
39:5,6,8,16
41:2 42:13
44:8 46:15,18
46:20 122:7
137:23 138:8
138:10,13
140:17 149:13
149:22 150:1,3
150:7,9,13,21
**phones** 41:11
**phonetic** 49:14
**phrase** 134:5
**picks** 47:3,23
**pitch** 154:2
**place** 2:4 22:14
43:14 55:14

104:3 106:5
112:16 113:12
131:9 153:17
**placed** 56:3,14
56:19 73:11
138:20
**plaintiff** 1:3 2:6
18:2 52:5
58:11,15 60:22
64:5 98:11
**platform** 138:9
**plays** 138:24
**please** 6:12 8:17
8:17 11:10
13:8 16:19
18:12 27:11
31:15 34:18
36:2 41:7
58:16 59:20
68:20 87:7
97:23 119:7
124:3 144:20
146:17
**plus** 102:5,5
151:10
**point** 25:1 27:14
33:10,12 36:3
53:11 65:8
69:14 70:16
75:17 84:8
86:6 113:4
121:7,18 141:3
141:13
**pointed** 61:10
**policies** 38:21
42:2 43:14,15
73:21 132:10
**policy** 32:20
33:6,19 34:5
35:1 44:3
129:11 131:9
**portfolio** 72:19
**portion** 56:7
109:14 141:6
143:15
**position** 22:15

123:24 132:10
**positions** 131:10
**possession** 26:20
**precise** 139:10
139:12
**preclude** 130:10
**prefer** 17:15
**preparation**
78:21
**prepare** 14:24
15:3 52:13
151:13
**prepared** 13:2
17:6,8 35:19
35:22 52:10
60:19 117:8,14
151:9
**preparing**
114:14 149:23
**present** 1:16
2:22 65:22
132:1
**presented**
116:12,23
124:21
**preservation**
71:16
**preserve** 114:23
**previous** 86:7
122:7 126:7
**previously** 123:8
127:2 149:24
**primary** 14:3
**principle** 153:16
**prior** 49:1 153:5
**privilege** 140:3
**privileged**
131:14 140:6
**privy** 45:21
**probably** 36:11
139:18,19
**procedures** 7:5
**proceed** 57:22
133:1,3 134:15
153:11
**proceedings**

128:9 155:3
**process** 101:9
136:23 137:1
137:15,18
**produce** 16:2
38:5
**produced** 51:11
60:21,22 87:10
87:11,12,20
104:17 106:11
106:14 110:9
110:11
**produces** 55:21
**production**
149:16
**Professional**
1:16,22 155:12
**profit** 1:5
**progress** 128:9
**prohibited** 1:18
**projected** 68:21
69:7,11,13,21
**projection** 69:24
**promised** 15:24
**proper** 64:17
**property** 5:6
71:17 89:7
111:4,9,17,19
112:11,15
114:23 115:1,2
**prosecute**
103:12 104:14
**prosecuting**
99:4,13 101:4
**protest** 52:16
**provide** 26:12
28:3 39:24
40:3 51:6
58:23 59:9
88:3 89:4
114:19 122:15
123:24 130:22
149:14
**provided** 16:17
26:16 31:14
39:11,20 40:11

44:8 63:3
64:16 72:13,24
78:8,20 88:6
88:11,14,17
116:6,18
117:17 121:17
122:20 129:15
130:11,13,19
149:20
**provides** 124:15
**Public** 1:16
155:12
**purpose** 42:9
111:5 113:17
**purposes** 24:10
46:21
**pursuant** 1:13
**pursue** 73:23
**put** 57:5 87:10
87:12,13
110:11 137:22
**putting** 152:13

_____
**Q**
**qualified** 17:24
48:20 58:9,12
85:1
**qualify** 130:13
130:13,14,15
**question** 8:11,16
14:1 23:24
26:6,17 33:15
33:17 34:9,13
34:14,20,22
37:14 38:24
39:2 40:20,22
43:2,4,17
44:15 45:5,5
45:18 46:7
47:15 49:5
50:2 56:10
58:2,6 59:1
60:10 63:7
64:2,18 65:6
66:14 67:14
71:21,23 73:24

Raymond Crawford

Page 168

| | | | | |
|---|---|---|---|---|
| 74:22 80:1 | 63:16 81:19,23 | 106:17 110:8 | 23:23 37:6,20 | 99:3,12 101:3 |
| 82:23 83:6 | 82:10,12 96:3 | 111:1 113:1 | 48:18 67:3 | 103:17,24 |
| 84:24 86:24 | 102:23 109:15 | 118:2 124:19 | 69:22 84:15 | **reinstatement** |
| 92:15,21 99:9 | 119:5 127:23 | **recollection** | 96:6 122:7,16 | 3:12 25:6,6,22 |
| 100:24 101:7 | 141:4,7 143:8 | 50:14 | 123:18,19 | 26:20 28:3 |
| 101:13 104:10 | 143:12,16 | **record** 6:13 | **reference** | 29:13 30:11 |
| 104:21 109:10 | 146:13,15,24 | 11:18 12:5,7 | 108:23 | 31:4 32:11,21 |
| 109:12,17 | **reading** 60:5 | 12:23 13:13,15 | **referenced** | 33:7,9,11,20 |
| 114:17 118:15 | **ready** 151:24 | 16:3,9,12,15 | 39:19 97:17 | 34:6 35:2,5 |
| 121:19,21 | **real** 113:21 | 16:17 17:3,9 | **referred** 121:9 | 36:9,18 37:5 |
| 122:1,11,14 | **really** 127:14 | 21:14 36:4 | **referring** 48:16 | 38:5 44:5 49:1 |
| 123:9,10 | **reason** 6:17 | 38:2 51:10,15 | 55:1,3 64:9,11 | 57:23 76:4 |
| 131:21,23 | 10:24 11:12 | 51:21 53:24 | 67:7 69:2,4,15 | 79:19 99:5 |
| 137:13 141:9 | 39:23 97:9 | 60:17,18 68:12 | 69:18 73:3 | 121:9 123:18 |
| 143:2,9,10,11 | 111:18 112:7 | 75:10,13 82:22 | 96:17 97:20 | 129:1 133:4 |
| 143:18,22 | 113:15 121:3 | 83:5,22 84:1 | 98:5 103:6 | 134:8 143:4,7 |
| 144:14,16,19 | 121:20 122:15 | 85:7 87:17 | 105:20,21 | 143:19 144:2 |
| 145:1,1,6,7 | 133:24 136:7 | 90:23 91:5 | 107:14,22 | 144:24 145:2,8 |
| 146:22,24 | 138:15 146:18 | 96:20 101:11 | 116:23 118:6 | 149:10 |
| 148:10 152:12 | 147:13 150:13 | 104:21 120:1,4 | 127:10,15,18 | **reinstates** 98:21 |
| **questions** 13:14 | 152:4 | 122:6,12 | 128:11 151:1 | **related** 18:2 |
| 31:14 50:5 | **reasonable** 13:5 | 133:11 134:10 | **refers** 8:9 33:23 | 26:16 48:22 |
| 91:7 126:4 | **reasons** 11:23 | 136:8,14,17 | **reflecting** 135:7 | 50:6 58:10 |
| 137:14 144:15 | **recall** 23:13,14 | 138:8 139:9 | **refrain** 13:8 | 73:1 102:10 |
| 151:14 | 23:18,19,20 | 140:20 142:1 | **refuse** 123:15 | 146:2 |
| **quick** 113:21 | 24:22 72:3 | 146:2 151:8 | **refused** 153:9 | **relationship** |
| **quicker** 45:7 | 120:17 150:10 | 152:14,16,19 | **regarding** 18:1 | 21:19 64:24 |
| **quote** 52:20 | **receive** 25:13,21 | 153:22 154:1 | 26:20 32:20 | 65:2 72:1,4 |
| 116:20 147:4 | 27:19 28:17 | **recorded** 39:7 | 33:7,19 34:5 | **relevance** 11:3 |
| | 29:6 30:2,19 | 140:1 150:17 | 35:2 37:4 | 40:3 |
| ___ | 31:11 50:22 | 150:18 | 151:22 | **relevant** 50:11 |
| **R** | 74:14 77:22 | **recording** 3:20 | **regards** 127:8 | 146:10 |
| **R** 2:1 155:1 | 78:6 83:13 | 35:18 60:21 | **Registered** 1:22 | **rely** 62:18 |
| **raised** 132:14 | **received** 25:24 | 126:12 127:3 | 155:12 | **remaining** 92:5 |
| **raising** 38:3 | 32:3 54:2 76:9 | 138:7 150:14 | **regular** 118:8 | **Remand** 103:2 |
| 85:8 101:12 | 79:20 80:6,10 | 150:16 | 141:18 | **remember** 23:12 |
| **Ralph** 60:19 | **receives** 54:19 | **recordings** | **reinstate** 32:23 | 150:6 |
| **range** 101:22 | **receiving** 142:18 | 138:16 149:13 | 36:6,14,22 | **remove** 22:13 |
| **Ray** 17:16,17 | **recess** 51:17 | **records** 13:21 | 37:10,18,22 | 127:6 |
| **Raymond** 1:13 | 105:3 134:12 | 45:12,15 49:6 | 54:1,4 57:7,12 | **removing** 22:8 |
| 3:3 6:2,14,15 | **recognize** 25:5 | 72:24 87:11,19 | 70:14 74:18,21 | **rep** 36:4 49:10 |
| 17:14,16 154:9 | 35:13,21 53:7 | 87:20 94:9 | 75:2,20,21 | **repeat** 34:10 |
| **read** 15:13 | 74:7 79:1 | 104:18 106:12 | 123:13,15 | 99:8 109:9,11 |
| 27:12 32:14 | 80:20 84:6 | 106:13 122:16 | 125:5 130:24 | **rephrase** 14:2 |
| 34:11,15 36:4 | 85:16 105:12 | 145:19 150:8 | 133:17 134:2 | 92:14 114:8 |
| 53:23 56:5,8 | 105:18 106:1 | **refer** 8:8,11 | **reinstated** 57:16 | 120:22 144:19 |
| 60:4 62:7 | | | | |

Raymond Crawford

Page 169

replace 139:6
report 73:12
    111:4,12,15,24
    112:4,15
    114:14 117:7
reported 140:14
reporter 1:16
    12:12 56:9
    109:16 141:8
    143:17 153:7
    155:12,19
Reporters 1:14
    1:22 60:19
Reporting
    105:23 113:7
reports 45:13
    72:12 73:6,7,8
    73:14,14,17,18
    73:19 111:20
represent 6:10
    37:17 68:5,10
    69:6 120:19
representation
    12:23
representations
    146:19
representative
    7:17 13:19
    36:13,21 37:2
    37:17,22 45:23
    46:1 47:22
    52:15 122:1
    126:18 133:15
    134:1,4,7
    135:8,15
    136:19,22
    137:23 138:1
    142:16
representatives
    37:9 38:15
    47:11 122:4,6
    132:19 136:6
represented
    12:20
Representing
    2:6,13,19

represents 65:22
    68:21
reproduction
    1:17 155:17
request 3:12
    16:3 25:6,21
    25:24 26:20
    33:9 38:7
    60:20 88:16
requested 34:3
    56:7 88:13,20
    102:10 109:14
    141:6 143:15
requests 34:1
    35:6 36:18
require 56:3,13
    56:18
required 9:12
    79:11 80:2,4,8
    87:15
requirement
    57:5,6 141:2
    141:12 142:7
requirements
    141:21,23
    142:14
requires 153:15
reschedule
    153:1
reside 7:14 10:4
    10:19
residence 9:7
    112:16 115:4
resident 115:16
    115:22
respond 13:13
    13:16 52:19
    151:19 152:10
responded 42:22
response 51:8
    60:23
responsibilities
    17:24 59:3,22
    62:1,11,21,23
    63:20 76:3,7
responsible 23:7

restate 108:8
result 5:6 11:22
results 111:8
retaining 23:7
Return 96:12
    103:1
returned 93:6,9
review 13:20,23
    14:4 15:23
    16:5 38:19,23
    39:9 42:1
    45:15 59:20
    87:7 149:23
    150:4
reviewed 125:11
    150:21 151:6
reviewing 43:15
reviews 45:13
reword 144:14
Rforrester@f...
    2:6
rhetorical
    137:13
Richard 2:3
    6:10 11:3,8
    13:7 15:11
    16:6 34:23
    50:10 108:16
    109:22 134:20
    144:18 146:5
ridiculous 126:5
    134:21 146:9
right 13:14
    22:11 32:22
    33:20 50:8
    55:10 57:11
    68:4 84:14,19
    98:2 108:19
    124:24 132:5,8
    150:2 154:2
rights 22:8
    114:4,6
Rodriguez 62:12
Rodriguez's
    62:21 63:9
role 61:18,20

Rosenberg
    60:19
row 84:12 86:11
    86:14 88:22
    89:6,18
rules 7:9 52:6
running 123:24
    124:14

_____
        S
S 2:1 3:8 4:1 5:1
sale 128:23
    147:4,10,11,15
    147:24 148:6
    148:13,16,21
    148:23 149:2
sanctions 52:18
saying 108:16
    129:21,24
says 36:4 49:9
    49:13 52:21
    66:5 85:4
    96:12 105:21
    108:21 121:8
    127:5 128:8
    150:16
scheduled 11:19
    11:22 13:1
    52:9
scheduling
    151:22
SCHIEL 2:10
    9:1 10:13,20
    11:2,7,14 12:1
    12:4 13:6,11
    14:6,19 15:4
    15:11,15,19,22
    16:16,22 17:1
    17:7 18:15,22
    20:10,22 21:11
    22:3,21 23:1
    25:7,16 26:5
    26:14,22 27:21
    28:5,19 29:8
    30:4,21 31:13
    32:5,24 33:13

33:21 34:7,14
34:19 35:3,15
36:15,24 37:11
37:24 38:10,22
39:13 40:1,17
41:4,12,21
42:3,17,23
43:9,16 44:13
44:20 45:3,16
46:2 47:4,13
47:24 48:8,14
49:3,23 50:9
50:24 51:9,20
52:19 53:18
54:12,20 55:8
57:8,17,24
58:4,19 59:5
60:3,16 61:11
61:19 62:13,22
63:10,22 64:7
64:14,21 65:3
66:4,13 67:5
67:13,22,24
68:11,22 69:9
70:7,15,20
71:1,9,20 72:5
72:15,22 74:8
74:20 75:3,22
76:6,16,24
77:9,24 79:7
79:21 80:23
81:5 82:1,19
83:2 84:16
85:6 86:1,18
87:9 88:8,23
90:14,22 91:15
92:10 93:4
96:19 97:3,10
97:18 98:17,23
99:6,16,23
100:7,19 101:6
101:16,24
102:11 103:7
103:15,19
104:7,15
106:10 107:9

Raymond Crawford

108:4,15,20
109:4,8,21
111:7 112:9
113:19 114:5
114:16 117:2,9
118:14,23
119:19 120:20
122:18 123:16
123:23 124:4
124:13 125:7
125:15,23
126:3 127:12
127:24 128:12
129:6,22 131:2
131:12,20
132:11 133:10
133:18 134:3
134:19 135:22
136:10 137:5
137:12 138:2
138:21 139:2,8
139:15 140:2
140:13 142:1,5
142:11,21
144:4,17 146:4
146:20 147:6
147:14,20
148:8,15 149:3
149:15 150:5
150:23 151:16
151:18 152:7
152:15,18
153:1 154:1
**scope** 18:15
  114:17
**score** 46:22
**scratch** 104:12
**second** 16:9
  32:19 69:20
  75:10 77:8
  82:10 96:3
  120:1 146:13
**Secondly** 52:3
  146:7
**section** 65:21
  68:13,19,23

69:10
**see** 15:21 17:18
  17:21 18:6
  25:3 27:17
  29:15,19 46:22
  48:17 53:14
  63:12 69:18
  78:19 84:10,12
  86:9,11,13,15
  86:15 96:11,14
  97:24 101:23
  105:17 107:23
  108:12 110:15
  113:6 120:16
  121:5,12
  122:17 124:21
  124:23 125:21
**seeing** 24:22
  133:21
**seen** 23:22 24:12
  30:5 35:23
  60:11,13 77:19
  77:21 78:17
  102:21 132:13
  148:17
**seller** 61:4
**send** 70:13
  80:11 125:10
  129:16 140:23
  141:9 142:10
  142:19
**sends** 79:17
  92:18 141:18
  141:24
**sent** 36:11 66:2
  66:9 92:5,19
  93:2 140:18
**sentence** 25:2
**separate** 114:13
  129:8,18
**served** 153:19
**service** 21:5,21
  98:19
**servicer** 21:24
  22:1
**servicing** 21:6

22:8 61:3
87:11,19
122:19,22,24
123:2,9 138:9
140:19 141:18
142:18 150:7
151:2,5
**set** 9:14 52:14
  103:3 148:21
**settlement** 13:22
  96:7,9,17
**seven** 11:8 12:8
  12:13,14 19:9
  52:21,23 121:1
  128:7 151:10
  153:7,8,11
**seven-hour** 52:5
**seventh** 27:15
**share** 9:4
**sharing** 8:24
**short** 11:24
  12:17 17:5
  128:23
**shortly** 12:6
**show** 66:16
  108:9 146:9
  151:24
**showing** 26:12
  121:10
**shows** 107:11,11
**side** 46:5,9,12,15
  68:9
**signature** 91:16
**significant**
  100:15 147:5
  147:13,18
  148:13
**silence** 139:1
**similar** 79:18
**simple** 145:7
**Singlar** 1:15
  155:11
**single** 10:11
  50:12,12
  121:24 132:18
  133:15 140:15

140:16
**sir** 7:11 11:16
  14:1 22:12,16
  23:13,17 24:24
  25:11 27:3
  28:1,9,23
  29:11 33:4
  35:24 36:17
  38:4 39:2
  41:18,23 42:14
  42:19 43:12,20
  44:23 45:18
  47:19 48:10
  50:2 51:13
  53:21 55:1,22
  56:21 59:8
  61:7,23 62:4
  63:13,24 64:9
  69:2,19 70:17
  73:4,19,24
  74:10 75:8
  77:12 78:18
  80:21 81:1,7
  81:15,18 82:23
  83:15 89:1,15
  90:5 91:11
  93:17,20,23
  94:7,10,18
  95:2,10,18
  96:2,10,15,18
  97:21 98:10
  99:9,18 100:3
  100:11,24
  102:14,22
  103:9 104:3,21
  106:8 109:10
  110:10 112:18
  113:3,14,23,24
  114:12,13
  115:5,23 116:5
  116:18 117:12
  118:3,10,17
  120:16 122:20
  124:22 125:17
  126:11 127:2
  127:16 129:9

130:1 131:7,23
132:12,20,20
132:20 133:20
134:6 137:8,21
138:4,18
139:16 141:21
142:7,13 143:2
144:14 145:20
145:23 146:24
148:11,20
149:20 151:6
152:11
**sit** 39:21 146:15
**situation** 130:20
**situations** 130:9
**six** 19:6 36:2
  48:24 49:1
  120:24 127:5
**skip** 7:10
**sole** 113:15
**somebody** 22:14
  37:22 46:19
  129:14 130:5
**somebody's**
  129:19
**someone's**
  115:24
**soon** 52:1
**sorry** 29:17
  49:16,20 56:4
  68:6 74:8
  91:17 99:8
  104:9 108:18
  126:21
**sort** 56:18
**sought** 99:4,14
  101:5
**South** 1:14,23
**speak** 17:24
  38:6 46:16
  48:3 51:10
  56:21 82:7
  86:19 100:17
  104:19 127:15
**speaking** 11:4,9
  13:10,15 34:17

97:6 122:17
123:3 124:2
125:9 128:16
134:24 148:21
**speaks** 25:8
54:13,16 66:5
68:12 86:2
100:21 108:5
125:16 139:9
142:2 149:16
**specific** 23:23
27:4 28:10
41:7 46:5
73:13 89:20
116:13 144:17
**specifically** 9:2
63:1 65:5
78:23 89:20
141:16 143:22
**speculate** 79:16
148:11
**speculating**
128:1
**speculation** 11:2
15:5 22:4
25:17 27:22
28:6,20 29:9
30:6,22 31:17
32:7 33:1,14
36:16 37:1,12
41:21 43:10
46:3 47:5,24
49:23 51:1,10
53:19 58:19
62:22 63:10
64:15 65:4
71:1 79:7,21
82:20 86:18
92:11 96:23
98:24 99:7
100:8 102:1
103:7 107:10
120:21 123:16
125:8 127:12
128:13 129:6
131:2 136:10

138:2,21 139:2
139:8 142:22
148:9 149:4
150:5
**speculative** 40:1
**spelled** 49:14
**spelling** 49:15
**spoke** 12:6,7
15:15 47:10
51:21 58:17
128:14 142:24
**spoken** 48:24
**stamp** 59:19
119:5,13
**stamped** 59:18
61:9 106:13
**standard** 55:6,8
**start** 13:3 71:18
**started** 15:16
153:3
**starts** 27:15 72:1
84:12 120:10
120:14
**state** 6:12 11:17
33:1,1,4,4,24
48:20 76:15,22
79:19 98:5
101:1 116:21
135:11 141:1
141:11
**stated** 40:10,12
44:6,8 45:14
56:22 57:2
58:8,11 63:12
77:8,8 78:3
104:5 113:15
113:21 120:11
123:8 142:13
145:1 147:1
149:24
**statement** 3:22
4:11,12 53:10
55:21,23 56:2
56:12,19 57:2
57:2,6 66:2,9
80:11 84:7

85:19,20,24
86:3,21 88:18
103:20 104:6
106:19 118:9
**statements**
38:20 55:15,24
56:10,22,23
86:19 116:14
118:12 140:23
141:9,18,24
142:10,18
**states** 1:1 6:21
15:6 17:23
53:24 75:19
92:19 121:1
128:11
**stating** 25:10
40:14,15 45:9
116:22
**status** 20:20,22
48:2,6 80:5,7
111:22,23
**stay** 11:21 12:12
12:14 13:2
52:4 153:7
**stenographic**
155:5
**Stipulation**
103:1
**stop** 16:19 33:12
124:4,6,13
**stops** 141:3,13
**Street** 1:14,23
2:4,10
**strictly** 130:16
130:19
**stuff** 9:21 20:19
105:1
**stupid** 146:11
**subject** 72:17
102:24
**subparagraph**
96:12
**subsequently**
99:13
**sued** 20:14

**sufficient** 64:1
84:23 86:23
**Sugita** 2:9 60:20
103:13
**suit** 77:7,8
**Suite** 1:14,23 2:4
2:16
**Superior** 98:4
**Supersedeas**
103:3
**supervise** 38:9
38:12,14,18
43:7 114:10
**supervising**
73:22
**supervision**
155:19
**supervisor** 39:9
**supporting**
129:15
**supposed** 37:20
85:1 142:10
**sure** 9:15,19
40:7 41:8
43:20 45:18
64:8 78:8 79:2
81:18 83:15
93:17,23 94:10
102:22 103:9,9
110:10,12
141:2,3,12,13
143:6 145:20
150:17,19
151:20
**Susan** 1:15
155:11
**sworn** 3:4 6:3
**system** 39:22
41:15 135:14
135:17,19,21
138:8 140:19

―――――――――
**T**
**T** 2:3 3:8 4:1 5:1
155:1,1
**table** 69:4,21

**take** 32:14 41:1
41:9 50:21
96:3 101:14
104:2,24
110:13,16
114:2 124:17
134:9 146:13
**taken** 1:13 6:18
7:6,21 8:5 9:18
9:24 10:6,9,11
10:16,18 24:13
51:17 105:3
134:12 155:5
**takes** 44:2 132:9
**talk** 13:11 16:24
45:22 47:21
78:22 141:16
**talked** 123:12
133:16
**talking** 12:2
16:20 22:22
43:22 46:6,15
54:23 68:1
69:17,20 71:22
72:17,18,20
106:7 109:6
110:15 116:14
116:15,19,20
122:7 127:20
136:8 142:23
147:22 148:18
**tardiness** 11:6
**task** 13:18
**tax** 66:16 70:3
70:10,10,11
**taxes** 67:16
**tech** 135:23
**telephone** 42:16
42:22 43:7,23
47:3,23 122:16
152:5
**tell** 21:16 36:6
36:21 37:22
58:16 59:21
60:6 65:21
68:20 81:20

87:2,8,24 88:3
109:2,18
110:23 118:7
118:11,19
119:16 142:17
**telling** 37:19
**ten** 19:18 121:8
134:23
**terminate**
153:12
**terms** 24:8 96:8
**testified** 6:4
33:22 44:16
82:3 93:5
101:8 102:2
117:4
**testify** 13:21
14:15 15:7
18:9,20 19:2,5
19:8,11,14,17
19:20,23 20:2
20:5 48:21
50:4,10 58:9
58:12 85:2
96:22 126:2
**testifying** 18:4
18:13 124:12
**testimony** 7:6,9
10:14 56:8
62:20 63:2
100:20 101:17
106:11 109:15
113:20 133:13
134:20 141:7
143:16 144:6
155:7
**text** 53:12,23
**Thank** 31:16
72:11 78:10
119:24
**thing** 7:12 92:20
139:16
**things** 13:12
45:18 122:13
129:9 130:2
132:1 151:8

**think** 40:19 52:7
119:1 124:1,7
125:24 138:4
**thinking** 128:3
128:15
**third** 34:8 91:12
91:15 105:17
105:18 113:5
152:20
**third-party**
71:13
**thought** 152:13
**thousand** 102:5
102:5
**threats** 151:23
**three** 18:14,16
34:20,22 96:11
96:12 113:12
126:21,22,23
127:1
**three-way** 138:5
**throwing** 124:5
**Thursday** 1:10
1:15 155:6
**time** 10:11,16
12:19 16:20
17:1,5,6,8 26:1
26:2 34:8
41:20 43:1
44:14 52:11
64:8,11 73:3
73:13,14,15,16
73:20 79:11
88:19 101:7
102:6 110:13
112:14 117:18
118:17 121:15
123:14 124:10
125:6 126:17
126:18 133:3,7
135:5,7,15
137:9 139:19
149:6 152:20
153:9,10
**times** 7:2,3,20
9:15,17 23:3

34:20,22 44:6
122:2 144:5
147:23
**title** 7:16 47:2,11
47:23 48:7
49:22 50:12
102:23 151:4
**titled** 68:13
69:10 86:7,11
**today** 6:16,18
11:8 12:9 16:2
18:3,20 52:4
52:14 138:17
**told** 36:13 44:3
48:13 122:4
133:16 134:1
**tomorrow** 11:22
13:1 52:9
152:1
**tomorrow's**
52:13 151:13
**tonight** 12:9,13
12:15 52:12,22
**top** 28:21 30:23
31:18 32:8
51:2 58:22
65:6 69:21
71:2,4 76:17
77:1 149:17
**topics** 18:4,6,10
18:14,21 19:3
19:6,9,12,15
19:18,21,24
20:3,6 48:21
48:22
**track** 9:20 44:19
44:22 45:1,10
131:10
**train** 39:4 41:1
41:10
**trained** 39:22
**training** 39:6,18
39:20,22 40:8
40:11 42:9
46:21 121:23
**transaction** 5:5

105:15 106:4
106:17,20
107:16
**transcribed** 61:6
**transcript** 1:17
3:20 34:16
35:17,18,21
50:2 60:18
120:17 126:12
127:3 155:7,16
**travel** 7:23 9:10
9:20 10:15,16
11:1,13 52:17
100:16
**traveled** 9:17
10:12
**trial** 15:2,5
97:13
**trials** 9:20 13:21
14:15,16
**true** 10:10 17:7
**try** 8:11 110:14
**trying** 14:22
121:2 124:6
144:20 145:5
**tune** 103:14
**turn** 17:20 18:12
36:2 49:12
62:6 63:15
120:8,9,24
126:7,13,20
127:4 128:6
**Turnita** 49:13
**Turnita's** 49:22
**twice** 112:10
**two** 17:20 18:7
18:10 25:2
49:12,18 62:8
63:17,24 65:16
68:8 69:12
91:7,9 105:22
105:22 129:8
129:24 130:1
**type** 50:13 56:1
56:11 79:4
89:12,17 111:5

**types** 88:1,21
89:5 106:24
115:6 116:9,16
116:24 117:5
**typical** 7:9
101:22
**typically** 4:8
137:11

___

**U**

**uncontested**
14:9
**underlying**
146:2
**underneath**
65:22 69:5
**understand** 8:9
8:14,19 14:1
14:22 24:6
26:7 33:16
37:13 39:1
40:5,6,13,20
40:21 43:3
45:10 58:6
72:7 73:24
92:21 97:10
131:22 143:11
144:2,9,12,16
144:19 145:5
146:23 147:1
147:21
**understanding**
20:8,13 38:17
53:16 55:18
123:17
**understood**
33:15 38:24
42:6 43:2,17
46:7 47:16
49:5 54:22
58:2 61:13,21
62:24 66:14
67:14 71:23
74:22 76:8
79:9 109:8
118:15 131:21

Raymond Crawford

Page 173

134:5 146:22
**United** 1:1 6:21
**unquote** 52:20
  116:20
**unusual** 142:17
**up-to-date** 77:11
**update** 21:14
  136:2,8,17,20
  137:15
**updated** 135:19
  135:21 136:14
  136:21,22
  137:2,3,8
**use** 71:15 119:20
**uses** 138:8
**usually** 142:19
**Utah** 1:5

――――――――

**V**

**vague** 9:1 14:6
  14:19 20:10,23
  21:12 22:22
  26:6 33:14
  36:24 37:11
  38:10,22 39:2
  40:2 42:4,24
  47:13 48:14
  54:21 58:1
  61:11 64:7,15
  66:13 67:13
  68:22 71:10,20
  72:6,15 74:20
  76:6 79:8,22
  84:16 88:8,23
  92:10 97:3,8
  97:18 98:23
  99:6 100:7,20
  102:12 104:15
  109:4 111:7
  114:5,16
  118:14 119:20
  120:20 122:18
  125:7 131:12
  131:20 132:11
  133:18 134:3
  140:2,13

146:20 147:6
147:20 148:8
149:3 150:23
**varies** 33:1,3
  141:1,11
**various** 44:8
**vary** 33:24
**vendor** 71:13
  114:12
**verbally** 140:12
**verify** 121:2
**versus** 57:2
**Villanova**
  153:23
**violate** 114:3
**violates** 114:7
**voice** 38:3 85:8
  101:12
**VS-** 1:4

――――――――

**W**

**W** 2:10
**wait** 12:3 31:15
**want** 8:8 9:3
  17:2,2 24:1,1,1
  34:15 40:2
  44:1 45:4,19
  53:11 66:20
  67:24 78:22
  79:24 87:9,12
  87:13 88:24
  90:22 101:1
  109:21,23
  113:18 117:17
  126:3 135:3
  137:14 143:13
  146:9,15
**wanted** 134:16
**wants** 139:24
  153:12
**wasn't** 68:1
  72:22 103:20
**Waste** 17:1
**way** 110:6
  130:14 131:18
  132:6 147:19

**We'll** 50:20
  104:12,22
**we're** 46:5 62:19
  104:24 153:14
  153:18
**wee** 52:12,20
**went** 12:7
  138:18 150:1
**whatsoever**
  58:14
**willing** 12:14
**willingness**
  12:12 153:11
**Withdraw** 103:2
**witness** 3:2,4
  10:15,22 11:16
  12:9 13:14
  14:8 15:1,3,6,6
  16:6,24 17:14
  18:18,24 20:13
  20:24 21:13
  22:7 23:2
  25:10,19 26:8
  26:16 27:3,24
  28:9,23 29:11
  30:5,8 31:1,20
  32:9 33:3,16
  33:22,24 34:21
  35:5,21,24
  36:17 37:2,13
  38:3,4,11 39:1
  39:15 40:6,19
  41:14,22 42:7
  42:18 43:3,11
  43:19 44:15,22
  45:6,17 46:9
  47:7,17 48:2,9
  48:15 49:6
  50:1 51:4,13
  51:22 53:20
  54:24 55:10
  57:19 58:3,23
  59:7 61:14,22
  62:14 63:2,12
  63:23 64:8,16
  64:22 65:7

66:7,15 67:7
67:15,23 68:15
69:1,12 70:9
70:16,21 71:4
71:24 72:8
74:10,23 75:24
76:9,19 77:3
77:11 79:10,23
81:1,7 82:2,5
82:21 83:4
84:17 85:8
86:3,21 87:14
87:18 88:24
91:19 93:5,8
96:22 97:7,19
98:19 99:8,17
100:1,10,13
101:2,8,13
102:1,4,13
103:8 104:9,20
107:11 109:9
110:2 111:8
112:11 113:23
114:18 117:3
117:11 118:16
119:1,22
122:19 123:17
124:1,5,6,8,14
125:9,17
127:14 128:4
128:16 129:8
129:24 131:6
131:15,22
132:12 133:20
134:6,15 135:3
135:24 136:13
137:7,15 138:3
138:22 139:4
139:11,16
140:4,16 142:6
142:13 143:1
143:10 144:7
146:23 147:8
147:15,23
148:10,20
149:5,19 150:9

151:1 152:11
152:23 153:6
153:17 155:8
**witness'** 10:13
  100:20 101:17
  106:11 113:20
  133:12 152:21
**Wolfe** 1:14,22
  35:19 64:20
**word** 14:7 26:14
  40:20 61:12,19
  74:21 113:6
  134:4 144:9,12
**words** 45:6 68:8
  96:23 119:20
  120:18 124:7
  127:13 128:1,3
  128:14
**work** 14:13,23
  14:24 22:2
  73:6,11 123:7
  151:11,12
**working** 123:5
  132:7 136:16
**workout** 128:9
  128:11,17,17
  128:19 149:12
**wouldn't** 85:3
  88:24 124:15
  136:7
**writing** 140:11
**written** 39:11,14
  39:15,19,24
  40:2,12,15,16
  57:11
**wrong** 42:9
  110:5
**Wyman** 64:20

――――――――

**X**

**X** 3:1,8 4:1 5:1

――――――――

**Y**

**yeah** 14:12 26:3
  39:21 40:6
  46:16 55:17

| | | | | |
|---|---|---|---|---|
| 109:7 127:14 | **13** 20:3 | **253** 59:23 | **5822** 59:4 | **89** 4:13 |
| **year** 9:16 68:16 | **13,302.11** | **26** 25:22 | **59** 4:3 | |
| 72:14 73:2,5 | 119:23 | **2653** 59:18 | **5th** 82:13,13,17 | **9** |
| 73:17 87:6 | **1303** 1:14,23 | **2653-2685** 4:3 | 82:18 | **9:00** 13:1 52:14 |
| 117:15 118:17 | **14** 20:6 119:3 | **2685** 59:19,24 | | 152:1,2 |
| 118:17 139:14 | **145** 5:9 | **26th** 2:10 26:21 | **6** | **90** 4:14,15 |
| **years** 138:12 | **14th** 28:4 | **27** 3:13 | **6** 3:6 119:2 | **91** 4:16 |
| | **15** 3:11 119:2,3 | **28** 3:14 | **6/15/18** 4:16 | **922-7112** 1:24 |
| **Z** | 119:3 124:12 | **29** 3:15,16 | **6/19/18** 4:17 | **93** 4:17 |
| | **15th** 93:3 | | **6/20/18** 4:18 | **94** 4:18,19,20 |
| **0** | **16-1-313** 76:14 | **3** | **6/26/18** 4:19 | **95** 4:21,22,23 |
| **08628** 2:17 | 98:4 | **3/19/18** 4:12 | **6/28/18** 4:20 | **96813** 2:5,11 |
| | **17** 54:2 108:14 | **30** 3:17 60:4 | **6/6/18** 4:15 | **999** 2:10 |
| **1** | **17th** 36:14 108:1 | 112:1,3 | **60** 7:3 | |
| **1-10** 1:6 | 108:16,17 | **30(b)(6)** 8:10 | **609** 2:17 | |
| **1,000** 101:21 | **18** 126:14 127:5 | 153:16 | **61** 119:8,11 | |
| **1,189** 67:21 | 127:23 128:7 | **31** 3:18,19 | **64** 124:18,20 | |
| **1/17/18** 3:22 | **18-00319** 1:4 | **31st** 77:23 78:7 | 125:1,20,22 | |
| **1/31/18** 4:6 | **18-319** 6:21 | **35** 3:20 | **65** 4:4 | |
| **10** 119:3 | **19102** 1:23 | **36** 62:6,8 126:20 | **6963** 62:12 | |
| **10/26/18** 4:22 | **19th** 86:4 | **3776** 48:7,9,13 | | |
| **10/9/18** 4:21 | | 48:16 | **7** | |
| **100** 102:5 | **2** | | **7** 1:10,15 2:16 | |
| **102** 5:4 | **2,500** 102:4 | **4** | 155:6 | |
| **105** 5:5 | **2/26/18** 4:7 | **4,362** 82:15,17 | **7/17** 107:15 | |
| **1099** 2:4 | **20** 126:14 | 82:17 | **74** 4:5 | |
| **11** 19:21 121:8 | 155:13 | **4/15** 119:2 | **75** 96:12 | |
| **11/1/18** 4:23 | **200** 102:5 | **4/16/18** 3:16 | **77** 4:6 | |
| **11/14/17** 3:13,14 | **2017** 26:21 28:4 | **45-133** 112:16 | **78** 4:7 125:24 | |
| 3:15 | 36:14 108:19 | **4736** 49:20 | **79** 63:15 120:10 | |
| **11/14/18** 5:4 | 118:22 133:4 | **473776** 49:21 | 120:14 | |
| **11/15/17** 3:17,18 | **2018** 54:2 77:23 | | | |
| 3:19 | 78:7 82:13,14 | **5** | **8** | |
| **11/16/17** 3:21 | 82:18,18 86:4 | **5,505.48** 86:14 | **8** 119:2 | |
| **11:30** 153:2 | 93:3 133:5 | 86:16 | **8,057.20** 68:10 | |
| **110** 5:6 | **2019** 1:10,15 | **5/22/18** 4:10 | **8/18/14** 4:11 | |
| **112** 5:7 | 155:6 | **5/31/18** 4:13,14 | **8/7/19** 5:9 | |
| **113** 121:2 | **2022** 155:13 | **5:00** 52:14 151:8 | **8:00** 12:8 | |
| **114** 121:2 | **2110** 2:4 | **5:04** 154:9 | **80** 4:8 | |
| **114,127.73** | **212** 2:16 | **50** 3:21 7:3 | **808)292-4324** | |
| 53:13 54:17 | **215** 1:24 | **53** 3:22 126:8,10 | 2:5 | |
| **117** 5:8 | **22** 85:15 | **54** 119:8,11 | **808)535-5700** | |
| **12** 19:24 119:3 | **2265** 2:17 | **55,000** 103:14 | 2:11 | |
| **12:15** 153:4 | **23** 90:23 | 103:20 | **81** 4:9 120:24 | |
| **12:29** 1:15 | **230** 1:14,23 | **566,940** 82:15 | **83** 4:10,11 | |
| **12:30** 11:18 | **24** 3:12 90:23 | **57** 126:13 | **85** 4:12 | |
| 153:4 | | **571,302** 82:15 | **883-3900** 2:17 | |