IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JOHN HOCHROTH,<br><br>            Plaintiff,<br><br>      vs.<br><br>ALLY BANK, a Utah for profit corporation; CENLAR FSB, a federally chartered bank; DOES 1–10,<br><br>            Defendants. | CIVIL NO. 18-00319 JAO-KJM<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS ALLY BANK AND CENLAR FSB'S MOTION FOR SUMMARY JUDGMENT AND REQUEST FOR SANCTIONS FOR PERJURY |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS ALLY BANK AND CENLAR FSB'S MOTION FOR SUMMARY JUDGMENT AND REQUEST FOR SANCTIONS FOR PERJURY**

This action arises from Plaintiff John Hochroth's ("Plaintiff") default on his mortgage and subsequent reinstatement efforts with Defendants Ally Bank ("Ally") and Cenlar FSB ("Cenlar").  Defendants seek summary judgment on all claims—Fair Debt Claims Protection Act ("FDCPA") (Counts 1 to 11) and state-law reinstatement claims (Counts 12 to 14)—and request sanctions for false statements in the Complaint.  For the following reasons, the Court HEREBY GRANTS IN PART AND DENIES IN PART Defendants' Motion for Summary Judgment and Request for Sanctions for Perjury.  ECF No. 49.

## BACKGROUND

I.   Factual History

A.   Default and Property Inspection

Ally is the holder of Plaintiff's mortgage, which Plaintiff defaulted on in or around June 2014.  ECF No. 89.  Cenlar began servicing the loan on approximately July 1, 2014 and retained Five Brothers Mortgage Company Services and Securing ("Five Brothers") to conduct monthly visual inspections of Plaintiff's real property and to leave door hangers on the property or with Plaintiff.  Defs.' Concise Statement of Facts ("CSF"), ECF No. 50 ¶ 23; Decl. of Rep. of Cenlar, Diane Constantine ("Constantine Decl."), ECF No. 50-2 ¶ 21; Decl. of Rebecca Sutton ("Sutton Decl."), ECF No. 50-3 ¶ 12.  The purpose of the inspections was to verify occupancy and to confirm the exterior condition of the property.  Defs.' CSF ¶ 23; Constantine Decl. ¶ 21; Sutton Decl. ¶ 14.  The door hangers were left at the property so that Plaintiff would contact Cenlar.[1]  Defs.' CSF ¶ 28; Sutton Decl. ¶ 25.

---

[1]  The door hangers had an outside envelope and insert.  The envelope was marked "CONFIDENTIAL"; the insert stated:  "URGENT" "PLEASE CONTACT OUR OFFICE" and provided the telephone number 866-401-4742.  Sutton Decl. ¶¶ 29, 31; Ex. T, ECF No. 50-31.  Another insert stated:  "Dear Borrower:  **URGENT NOTICE:** Central Loan [handwritten]  Please contact your mortgage servicer immediately at: (877) 237-2662 [handwritten]  Thank you."  Sutton Decl. ¶ 32; Ex. T.

All facts pertaining to Five Brothers are undisputed.  Cenlar did not provide Five Brothers with any financial information concerning Plaintiff's debt or foreclosure process; Cenlar did not hire Five Brothers to collect funds from Plaintiff, enforce any security interest, or pay Five Brothers based on amounts paid by Plaintiff; and Cenlar provided all information for the door hangers to Five Brothers and approved the final product.  Defs.' CSF ¶¶ 24–25, 27; Constantine Decl. ¶¶ 22–23, 25, 30; Sutton Decl. ¶¶ 6–11, 15–19, 29–32.  Five Brothers does not send mailings to debtors and it did not mail anything to Plaintiff.  Defs.' CSF ¶ 29; Sutton Decl. ¶¶ 7, 34.

For each inspection conducted from March 16, 2015 to February 2018, Five Brothers prepared a Property Inspection Report.  Defs.' CSF ¶ 31; Sutton Decl. ¶¶ 13, 20–21; Ex. U, ECF No. 50-32.  During the inspections, which occurred between 8:00 a.m. and 8:00 p.m., Five Brothers did not serve Plaintiff with any documents.  Defs.' CSF ¶¶ 30, 32; Sutton Decl. ¶¶ 23, 36.  Property inspections are conducted pursuant to strict instructions to:  (1) visually confirm and document (with photos) the property's condition; (2) attempt to contact the occupant by knocking on the door; (3) tell the occupant that the inspector was hired by the servicer to inspect the exterior of the property; (4) if the occupant confirms that he or she is the mortgagor, tell him or her to contact the servicer at the telephone number provided with the door hanger if he or she needs additional information;

and (5) leave a door hanger with the occupant who spoke to the inspector, or leave the door hanger on or near the entry door.  Defs.' CSF ¶ 34; Sutton Decl. ¶ 24.  The Court has no evidence before it that the Five Brothers inspectors here did otherwise.

### B.   Reinstatement

On February 19, 2016, Ally initiated a foreclosure action against Plaintiff and others in the Circuit Court of the First Circuit, State of Hawai'i.  Mem. in Supp. of Mot. at 4.  On October 16, 2017, judgment entered against Plaintiff. Defs.' CSF ¶ 1; Ex. A, ECF No. 50-4.  Later that month, Plaintiff's counsel, Richard Forrester, requested reinstatement amounts from Ally.  Defs.' CSF ¶ 2; Decl. of Counsel, Jesse Schiel ("Schiel Decl."), ECF No. 50-1 ¶ 6; Pl.'s CSF in Opp'n (additional facts), ECF No. 74 ¶ 1; Ex. 2, ECF No. 73-4.  At the time, Ally determined that the deadline for reinstatement under the mortgage had expired. Defs.' CSF ¶ 3; Schiel Decl. ¶ 6; Pl.'s CSF in Opp'n (additional facts) ¶ 2; Ex. 16, ECF No. 73-18.

Plaintiff then called Cenlar about reinstating the mortgage.  Defs.' CSF ¶ 4; Ex. D, ECF No. 50-7 at 4:14–16, 5:24–6:21.  Between December 2017 and February 2018, Plaintiff telephoned Cenlar 12 times.  Defs.' CSF in Opp'n ¶¶ 14– 15; Ex. Q, ECF No. 50-28; Ex. R, ECF No. 50-29; Decl. of John Hochroth ("Hochroth Decl."), ECF No. 73-1 ¶¶ 19, 21, 23, 25–29, 31–33, 36.  Plaintiff

claims that on January 6, 2018, Cenlar left him a voicemail.  Hochroth ¶ 10; Ex. 211.

On December 27, 2017, Plaintiff sent Cenlar a letter stating that it could communicate with him directly and that neither he nor his attorney had any cease and desist document in place prohibiting direct communication with him.[2]  Defs.' CSF ¶¶ 5–6; Ex. C, ECF No. 50-6; Ex. R.  During communications with Plaintiff, Cenlar representatives repeatedly told him that he must obtain the reinstatement amount from, and negotiate any attorneys' fees and costs with, its attorneys.  Defs.' CSF ¶ 9; Ex. D at 5:24–7:7; Ex. E, ECF No. 50-10 at 18:20–19:21, 22:20–24:11, 25:25–28:1, 29:5–30:3, 31:7–9; Ex. F, ECF No. 50-12 at 41:17–42:6, 43:17–50:20.  Plaintiff complains that Cenlar provided contradictory information about the law firm representing them for his foreclosure, but the record demonstrates otherwise.  Plaintiff acknowledged that Jesse Schiel was the attorney referenced in his conversations.[3]  Ex. F at 45:22–25 ("All I want is a letter, an e-mail, a fax that

---

[2]  Plaintiff claims that he prepared the letter at Cenlar's direction during communications in violation of 15 U.S.C. § 1692c(a)(2).  Pl.'s CSF in Opp'n ¶ 6; Hochroth Decl. ¶ 20.  This does not refute the fact that Plaintiff sent the letter consenting to communications that *he*, not Cenlar, initiated.  Hochroth Decl. ¶ 19 ("On December 27, 2017, I called Cenlar and was told that they could not speak to me due to a 'cease-and-desist' in the file, and I was told by an employee of Cenlar over the telephone that to further communicate regarding reinstatement, they needed a letter providing consent to speak further without counsel.").

[3]  That Plaintiff was purportedly confused about Mr. Schiel's firm affiliation—

(continued . . .)

says:  To:  Jesse Schiel, at whatever that firm is that you hired—it's okay to go ahead and give Mr. Hochroth the reinstatement quote.").

After receiving a copy of Plaintiff's December 18, 2017 loan statement from Cenlar, Ally responded that it would permit reinstatement in the amount of $113,356.91, even though it was not obligated to do so under applicable law and the terms of the note and mortgage.  Defs.' CSF ¶¶ 7–8; Ex. B, ECF No. 50-5; Ex. G, ECF No. 50-14.  As a condition of the reinstatement, Ally required Plaintiff to pay $47,021.68 in attorneys' fees and costs incurred in the foreclosure action through January 31, 2018.  Defs.' CSF ¶ 8; Ex. G.  Plaintiff accepted the proposed reinstatement amount but rejected the proposed attorneys' fees.  Ex. 43, ECF No. 73-45.  Plaintiff agreed to pay $5,500 in fees and asked that his ex-wife not be part of any settlement.  *Id.*

Following email discussions about Ally's proposal, by email dated February 6, 2018, Mr. Forrester responded:

---

(. . . continued)
which it does not truly appear he was—or why Cenlar retained Kobayashi Sugita & Goda, LLP ("KSG") versus The Mortgage Law Firm Hawaii, does not create a factual issue.  Ex. D ("And now, of course, adding insult to injury, now I've got the law firm that . . . the bank hired here in Hawaii[.]  It's apparently the highest-priced law firm in town.  It has the former Attorney General, who's on my case for some reason, going against little old me."); Ex. E at 30:15–20 ("It's the foreclosure attorney in Hawaii here . . . the firm that you guys hired for my case is, like I said, is not—from what my attorney tells me, is not the one you guys would normally—not the one you'd normally hire.").

6

> Jesse:
>
> I spoke with Mr. Hochroth and it seems we are in a [sic] agreement on all of the material terms, namely: (1) $113,356.91 to Cenlar (or similar adjusted figure if Feb 14 passes); (2) reasonable attorneys' fees should be decided by motion (hearing or non-hearing); (3) a settlement agreement documenting the above; and (4) dismissals of all claims and appeals.
>
> However, for reasons we can discuss tomorrow, we need you to file your motion for attorneys' fees first. Mr. Hochroth can provide proof of funds for the reinstatement to Cenlar in the meantime.

Ex. H, ECF No. 50-15; Defs.' CSF ¶ 11. Notwithstanding this communication, Plaintiff contacted Cenlar that day to inquire about the reinstatement amount— whether it was $113,356.91, as provided in the email from Mr. Schiel, or $114,127.73, per his January statement. Defs.' CSF ¶ 12; Ex. I, ECF No. 50-16 at 80:8–81:7; Constantine Decl. ¶¶ 14–15, 19. The Cenlar representative advised Plaintiff that he should rely on the amount provided by Mr. Schiel. Defs.' CSF ¶ 13; Ex. I at 81:16–18. But the next day, Plaintiff sent Cenlar a $114,127.73 certified check, the January statement amount. Defs.' CSF ¶ 13; Constantine Decl. ¶ 20. Plaintiff construes the January statement as a "bonafide offer" to reinstate the mortgage.[4] Pl.'s CSF in Opp'n ¶ 8; Ex. 38, ECF No. 73-40.

---

[4] Plaintiff cites paragraphs 4 and 24 of his Declaration, neither of which pertains to the January statement or his understanding of the same. Paragraph 4 discusses the filing of his Answer in the foreclosure proceedings and paragraph 24 mentions unproduced transcripts or recordings.

By letter dated February 26, 2018, Cenlar notified Plaintiff that it received his reinstatement payment and that any foreclosure action would be closed. Defs.' CSF ¶ 19; Ex. M, ECF No. 50-24 at Ex. A. The letter also advised Plaintiff that "there may be default-related charges that were not yet billed at the time your last billing statement was issued. Any such fees will be included on a future billing statement." Ex. M at Ex. A. Plaintiff's loan statements in the months following reinstatement did not include charges for attorneys' fees and costs. Defs.' CSF ¶ 21; Ex. S, ECF No. 50-30.

To comply with what it thought was an agreement between the parties, Ally filed a motion for fees and costs in the foreclosure action. Defs.' CSF ¶ 16; Ex. J, ECF No. 50-18. Plaintiff disputes that he reached an agreement with Ally. Decl. of Counsel, Richard T. Forrester ("Forrester Decl."), ECF No. 73-2 ¶ 97. Yet Mr. Forrester never argued that fees and costs were satisfied; he only challenged the reasonableness of the fees and costs. Defs.' CSF ¶ 17; Ex. J; Ex. J1, ECF No. 50-19; Ex. J2, ECF No. 50-20; Ex. J3, ECF No. 50-21. The state court awarded Ally attorney's fees totaling $44,293.70. Defs.' CSF ¶ 18; Ex. K, ECF No. 50-22; Ex. L, ECF No. 50-23.

Following the issuance of the fee orders, Mr. Forrester submitted a letter to the state court asserting that a post-reinstatement February 26, 2018 letter from Cenlar to Plaintiff negated the fee order. Defs.' CSF ¶ 19; Ex. M. The state court

8

nevertheless issued a Judgment for Attorneys' Fees and Costs on July 27, 2018.[5]

Defs.' CSF ¶ 19a; Ex. Y, ECF No. 50-36.

By letter dated June 6, 2018, Mr. Forrester demanded that Ally dismiss the foreclosure action because Plaintiff had settled the matter with Cenlar and reinstated the mortgage.  Pl.'s CSF in Opp'n (additional facts) ¶ 14; Ex. 61, ECF No. 73-63.  Ally rejected the demand, responding that it was entitled to the fees awarded and was not agreeable to setting aside the fee or foreclosure order, but that it would not pursue a foreclosure sale of Plaintiff's property.  Ex. 68, ECF No. 73-70.

On August 28, 2018, the state court issued a Garnishee Order directing First Hawaiian Bank to pay Ally $45,637.88—the attorneys' fees plus costs—with interest.  Defs.' CSF ¶ 20; Ex. N, ECF No. 50-25.

II.   Procedural History

Plaintiff commenced this action on August 16, 2018.  The Complaint asserts

---

[5]  In separate appeals, which were consolidated, Plaintiff challenged the foreclosure and fees.  On April 21, 2020, The Hawai'i Intermediate Court of Appeals ("ICA") issued a Summary Disposition Order ("SDO") vacating the foreclosure order and judgment; a motion for reconsideration; and the amended fee order.  Defs.' Summary of ICA SDO, ECF No. 91 at Ex. A at 10–11.  The ICA determined that the state court erred in entering the foreclosure judgment and decree because of inadmissibility of the evidence.  *Id.* at 3–8.  Although concluding that the state court had jurisdiction to address the fee motion, the ICA vacated the fee order based on the erroneous foreclosure.  *Id.* at 9–10.

the following claims:[6]  Count 1—violation of 15 U.S.C. § 1692c(a)(1)

(communications regarding mortgage debt outside the hours of 8:00 a.m. to 9:00

p.m.); Count 2—violation of 15 U.S.C. § 1692c(a)(2) (communications with

Plaintiff while he was represented by counsel); Count 3—violation of 15 U.S.C. §

1692c(c) (communications not authorized as exceptions); Count 4—violation of 15

U.S.C. § 1692d (repeated and invasive actions); Count 5—violation 15 U.S.C. §

1692d(5) (harassing phone calls); Count 6—violation of 15 U.S.C. § 1692d(6)

(failing to disclose identity when contacting Plaintiff); Count 7—violation of 15

U.S.C. § 1692e (contradictory communications from Ally and Cenlar to Plaintiff

constitute false, deceptive, or misleading representations in connection with the

collection of debt); Count 8—violation of 15 U.S.C. § 1692e(2) (false

representations of the character, amount, or legal status of Plaintiff's debt); Count

9—violation of 15 U.S.C. § 1692e(11) (failure to include a mini-Miranda warning

that a communication was from a debt collector); Count 10—violation of 15

U.S.C. § 1692e(13) (Five Brothers' delivery of documents and notices implied

they were legal process); Count 11—violation of 15 U.S.C. § 1692f(7) and (8)

(placement of door tags and sending of postcards by Five Brothers); Count 12—

breach of contract; Count 13—promissory estoppel; and Count 14—unfair and

---

[6]  Counts 1 to 6 and 8 to 11 are asserted against Cenlar.  Counts 7 and 14 are
asserted against Cenlar and Ally.  Counts 12 and 13 are asserted against Ally.

deceptive acts and practices in violation of Hawai'i Revised Statutes ("HRS") Chapter 480.

Defendants sought dismissal of the action. ECF No. 8. On March 27, 2019, the Court issued an Order Denying Defendants' Motion to Dismiss or in the Alternative to Stay Complaint. ECF No. 22.

<u>LEGAL STANDARD</u>

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). "A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). In a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party. *See State Farm Fire & Cas. Co. v. Martin*, 872 F.2d 319, 320 (9th Cir. 1989).

Once the moving party has met its burden of demonstrating the absence of any genuine issue of material fact, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *See T.W. Elec.*, 809 F.2d at

630; Fed. R. Civ. P. 56(c). The opposing party may not defeat a motion for summary judgment in the absence of any significant probative evidence tending to support its legal theory. *See Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). The nonmoving party cannot stand on its pleadings, nor can it simply assert that it will be able to discredit the movant's evidence at trial. *See T.W. Elec.*, 809 F.2d at 630; *Blue Ocean Pres. Soc'y v. Watkins*, 754 F. Supp. 1450, 1455 (D. Haw. 1991) (citing *id.*).

If the nonmoving party fails to assert specific facts beyond the mere allegations or denials in its response, summary judgment, if appropriate, shall be entered. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 884 (1990); Fed. R. Civ. P. 56(e). There is no genuine issue of fact if the opposing party fails to offer evidence sufficient to establish the existence of an element essential to that party's case. *See Celotex*, 477 U.S. at 322; *Citadel Holding Corp. v. Roven*, 26 F.3d 960, 964 (9th Cir. 1994) (citing *id.*); *Blue Ocean*, 754 F. Supp. at 1455 (same).

In considering a motion for summary judgment, "the court's ultimate inquiry is to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." *T.W. Elec.*, 809 F.2d at 631 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986)) (footnote omitted). Inferences must be drawn in favor of the nonmoving

party.  *See id.*  However, when the opposing party offers no direct evidence of a

material fact, inferences may be drawn only if they are reasonable in light of the

other undisputed background or contextual facts and if they are permissible under

the governing substantive law.  *See id.* at 631–32.  If the factual context makes the

opposing party's claim implausible, that party must come forward with more

persuasive evidence than otherwise necessary to show there is a genuine issue for

trial.  *See Bator v. Hawaii*, 39 F.3d 1021, 1026 (9th Cir. 1994) (citing *Cal.*

*Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468

(9th Cir. 1987)).

<u>DISCUSSION</u>

Defendants move for summary judgment on all claims.  They argue that:  (1)

Plaintiff's FDCPA claims (Counts 1, 2, 4, 5, 6, 8, and 9) fail because they are

premised on phone calls Plaintiff received from Cenlar that never happened; (2)

Plaintiff's FDCPA claim (Count 3) fails because Cenlar did not have a written

cease and desist on file for Plaintiff; (3) Plaintiff's FDCPA claims (Counts 1, 3, 4,

8, 10, and 11) regarding Five Brothers' conduct fail because Five Brothers is not a

"debt collector" and it did not engage in conduct violative of the FDCPA ; and (4)

Plaintiff's reinstatement claims (Counts 7, 12, 13, and 14) fail because they are all

based on the falsehood—explicitly rejected in the foreclosure action—that Plaintiff

negotiated a reinstatement agreement with Cenlar regarding KSG's foreclosure-related attorneys' fees and costs.

## I.   Evidentiary Issues

As a preliminary matter, the Court addresses the evidentiary objections presented by Defendants, including Plaintiff's violations of Local Rule 56.1 and authentication/admissibility issues.

### A.   Violations of Local Rule 56.1

Plaintiff violated Local Rule 56.1 in multiple respects, and these infractions are not without consequence. First, Plaintiff failed to attach his Declaration, Mr. Forrester's Declaration, and his 213 exhibits to his responsive CSF; rather, he attached them to his Opposition. *See* Local Rule 56.1(h) ("Affidavits or declarations setting forth facts and/or authenticating exhibits, as well as exhibits themselves, shall only be attached to the concise statement."). Second, of the 213 exhibits he submitted, he only cited 25 in the responsive CSF. "When resolving motions for summary judgment, the [C]ourt shall have no independent duty to search and consider any part of the court record not otherwise referenced in the separate concise statements of the parties." Local Rule 56.1(f). Neither is the Court obligated "to review exhibits in their entirety . . . rather[, it] will review only those portions of the exhibits specifically identified in the concise statements." *Id.*

Because Plaintiff failed to comply with this provision, the Court limits its review to the exhibits cited in the responsive CSF.

Third, Plaintiff included exhibits in their entirety, rather than limiting them to their relevant portions.  And in multiple instances, Plaintiff did not offer pinpoint citations, nor highlight or emphasize relevant portions of the exhibits.  *See* Local Rule 56.1(b) ("Documents referenced in the concise statement may be filed in their entirety only if a party concludes that the full context would be helpful to the court.  Each citation shall particularly identify the page and portion of the page of the document referenced.").  Worse yet, many exhibit and pinpoint citations in Plaintiff's responsive CSF are incorrect; virtually every declaration citation in the additional facts section of Plaintiff's responsive CSF is incorrect.  In these instances, the Court will not comb through the needlessly voluminous record to determine what evidence supports Plaintiff's factual assertions.  Besides the 213 exhibits supplied in opposition to the Motion, Plaintiff's and Mr. Forrester's Declarations are comprised of 50 and 120 paragraphs, respectively.

Fourth, Plaintiff asserted arguments in his responsive CSF, rather than facts.[7] However, "[t]he separate concise statement shall assert only the material *facts* that are necessary for the [C]ourt to determine the issues presented in the motion."

---

[7] *See*, *e.g.*, Pl.'s CSF in Opp'n (disputed facts) ¶¶ 5, 18, 20; *id.* (additional facts) ¶¶ 4, 8.

15

Local Rule 56.1(b) (emphasis added); *see id.* ("Each factual assertion shall be a single sentence, followed by a citation to a particular affidavit, deposition, or other document that supports the assertion.").  Finally, Plaintiff did not admit, deny, or admit in part and deny in part each fact set forth in Defendants' CSF.  *See* Local Rule 56.1(e) ("Any party who opposes the motion shall file and serve with the opposing documents a separate document containing a single concise statement that admits or disputes each fact set forth in the movant's concise statement," and, "if appropriate, admit in part and deny in part a fact asserted by the movant, stating specifically what is admitted and what is denied.").  He only responded to select statements from Defendant's CSF.

B.     Authentication and Admissibility of Plaintiff's Exhibits

When ruling on a motion for summary judgment, the district court is limited to considering admissible evidence.  *See Orr v. Bank of Am.*, *NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) (citations omitted).  "Authentication is a 'condition precedent to admissibility,'" *id.* (footnote and citation omitted), and "unauthenticated documents cannot be considered in a motion for summary judgment." *Id.* (citations omitted).

i.     Exhibits 207 and 209

Defendants contest the admissibility of Exhibits 207 and 209 (deposition transcripts) on the basis that they are not authenticated because the certification

16

pages are unsigned.  In the summary judgment context, authentication of a deposition or portion thereof requires "the names of the deponent and the action and . . . the reporter's certification that the deposition is a true record of the testimony of the deponent."  *Orr*, 285 F.3d at 774 (citations and footnote omitted); *see also* Fed. R. Civ. P. 30(f)(1) ("The officer must certify in writing that the witness was duly sworn and that the deposition accurately records the witness's testimony.").  Mr. Forrester's Declaration represents that true and correct copies of Raymond Crawford and Scott Goldman are attached as Exhibits 207 and 209.  Forrester Decl. ¶¶ 117, 120.  But "[i]t is insufficient for a party to submit, without more, an affidavit from her counsel identifying the names of the deponent, the reporter, and the action and stating that the deposition is a 'true and correct copy.'"  *Orr*, 285 F.3d at 774.  Because these deposition transcripts have unsigned certification pages, they are unauthenticated and therefore inadmissible.[8]

ii.     Exhibits 208 and 212

Defendants also argue that Exhibits 208 and 212 (transcripts of telephone calls between Plaintiff and Cenlar representatives) are inadmissible for lack of certification.  Although these transcripts are missing requisite information, they appear to overlap with Defendants' Exhibits I and D.  The Court relies on Exhibits I and D, so Plaintiff's failures are of no consequence.

---

[8]  Even if they were admissible, they would not affect the outcome of this Motion.

iii.      Exhibits 211 and 212A

That last two pieces of evidence that Defendants seek to exclude are a

purported January 6, 2018 voicemail that Plaintiff received from Cenlar (Exhibit

211) and an audio file of one of Plaintiff's phone calls to Cenlar on December 27,

2017 (Exhibit 212A).  Plaintiff represents that Exhibit 211 is a true and correct

recording of the voicemail, Hochroth Decl. ¶ 10, but it is unauthenticated.  *See* Fed.

R. Evid. 901(a) ("To satisfy the requirement of authenticating or identifying an

item of evidence, the proponent must produce evidence sufficient to support a

finding that the item is what the proponent claims it is."); *see also Asia Econ. Inst.

v. Xcentric Ventures, LLC*, No. CV 10-1360 SVW (PJWx), 2010 WL 4977054, at

*12 (C.D. Cal. July 19, 2010) ("When offered into evidence, a tape recording must

normally be accompanied by proof that the recording is what it is purported to be."

(citations omitted)).  The speaker identifies herself as representing Cenlar, but

Plaintiff has provided no verification of the date, whether he was competent to

operate the recording device, and whether any change, additions or deletions were

made to the recording. *See Asia Econ. Inst.*, 2010 WL 4977054, at *12 (identifying

foundational factors considered by a court when determining whether a tape

recording is admissible) (citation omitted).  Therefore, the Court need not consider

18

it.[9]  *See Hamilton v. Keystone Tankship Corp.*, 539 F.2d 684, 686 (9th Cir. 1976) ("Exhibits which have not had a proper foundation laid to authenticate them cannot support a motion for summary judgment." (citation omitted)).

Exhibit 212A is likewise unauthenticated.  However, because it appears to be the same audio file submitted by Defendants (Ex. D1), and the Court relies on Defendants' submissions, its lack of authenticity is of no consequence.

## II.    FDCPA Claims

Congress enacted the FDCPA to address "the use of abusive, deceptive, and unfair debt collection practices by many debt collectors," 15 U.S.C. § 1692(a), and "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e).  A violation of any of the prohibited activities listed in the FDCPA by a "debt collector" gives rise to a private cause of action.  *See* 15 U.S.C. § 1692k (addressing civil liability for debt collectors who fail to comply with provisions of the subchapter).

---

[9]  Again, even if the Court considered it, the recording would not change the outcome here.  *See infra* note 19.

An FDCPA claim requires the following:  (1) the plaintiff is a consumer; (2) "the debt arises out of a transaction entered into for personal purposes"; (3) the defendant is a debt collector; and (4) a violation of a provision under the FDCPA. *Datta v. Asset Recovery Sols., LLC*, 191 F. Supp. 3d 1022, 1028 (N.D. Cal. 2016). Although the parties focused on the fourth element, the Court finds it necessary to first determine whether Defendants are debt collectors as defined in the FDCPA:

> The term "debt collector" means any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.  Notwithstanding the exclusion provided by clause (F) of the last sentence of this paragraph, the term includes any creditor who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts.

15 U.S.C. § 1692a(6).  There are also enumerated exceptions, one of which is relevant here:

> (F) any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity (i) is incidental to a bona fide fiduciary obligation or a bona fide escrow arrangement; (ii) concerns a debt which was originated by such person; (iii) concerns a debt which was not in default at the time it was obtained by such person; or (iv) concerns a debt obtained by such person as a secured party in a commercial credit transaction involving the creditor.

15 U.S.C. § 1692a(6)(F).

A.    Whether Defendants Are Debt Collectors under the FDCPA

As a threshold matter, the Court considers whether Defendants are debt collectors, and finds that they are not.  Plaintiff objects to the Court addressing this issue because Defendants did not raise it, the Court only provided 24 hours' notice of this issue, and the Court provided handholding to Defendants.[10]  First, although Defendants did not argue that Cenlar is not a debt collector, it asserted that Ally is not a debt collector.  Mem. in Supp. of Mot. at 19 n.4.  Plaintiff criticizes Defendants for raising the argument in a footnote and relying on a case from the

---

[10]  Plaintiff's counsel also argued that law of the case doctrine and estoppel should preclude Defendants from arguing that they are not debt collectors.  Neither law of the case nor estoppel apply, as this is the *first time* the Court is considering the issue.  *See Musacchio v. United States*, __ U.S. __, 136 S. Ct. 709, 716 (2016) (explaining that "[t]he law-of-the-case doctrine generally provides that 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case'" and "expresses the practice of courts generally to refuse to reopen what has been decided" (citations omitted)); *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1042 (9th Cir. 2018) (citing *id.*); *see also New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("[J]udicial estoppel[] 'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.'" (citations omitted)).

In his Supplemental Brief, Plaintiff again argues that judicial estoppel precludes Defendants from arguing that they are not debt collectors.  He also raises the principle of party presentation.  This doctrine is likewise irrelevant.  Under the principle of party presentation, courts "rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present."  *United States v. Sineneng-Smith*, No. 19-67, __ U.S. __, 2020 WL 2200834, at *3 (May 7, 2020) (citation omitted).  Plaintiff presents FDCPA claims and whether Defendants are debt collectors is a salient inquiry.

Eastern District of Virginia, but Plaintiff did not respond *at all* to this argument, despite having between November 13, 2019 (the day Defendants filed this Motion) until the filing of his Opposition on March 13, 2020 to do so.  Regardless of whether Defendants raised the issue, FRCP 56(f)(2) authorizes the Court to "grant the [summary judgment] motion on grounds not raised by a party."  Fed. R. Civ. P. 56(f)(2); *see also Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 803 F.3d 1084, 1090 n.3 (9th Cir. 2015) (concluding the district court did not violate FRCP 56(f)(2) by factoring concerns into its analysis); *Peters v. Richwine*, 462 F. App'x 689, 691 (9th Cir. 2011) (holding that because "courts may enter summary judgment on grounds not raised by a party," the appellant's "contention that the district court erred in ordering supplemental briefing and on entering summary judgment on grounds which were not initially raised is without merit").  In addition, "[s]ummary judgment for a defendant is appropriate when the plaintiff fails to make a showing sufficient to establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial."  *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006) (alterations in original) (citation and internal quotation marks omitted).  Whether Defendants are debt collectors is an element of an FDCPA claim, and Plaintiff's counsel conceded as much at the hearing, though he argued that it is an issue for trial.

Second, Plaintiff's lack of notice objection is without merit.  The Court provided questions about whether Defendants are debt collectors one day prior to the hearing *as a courtesy*.  The Court is not obligated to provide parties with any questions it intends to ask at the hearing in advance.  In any event, the Court afforded Plaintiff the opportunity to submit supplemental briefing and supplemental evidence in response to Defendants' supplemental declarations.  As such, Plaintiff cannot complain that he was not given a fair opportunity to respond to this issue.

Third, Plaintiff's accusation that the Court engaged in handholding with Defendants is not well-taken.  This is based at least in part on Plaintiff's counsel's erroneous belief that the Court fed cases to Defendants when it did not.  Requiring Defendants to respond to pointed questions that bear on this Motion is not handholding; it ensures that all matters relevant to the disposition of this Motion are before the Court.  If asking questions constitutes handholding, Plaintiff benefited equally, as the parties received the same Entering Order with questions prior to the hearing.  And Plaintiff availed himself of the opportunities to submit supplemental briefing.

In his first Supplemental Brief, Plaintiff argues that the Court deprived him of responding to the supplemental evidence provided by Defendants.  Not only did Plaintiff have an opportunity to submit a 10-page brief on the debt collector issue

23

alone, the Court also gave him an opportunity to file a separate response to Defendants' supplemental evidence.  ECF No. 96.  Plaintiff received notice of this opportunity approximately six hours before he filed his Supplemental Brief, but nevertheless promotes the fallacy that he was not given fair opportunities to respond.  And he ultimately filed a declaration containing legal arguments, not admissible factual evidence, in response to Defendants' supplemental evidence.[11]

The Court now turns to the issue at hand.  Under the FDCPA, creditors[12] are generally excluded from its definition of debt collector.  *See* 15 U.S.C. § 1692a(6)(F)(ii)–(iii).[13]  "The legislative history of section 1692a(6) indicates conclusively that a debt collector does not include the consumer's creditors, a mortgage servicing company, or an assignee of a debt, as long as the debt was not

---

[11]  For example, Plaintiff relied on arguments he made in the foreclosure proceedings and attached a motion therefrom.

[12]  The FDCPA defines a "creditor" as

> any person who offers or extends credit creating a debt or to whom a debt is owed, but such term does not include any person to the extent that he receives an assignment or transfer of a debt in default solely for the purpose of facilitating collection of such debt for another.

15 U.S.C. § 1692a(4).

[13]  *Helms v. Wells Fargo Bank, N.A.*, 775 F. App'x 895, 896 (9th Cir. 2019) (explaining that § 1692a(6)(F)(ii) "exclud[es] from the definition of debt collector a creditor collecting debts on its behalf").

in default at the time it was assigned." *Perry v. Stewart Title Co.*, 756 F.2d 1197, 1208 (5th Cir. 1985) (citations omitted). Indeed, under § 1692a(6), "you have to attempt to collect debts owed *another* before you can ever qualify as a debt collector." *Henson v. Santander Consumer USA Inc.*, __ U.S. __, 137 S. Ct. 1718, 1724 (2017). And this is before factoring the exceptions set forth in § 1692a(6)(F).

At the hearing, Plaintiff's counsel argued in part that Defendants are debt collectors because they transferred collection duties back and forth and have a complicated relationship. Plaintiff's counsel also asked to reopen discovery, as he represented that he intended to take depositions to obtain necessary information, but that Magistrate Judge Mansfield denied Plaintiff's Ex Parte Motion for Extension of Time for Discovery, which related to a Motion for Sanctions and to Compel Production of Sufficiently Knowledgeable Witnesses and Documents. Judge Mansfield denied the motion because Plaintiff failed to meet FRCP 16(b)(4) and *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604 (9th Cir. 1992)'s good cause standard:

> The discovery dispute Plaintiff seeks leave to bring before the Court concerns discovery and depositions which occurred in October and November, 2019. The Court is mindful of the medical challenges that Mr. Hochroth has been experiencing, but those difficulties do not excuse his counsel from taking the necessary steps of communicating with him regarding the need to timely present this discovery dispute to the Court and in fact doing so. Mr. Hochroth has been able to work on lengthy declarations for submission to Court, and he actively participated remotely during the January 14, 2020 settlement conference.

Earlier in January the Court moved the trial date and discovery cutoff at Plaintiff's request, but Plaintiff nevertheless delayed in seeking relief from purported discovery violations he now seeks.

In light of the above, the Court finds that Plaintiff was not diligent in bringing the underlying discovery motion he seeks leave to file, and the Court's inquiry into amending the scheduling order necessarily ends there. *Johnson*, 975 F.2d at 609 ("the focus of the inquiry is upon the moving party's reasons for seeking modification. . . [i]f that party was not diligent, the inquiry should end.").

ECF No. 72.  Plaintiff did not seek reconsideration of or appeal this Entering Order.  Therefore, not only is his oral request for discovery inappropriate and untimely, it is unfounded.  Plaintiff has had nearly two years to conduct discovery and knew, since Defendants filed this Motion, about the debt collector argument.

Here, the Court finds that Ally is not a debt collector because it is owed a debt and the debt was not in default at the time Ally obtained it.[14]  Decl. of Rep. of Ally Bank, Scott Goldman ("Goldman Decl."), ECF No. 95-1 ¶ 7.  Instead, Ally is a creditor; therefore, it is excepted from the strictures of the FDCPA.  *See*, *e.g.*, *Flint v. Ally Fin. Inc.*, DOCKET NO. 3:19-cv-00189-FDW-DCK, 2020 WL 1492701, at *8 (W.D.N.C. Mar. 27, 2020) (discussing *Henson* and concluding that

---

[14]  Even if Ally obtained the debt after Plaintiff defaulted, that would not transform it into a debt collector because it is not collecting a debt "for another."  15 U.S.C. § 1692a(4) (excluding from the creditor definition one who obtains "a debt in default solely for the purpose of facilitating collection of such debt for another"); *see Henson*, __ U.S. at __, 137 S. Ct. at 1724–25 (affirming that purchaser of defaulted debt was not debt collector under the FDCPA).

"[t]o the extent Plaintiff asserts a violation of the FDCPA against Ally Bank, it is barred as Ally Bank was a creditor acting to collect a debt owed to it"; [i]n other words, the FDCPA is not applicable to Ally Bank under these facts, and Plaintiff's claims under the FDCPA against Ally Bank fail as a matter of law" (citations omitted)); *Schlegel v. Wells Fargo Bank, N.A.*, 799 F. Supp. 2d 1100, 1104 (N.D. Cal. 2011), *aff'd in part, rev'd in part on other grounds by* 720 F.3d 1204 (9th Cir. 2013) ("Accordingly, collecting debt not for another, whether or not the debt is assigned in default, makes one a creditor.  This is in keeping with the legislative history of the FDCPA, which highlights Congress's intent to police the coercive, unrestrained activities of third party debt collectors as distinct from debt servicers." (citation omitted)).

Whether Cenlar is a debt collector is less clear.  Historically, courts have held that "debt collector" does not include "mortgage service companies and others who service outstanding debts for others, so long as the debts were not in default when taken for servicing[.]"  *De Dios v. Int'l Realty & Invs.*, 641 F.3d 1071, 1075 n.3 (9th Cir. 2011) (citations omitted); *Webb v. Green Tree Servicing, LLC*, Civil Action No. ELH-11-2105, 2013 WL 5442423, at *26 (D. Md. Sept. 30, 2013) ("'[M]ortgage servicing companies are not debt collectors and are statutorily exempt from liability under the FDCPA,' to the extent that they take action to

27

collect debts that were not in default at the time they acquired the debts." (citations omitted)).

Defendants indicate that Cenlar began servicing the loan in July 2014, after Plaintiff defaulted in June 2014. Decl. of Rep. of Cenlar, Jason Webb ("Webb Decl."), ECF No. 95-2 ¶ 7; Goldman Decl. ¶ 9. However, that servicing may have commenced after the debt was in default does not necessarily make Cenlar a debt collector. In a departure from the previously-applied standard in some circuits that one must obtain debt prior to default to avoid being a debt collector under the "regularly collects" prong of § 1692a(6), the Supreme Court held that "[a]ll that matters is whether the target of the lawsuit regularly seeks to collect debts for its own account or does so for 'another.'" *Henson*, __ U.S. __, 137 S. Ct. at 1721. And although § 1692a(6) "excludes from the debt collector definition certain persons who acquire a debt before default, it doesn't necessarily follow that the definition must include anyone who regularly collects debts acquired after default." *Id.* at __, 137 S. Ct. at 1724. In other words, "a company collecting purchased defaulted debt for its own account could be a creditor rather than a debt collector." *Diffley v. Nationstar Mortg., LLC*, Case No. C17-1370 RSM, 2017 WL 6034367, at *8 (W.D. Wash. Dec. 6, 2017) (applying *Henson* and concluding that the defendant loan servicer was not a debt collector). This is because "the creditor definition excludes persons who 'receive an assignment or transfer of a debt in

28

default,' . . . only (and yet again) when the debt is assigned or transferred '*solely for the purpose of facilitating collection of such debt *for another*.'"  *Henson*, __ U.S. at __, 137 S. Ct. at 1724 (citation omitted).

Here, Cenlar did not obtain the debt solely for the purpose of facilitating the collection of debt for Ally.  Ally retained Cenlar to service thousands of loans in its portfolio and Cenlar's loan servicing includes "payment processing, maintaining records of payments and balances, collecting and making disbursements for tax and insurance payments, sending monthly statements, [and] providing customer service."  Webb Decl. ¶ 8; Goldman Decl., ECF No 95-1 ¶¶ 9–10.  Nevertheless, because *Henson* did not address loan servicers and the Ninth Circuit has yet to weigh in on its application to loan servicers, if at all, whether Cenlar is a debt collector is unclear.  The Court need not decide the issue now because Cenlar is entitled to summary judgment on the FDCPA claims for the reasons articulated herein.[15]

B.    Communications with Plaintiff

Plaintiff's FDCPA claims arise from allegedly violative communications

---

[15]  That the disposition of this Motion does not rest exclusively on whether Defendants are debt collectors further undermines Plaintiff's allegations that he was deprived of opportunities and that the Court improperly considered the debt collector issue.

from Cenlar and Five Brothers.  The FDCPA protects consumers from non-

consensual communications with debt collectors:

> Without the prior consent of the consumer given directly to the debt collector or the express permission of a court of competent jurisdiction, a debt collector may not communicate with a consumer in connection with the collection of any debt—
>
> (1) at any unusual time or place or a time or place known or which should be known to be inconvenient to the consumer.  In the absence of knowledge of circumstances to the contrary, a debt collector shall assume that the convenient time for communicating with a consumer is after 8 o'clock antemeridian and before 9 o'clock postmeridian, local time at the consumer's location;
>
> (2) if the debt collector knows the consumer is represented by an attorney with respect to such debt and has knowledge of, or can readily ascertain, such attorney's name and address, unless the attorney fails to respond within a reasonable period of time to a communication from the debt collector or unless the attorney consents to direct communication with the consumer[.]

15 U.S.C. § 1692c(a)(1)–(2).  The FDCPA also prohibits debt collectors from

engaging in any conduct with "the natural consequence of . . . harass[ing],

oppress[ing], or abus[ing] any person in connection with the collection of a debt."

15 U.S.C. § 1692d.  Violations of this section include:

> (5) Causing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number.
>
> (6) Except as provided in section 1692b of this title, the placement of telephone calls without meaningful disclosure of the caller's identity.

15 U.S.C. § 1692d(5)–(6).

     "[F]alse, deceptive, or misleading representations or means in connection with the collection of any debt" by debt collectors is likewise proscribed.  15 U.S.C. § 1692e.  At issue in this ligation are four prohibitions:

     (2) The false representation of—

     (A) the character, amount, or legal status of any debt; or

     (B) any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt.

     (3) The false representation or implication that any individual is an attorney or that any communication is from an attorney. . . .

     . . . .

     (11) The failure to disclose in the initial written communication with the consumer and, in addition, if the initial communication with the consumer is oral, in that initial oral communication, that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose, and the failure to disclose in subsequent communications that the communication is from a debt collector, except that this paragraph shall not apply to a formal pleading made in connection with a legal action.

     . . . .

     (13) The false representation or implication that documents are legal process.

15 U.S.C. § 1692e(2), (3), (11), (13).

i.      Phone Calls

Defendants argue that Counts 1, 2, 4, 5, 6, 8, and 9, all of which are based on

purportedly incessant and unsolicited phone calls that Plaintiff received from

Cenlar, fail because Plaintiff initiated all telephonic communications between

December 26, 2017 and February 6, 2018.  Plaintiff contends that the averments in

his Declaration contradict any assertion that Cenlar did not contact him *outside* this

time period, as these claims pertain to phone calls he received in the year preceding

the commencement of this action.

a.      Calls Received Prior to December 26, 2017

Plaintiff complains of harassing and violative communications that occurred

for one year leading up to this case.  In his Declaration, he represents that Cenlar

called him at all hours of the day and night beginning more than one year prior to

the initiation of this action; that certain calls about his mortgage were from

unidentified individuals who he later learned were Cenlar employees; and that calls

from Cenlar were sometimes so frequent that he received multiple calls

simultaneously.  *See* Hochroth Decl. ¶¶ 6–7, 9–10.  Plaintiff further claims that as a

result of Cenlar's conduct, he set up call forwarding for all incoming calls from

Cenlar.  But with the exception of one voicemail from January 6, 2018,[16] he has

---

[16]  The Court addresses this in the next section.

32

been unable to recover many of the phone records.  *See id.* ¶ 10.  Other than these arguably self-serving statements in his Declaration,[17] Plaintiff has not supplied any evidence showing that he received the referenced flurry of calls from Cenlar.  In fact, Cenlar's servicing records, which reflect all communications including telephonic correspondence for the period November 7, 2016 to March 15, 2018, show no calls to Plaintiff in the year prior to the filing of the Complaint, or any at all.  Ex. R; Constantine Decl. ¶ 6.  Similarly, Plaintiff's own telephone records, ranging from December 2017 to January 2018, show one incoming call on January 30, 2018, but not from a telephone number associated with Cenlar.  Ex. Q; Constantine Decl.  ¶ 6 (identifying telephone numbers associated with Cenlar).

While a declaration can create a question of material fact and defeat summary judgment, Plaintiff's statements in his Declaration do not create a question of fact because they are not corroborated by evidence and are contradicted by documentary evidence.  *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) ("However, this court has refused to find a 'genuine issue' where the only evidence presented is 'uncorroborated and self-serving' testimony." (citations omitted)).  Accordingly, the Court GRANTS Defendant's Motion as to Counts 1, 2, 4, 5, 6, 8, and 9 with respect to phone calls preceding this action.

---

[17]  The Court acknowledges that it cannot disregard evidence based solely on its self-serving nature.  *See Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir. 2015) (citation omitted).

b.   <u>Calls between December 26, 2017 and February 6, 2018</u>

Defendants argue that Counts 2 and 3 fail as a matter of law because

Plaintiff voluntarily reached out to Cenlar and sent a letter authorizing

communications, thereby waiving any cease and desist/prohibition on

communicating.  Mem. in Supp. of Mot. at 15–16; Reply at 14–15.  Plaintiff

counters that a written cease and desist was not required to bar communications;

that insofar as Cenlar had notice that Plaintiff was represented by counsel, § 1692c

prohibited it from contacting him.[18]  Opp'n at 27; Pl.'s CSF in Opp'n (disputed

facts) ¶ 5.

Section 1692c(a)(2) prohibits debt collectors from communicating with

consumers in connection with the collection of debts without the prior consent of

the consumer if the debt collector knows the consumer is represented by counsel

and counsel's contact information can be readily ascertained, unless counsel is

non-responsive or consents to communicating directly with the consumer.  *See* 15

U.S.C. § 1692c(a)(2).  In instances where the consumer notifies the debt collector

in writing that he or she refuses to pay the debt or that he or she wishes to cease

further communication, the debt collector may not communicate further with the

consumer except:

---

[18]  This is a departure from the allegation in his Complaint that he sent Cenlar a cease and desist letter.  *See* Compl. ¶ 68.

34

(1) to advise the consumer that the debt collector's further efforts are being terminated;

(2) to notify the consumer that the debt collector or creditor may invoke specified remedies which are ordinarily invoked by such debt collector or creditor; or

(3) where applicable, to notify the consumer that the debt collector or creditor intends to invoke a specified remedy.

15 U.S.C. § 1692c(c).

### 1.   Cease Communication Directive

Here, Cenlar did not violate § 1692c(c) because there is no evidence that Plaintiff notified Cenlar in writing—or at all—that he wished to cease communications.  But assuming he had, as alleged in his Complaint, he waived his right not to be contacted.  In *Clark v. Capital Credit & Collection Services, Inc.*, 460 F.3d 1162 (9th Cir. 2006), the Ninth Circuit determined that consumers can waive the protection of § 1692c(c) by calling a debt collector and requesting further information.  *See id.* at 1172.  Applying the "least sophisticated debtor" standard, the *Clark* court held that waiver of the cease communication directive must be knowing and voluntary and is enforceable "only where the least sophisticated debtor would understand that he or she was waiving his or her rights under § 1692c(c)."  *Id.* at 1170–71 (footnote omitted).

Under this heightened standard, there are no issues of fact concerning Plaintiff's waiver of the protections provided by § 1692c(c).  If a cease

communication directive had been in place, Plaintiff's multiple *voluntary and self-initiated* phone calls to Cenlar constituted consent for Cenlar to communicate with him.  The evidence demonstrates that from December 26, 2017 to February 6, 2018, Plaintiff initiated all calls with Cenlar—a total of 12—to ask a wide range of questions regarding the reinstatement of his mortgage.  Ex. R; Exs. D, E, F, I; Hochroth Decl. ¶¶ 19, 21, 23, 25–29, 31–33, 36.

Additionally, Plaintiff expressly authorized communications.  During his initial calls, Cenlar's representative notified Plaintiff that he could not communicate with Plaintiff unless he received written permission by faxed letter. Hochroth Decl. ¶ 23.  In order to discuss his reinstatement issues with Cenlar representatives, Plaintiff transmitted a letter to Cenlar on December 27, 2017 permitting it to communicate with him directly, noting that neither he nor his attorney had any cease and desist in place prohibiting direct communication with him.  *See* Ex. C.  Plaintiff advances the novel theory that any waiver was void because a Cenlar representative provided the requisite verbiage.  Plaintiff argues that under the "least sophisticated debtor" standard, he lacked awareness of the circumstances and likely consequences of submitting the letter.  The undisputed facts demonstrate otherwise.

Plaintiff, not Cenlar, repeatedly initiated communications.  Moreover, the transcripts of the calls reveal that Plaintiff sought information, advice, and

36

assistance from Cenlar representatives and submitted his letter to facilitate that.

Plaintiff was so eager to speak to Cenlar about his reinstatement that he contacted

Cenlar four times between December 27, 2017 and January 2, 2018 to confirm that

it received his faxed letter.  Hochroth Decl. ¶¶ 25–29.  Plaintiff took multiple

knowing and voluntary steps to talk to Cenlar.  He cannot reasonably argue that he

lacked knowledge of the consequences of his actions—or that a least sophisticated

debtor would—when he took multiple steps, over the course of days, to ensure that

Cenlar would communicate with him, conduct he now claims violates the FDCPA.

The Cenlar representatives did not initiate communications[19] or coerce Plaintiff to

provide the letter in an effort to circumvent § 1692c(c) or § 1692c(a)(2), as the

Court discusses below.

### 2.  Representation by Counsel

Plaintiff's contention that Cenlar violated § 1692c(a)(2) is equally

unavailing.  Again, it is undisputed that Plaintiff initiated contact with Cenlar on

December 26, 2017, and continued to do so on 12 separate occasions through

---

[19]  Consideration of the unauthenticated voicemail (Exhibit 211) that Plaintiff
claims to have received from Cenlar on January 6, 2018 would not alter the
analysis.  By January 6, 2018, Plaintiff had already waived any prohibition on
communications.  And because there is no way to verify when he received the
voicemail, it is unclear whether it occurred after he verbally told a Cenlar
representative (Ms. Rodrigues) that he authorized Cenlar to contact him at his cell
number during normal hours between 8:00 a.m. and 9:00 p.m. HST.  Ex. F at 37:3–
19.

February 6, 2018.[20]  Cenlar did not initiate communications with Plaintiff, so any argument that it engaged in proscribed conduct by responding to Plaintiff's inquiries during calls initiated by Plaintiff is without merit.

The waiver analysis in the preceding section applies here, notwithstanding *Clark's* limitation to § 1692c(c) because if a consumer can waive a cease communication directive, it follows that a consumer can waive the requirement that a debt collector communicate exclusively with a consumer's attorney.  *See Jackson v. Specialized Loan Servicing, LLC*, No. 17 C 7169, 2019 WL 4674572, at *3 (N.D. Ill. Sept. 25, 2019) ("Although *Clark* covers a different subsection of § 1692c, the provisions are analogous:  Section 1692c(a)(2) prohibits a debt collector from communicating with a consumer represented by an attorney, while § 1692c(c) prohibits communication with a consumer when that consumer requests a debt collector to end further correspondence." (citing 15 U.S.C. §§ 1692c(a)(2), (c)); *see also Backlund v. Messerli & Kramer, P.A.*, 964 F. Supp. 2d 1010, 1015–16 (D. Minn. 2013) (extending *Clark* to § 1692c(a)(2)).  Even though Cenlar did not contact Plaintiff in lieu of counsel here, applying the above reasoning, Plaintiff

---

[20]  In Count 2 of the Complaint, Plaintiff alleges that "[p]rior to December 27, 2017, Cenlar made phone calls, placed door tags, and otherwise communicated with Mr. Hochroth in connection with the collection of his mortgage debt, knowing that Mr. Hochroth was represented by Counsel with respect [sic] the mortgage loan, in violation of 15 U.S.C. § 1692c(a)(2)."  Compl. ¶ 64.  The Court already determined that Plaintiff proffered no evidence to refute Cenlar's documentary evidence that it did not contact Plaintiff.

unquestionably waived the requirement that Cenlar communicate through counsel. Plaintiff himself repeatedly called Cenlar instead of enlisting counsel to do so. Under these circumstances, Plaintiff's argument that Cenlar violated § 1692c(a)(2) by indulging his questions fails. Accepting Plaintiff's argument would lead to a perverse result—a consumer represented by counsel could, by personally initiating communications, cause a debt collector to violate § 1692c(a)(2).

Based on the foregoing, Counts 2 and 3 fail as a matter of law and summary judgment is granted in Defendants' favor.

C.      Five Brothers

Defendants request summary judgment on all claims in which Plaintiff alleges that Cenlar violated the FDCPA through Five Brothers' actions. They argue that Five Brothers is not a "debt collector" under either definition—primary or limited-purpose—under the FDCPA, and in any event, Five Brothers did not engage in conduct that violates the FDCPA. Mem. in Supp. of Mot. at 16–19. In response, Plaintiff contends that because Five Brothers placed documents on his door at Cenlar's instruction and Cenlar is a debt collector, Five Brothers violated the FDCPA.[21] Opp'n at 30–31.

---

[21]  This is the totality of Plaintiff's argument on this topic. He did not cite any applicable law and presented no evidence. Plaintiff also failed to dispute any of the facts regarding Five Brothers in Defendants' CSF, including Defendants' assertion that Five Brothers is not a debt collector.

i.    <u>Whether Five Brothers Is a "Debt Collector"</u>

In addition to the FDCPA's general definition for a debt collector articulated above, there is a limited-purpose definition applicable to § 1692f(6):[22] "For the purpose of section 1692f(6) of this title, such term also includes any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the enforcement of security interests." 15 U.S.C. § 1692a(6). None of the exceptions set forth in § 1692a(6) apply to Five Brothers.

Liability attaches under the FDCPA "only when an entity is attempting to collect debt." *Ho v. ReconTrust Co., NA*, 858 F.3d 568, 571 (9th Cir. 2017) (citing 15 U.S.C. § 1692(e)); *Dowers v. Nationstar Mortg., LLC*, 852 F.3d 964, 971 (9th Cir. 2017) (identifying "attempt to collect a money debt" as "a necessary element of a claim under Sections 1692c(a)(2), 1692d, or 1692e"). Because "debt" is synonymous with an "obligation . . . to pay money" for the purposes of the FDCPA, *see* 15 U.S.C. § 1692a(5), Cenlar would only be liable if it used Five Brothers to collect money from Plaintiff. *See Ho*, 858 F.3d at 571; *see also Dowers*, 852 F.3d at 970 (explaining that except as to § 1692f(6), "'debt collection' refers only to the collection of a money debt").

It is undisputed that Cenlar retained Five Brothers to perform monthly visual inspections of Plaintiff's property and to leave door hangers asking him to contact

---

[22] Plaintiff does not assert claims under § 1692f(6).

Cenlar.  Constantine Decl. ¶ 21; Sutton Decl. ¶¶ 12, 14.  Because Five Brothers did not engage in any acts involving the collection of money, it is not a debt collector for the purposes of the FDCPA.  *See Dowers*, 852 F.3d at 968, 970–71 ("Nationstar's conduct [(calling, posting notices on the plaintiff's door, sending letters)] was not an attempt to collect a money debt, which is a necessary element of a claim under Sections 1692c(a)(2), 1692d, or 1692e."); *see also Hernandez v. Ditech Fin., LLC*, CV 17-4294-GW(JEMx), 2019 WL 856406, at *8 (C.D. Cal. Feb. 1, 2019) (finding that Five Brothers was not a debt collector because it was "not trying to retrieve a *money* debt" (citation omitted)); *Thompson v. Five Bros. Mortg. Co. Servs. & Securing Inc.*, Case No. 1:15-CV-39, 2019 WL 2051798, at *3–4 (W.D. Mich. May 9, 2019), *aff'd*, 800 F. App'x 369 (6th Cir. 2020) (holding that Five Brothers was not a debt collector under the FDCPA's general or limited-purpose definitions).  Where, as here, Five Brothers is not liable under the FDCPA, Plaintiff cannot maintain claims against Cenlar that are predicated on Five Brothers' inspection of his property and distribution of door hangers.  Consequently, the Court grants summary judgment on Counts 2, 3, 4, 8, 9, 10, 11 to the extent they pertain to Five Brothers' conduct.

      D.    <u>FDCPA Reinstatement Claim</u>

In Count 7, Plaintiff alleges that Defendants' contradictory communications about his ability to reinstate his mortgage violated § 1692e because they were

false, deceptive, or misleading representations or means related to the collection of his debt.  Compl. ¶¶ 93–100.  Defendants contend that the conversations between Plaintiff and Cenlar representatives prove that he knew that Ally would provide both reinstatement and KSG's foreclosure-related attorneys' fees and costs, and that Plaintiff knew that Messrs. Forrester and Schiel were negotiating the terms of reinstatement and settlement of the foreclosure action.  Mem. in Supp. of Mot. at 21.

Plaintiff asserts this claim against both Ally and Cenlar.  Because the Court has determined that Ally is not a debt collector, it cannot be liable under § 1692e.  Even if Ally is a debt collector, however, it, like Cenlar, did not violate § 1692e.

Pursuant to § 1692e, "[a] debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt."  15 U.S.C. § 1692e.  Plaintiff has not identified the specific provision that Defendants purportedly violated, but § 1692e(10), the section's catchall provision, most closely aligns with his allegations.  *See Gonzales v. Arrow Fin. Servs., LLC*, 660 F.3d 1055, 1062 (9th Cir. 2011) (citation omitted).  It prohibits "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer."  15 U.S.C. § 1692e(10).  In the Ninth Circuit, a debt collector's liability under § 1692e of the FDCPA is an issue of law.  *See Gonzales*, 660 F.3d at 1061 (footnote and citation omitted).

42

"Whether conduct violates [§ 1692e] . . . requires an objective analysis that takes into account whether the 'least sophisticated debtor would likely be misled by a communication.'"  *Id.* (alterations in original) (citations omitted).  The Ninth Circuit has described the "least sophisticated debtor" as "distinguished from the ordinary, reasonable person by being financially unsophisticated."  *Stimpson v. Midland Credit Mgmt., Inc.*, 944 F.3d 1190, 1196 (9th Cir. 2019) (citation omitted).  Although such a debtor is financially unsophisticated, he "is not 'the *least* intelligent consumer in this nation of 300 million people.'"  *Id.* (citation omitted).  Instead, he "grasps the normal, everyday meaning of words, and is 'capable of making basic logical deductions and inferences.'"  *Id.* (citations omitted).  "In short, the least sophisticated debtor is reasonable and functional, but lacks experience and education regarding financial matters."  *Id.*  "The FDCPA does not subject debt collectors to liability for 'bizarre,' 'idiosyncratic,' or 'peculiar' misinterpretations."  *Gonzales*, 660 F.3d at 1062 (citations omitted).

Plaintiff identifies the contradiction between the following as violative of § 1692e:  (1) Ally told Plaintiff's counsel that Plaintiff could not reinstate the loan; (2) Cenlar told Plaintiff that he could reinstate; (3) Plaintiff paid the reinstatement amount to Cenlar and Cenlar represented that default-related charges unbilled the time he reinstated would be included on a future billing statement; (4) future billing statements increased to reflect attorneys' fees and costs; and (5) Ally

43

enforced an attorneys' fees order in the foreclosure case, which should have been dismissed pursuant to the reinstatement.  The evidence does not support Plaintiff's characterization of the foregoing as false, deceptive, or misleading representations. In fact, the allegations that form the basis of this claim are refuted by the evidence.

It is undisputed that although Ally initially informed Plaintiff's counsel on November 15, 2017 that Plaintiff could not reinstate because it believed the deadline to do so had expired, Schiel Decl. ¶ 6, Ally later informed Mr. Forrester, via letter dated January 31, 2018, that it would accept a reinstatement payment subject to certain conditions.  Ex. G.  In the period between these communications, Plaintiff contacted Cenlar 11 times.  During the calls, Plaintiff repeatedly asked whether he should obtain reinstatement figures from Ally or Cenlar and how he should handle attorneys' fees and costs.  Cenlar representatives consistently told Plaintiff that he must obtain figures from Ally's counsel for reinstatement and fees and costs, as reflected in these excerpts of conversations from December 27, 2018, January 2, 2018, January 10, 2018, January 16, 2018, and February 6, 2018:

> EMPLOYEE ID #473776:  Yeah.  You can—all you have to—yes, you can reinstate, but it has to go through them for you to reinstate it.  And you don't have to pay off the full balance. You just have to pay the past due balance.
>
> MR. HOCHROTH:  Which is how much?
>
> EMPLOYEE ID #473776:  Well, the balance that I have is not going to be the same balance as they would have gave you. That 111,000 that was sent from the attorney—

MR. HOCHROTH:  Yeah.  No.  That's from you guys.  That's on my statement.

EMPLOYEE ID #473776:  All right.  *So you have to get a reinstatement letter from the attorney directly.*  That would include all of their fees.[23]

Ex. D at 6:17–7:6 (emphasis added).

MR. JOHNSON:   And then in regards to when you're reinstating the loan by bringing—

MR. HOCHROTH:  Uh-huh.

MR. JOHNSON:  —it current to the foreclosure attorney, the only time that they'll place the foreclosure process on hold is when they have the actual funds in-house.

MR. HOCHROTH:  Okay.  So also related to, I guess, well, both of these, but really the reinstatement one—I still think they need something from you guys that says that it's okay for them to send me a reinstatement quote—I don't know what you call it—but what you said—so that he knows to do that.

. . . .

MR. JOHNSON:  *You can try to negotiate that with them, because that's—they're charging the fees and costs.*  They're in compliance with the maximum cap that can be charged for your state that the property is located in.  *So if they want to lower their—if they want to lower their costs, it's up to them.  We have*

---

[23]  Viewing the evidence in the light most favorable to Plaintiff, this could potentially cause him to believe that the reinstatement amount includes attorneys' fees and costs.  In all subsequent conversations, however, Cenlar representatives consistently stated that fees and costs are separate, which Plaintiff acknowledged.  Therefore, any ambiguity in the statement "[t]hat would include all of their fees" does not create an issue of material fact.

*no control over that.  We don't dictate to them,* You can only charge a thousand dollars when you've charged 10,000.  We—

MR. HOCHROTH:  *Sure.*

MR. JOHNSON:  *We don't do that.*  That's—if they want to lose their costs, *that's up to them.*

MR. HOCHROTH:  *Okay.  All right.* . . .

. . . .

MR. JOHNSON:  *We don't negotiate any fees.*  I can tell you that right now.  We don't do any of that.

MR. HOCHROTH:   You guys don't negotiate your fees you're saying?

MR. JOHNSON:  *No, we don't.  We don't negotiate any of those fees.*  If the foreclosure attorney has fees that they—that they're willing to negotiate with you, that's up to them.

MR. HOCHROTH:  *Uh-huh.  Okay.  That's fine.*  Now, the other item—last—sorry.  There's one last item—sorry—one last question.  I'm trying to remember what it was.  What was it?  Sorry.  I'm just trying to—oh.  Well, two questions.

We touched on, a second ago—so you will, following this call, reach out to your attorney to have them send me a reinstatement?

MR. JOHNSON:  No.

MR. HOCHROTH:  Oh.  Okay.  How do we make that happen?

MR. JOHNSON:  *You're gonna do that.  You're gonna reach out to the foreclosure attorney.*

MR. HOCHROTH:  Okay.

46

MR. JOHNSON:  *You're gonna given them a call*.  You're gonna let them know that you've requested to have the cease and desist removed.  We've confirmed we've received it.  It's not showing up on the file at this time.  And that we've spoken in regards to the loan modification process and spoken in regards to the reinstatement process.

Now, once they get notification from you in regards to attempting to reinstate the loan and you wanting those figures, they'll send our processor in foreclosure a message requesting the fees and—the reinstatement amount on our end to be sent to them—

MR. HOCHROTH:  Okay.  All right.  Yeah.

MR. JOHNSON:  —to the foreclosure attorney.

. . . .

MR. HOCHROTH:  . . . .  Is it possible for someone to send him like an e-mail or something, just like, Hey, yeah, you guys, it's okay to go ahead send them the—

MR. JOHNSON:  No.  That's how the process generally works; is that our clients, our borrowers, which is you, reaches out to the foreclosure attorney to obtain the reinstatement amount.  So I'm really surprised that they're telling you to call us, because that's not how generally it's done.

MR. HOCHROTH:  Yeah.  So what—and I'll try again.  I'm totally okay with—maybe now something's different, since last week.  I don't know[.]

Ex. E at 22:20–23:8, 23:25–24:12, 26:11–27:25, 29:5–17 (emphases added).

MR. HOCHROTH:  . . . .  I'm just trying to see if maybe you can like, you know, send a fax and cc me, or send a copy of it to me, to my lawyer, so we know it's been sent, that just says, yes, it's okay for you to give a reinstatement quote to Mr. Hochroth?

47

MS. RODRIGUES:  So in this—you're going to have to get the reinstatement—

MR. HOCHROTH:  I know.

MS. RODRIGUES:  *Amount from the attorney.  We don't provide that anymore*.

MR. HOCHROTH:  Exactly.  I'm not asking for the reinstatement amount from you guys at all.  That's not my question.  Was I not clear what I was asking?  You sound like you're confused.  I'm not asking you to give me—

MS. RODRIGUES:  You threw a lot at me right now, sir, so it's a lot, you know.  So what is the question that you have?

MR. HOCHROTH:  Yeah.  I just need you to—if you could please reach out to your attorney in writing and say it's okay for him to give me the reinstatement quote.  It's not from you.  The quote is not coming from you.  It's going to come from him— just to tell him that Cenlar is okay with him going ahead and providing that quote, something in writing that—

. . . .

MS. RODRIGUES:  Okay.  Well, I'll let you know right now *we're not going to send anything to our foreclosure attorney verifying that, you know, give him a reinstatement amount.  We don't send anything like that*.  In the case—

MR. HOCHROTH:  Why not?

MS. RODRIGUES:  —usually, *you're supposed to contact the foreclosure attorney yourself and get the reinstatement amount*.

And I understand your attorney is stating something different, that he should be contacting them, but in the case,

originally, you know, homeowners contact the foreclosure attorney to get that reinstatement amount.

MR HOCHROTH:  Okay.  So you're saying that you just can't do this, there's no way to do this?  You just can't help me here?  It seems like the simplest thing in the world for you guys to just—

MS. RODRIGUES:  You want me to see if we can send out—

MR. HOCHROTH:  Just reach out to your—yeah.

MS. RODRIGUES:  To reach out to our attorney, our foreclosure attorney, to see if we can have them provide you a reinstatement amount; correct?

. . . .

MS. RODRIGUES:  So let me—because I've never heard of any situation being in that sense of us sending our attorney—our foreclosure attorney a reinstatement amount to give to you, so let me—

MR. HOCHROTH:  You don't have to give him the amount or whatever.  You don't have to change your process.

MS. RODRIGUES:  Well, just give information—I understand what you're saying; to allow him to release that information.  I've never heard of anything like that.  Okay.  So I'm going to double-check, just to be on the safe side, see if there's anything that we can do when it comes to that situation.

. . . .

MS. RODRIGUES:  All right.  Just one moment.  All right.  Sorry about the hold, sir.  *So I did verify with the supervisor, yeah, we don't send anything like that.*  But what he did tell me

49

is if you'd like, we can go ahead and submit the reinstatement amount to you[.]

Ex. F at 43:12–44:12, 47:6–48:7, 49:8–21, 50:12–17 (emphases added).

> MR. HOCHROTH: So this is probably the—you know, this is the thing we have to evaluate. *I have to get this, see what your lawyer ends up adding onto it, because they're going to put their legal fees and stuff, see how much flexibility they offer and then see where we end up at the end of the day.*

> MS. RODRIGUES: Yeah. And then you still have the foreclosure attorney information, correct, so everything—you still have that information or—

> MR. HOCHROTH: I do, yeah. Well, you actually didn't give me anything. But we've been dealing with him in court, so my lawyer knows who it is.

Ex. Z1, ECF No. 78-4 at 56:23–57:12 (emphasis added).

> MR. HOCHROTH: Actually, I've got a couple of questions for you I hope that you can help me out with. I was in touch with you guys about getting a reinstatement amount, and you had directed me to your attorney, who finally did get me a number. I just got it. It came in as of a February 1st e-mail, just last week, and the amount that your attorney gave me was 113,356.91. But I just got a statement from you guys, which is weird—it's the January statement, but I just received it—and it has a—on it, it says Amount Due 114,127.73, and the amount due is—the amount due is the amount to reinstate your loan as of 1/17/18 and must be received in the form of certified funds. If you're making your reinstatement payment after 1/17/18, please contact us to obtain a current reinstatement amount.

> *So that's kind of why I was contacting you, because slightly confused—the number he gave me, which he said I'm supposed to make payment to you no later than the 14th of February was 113,356. So I'm about to go get the certified check*

*and send it to you, and I'm just trying to verify is it the 113, is it the 114, or is it a different amount*?  That's the reason for the call.

. . . .

MS. LAN:  *But yes, you would want to—when you get the attorney's office reinstatement, that's the one that you would go with.*

MR. HOCHROTH:  *Okay.*  And in terms of where I send this to, because he wasn't really specific there; he just—he said send it to my client.  Where do I send the certified check to?

MS. LAN:  Did you receive the actual reinstatement quote?

MR. HOCHROTH:  Yeah.  Like I said, it's 113,356.91.

MS. LAN:  Okay.  They should—the attorney's office should have also let you know who to send it to.  Like to send it to (inaudible) servicer.  Let me just place you—

. . . .

MR. HOCHROTH:  45-133 Alina Place, Kaneohe, Hawaii.  Actually, you know what?  I think it's in here.  Sorry.  My apologies.

MS. LAN:  Okay.  So you are showing where to send the payment at—to?

MR. HOCHROTH: Yes.  Yeah. I got it.  Sorry about that.  I just wanted to check that, because—

Ex. I at 80:8–81:7, 81:16–82:5, 82:14–21 (emphases added).

These conversations demonstrate that despite Cenlar's unwavering response that Plaintiff must obtain reinstatement figures and attorneys' fees and costs from Ally, and Ally having provided the reinstatement amount, Plaintiff

remained confused.  But his confusion cannot be attributed to Defendants' conduct. Plaintiff did not negotiate with Cenlar; its representatives told him he had to obtain information from and negotiate with Ally's counsel.  Even after he obtained the reinstatement amount from Ally's counsel, and Cenlar again told him to remit that amount, he instead sent the reinstatement amount from his January 2018 statement.

In addition, Plaintiff provides no evidence that his billing statements from Cenlar increased after reinstatement *to reflect attorneys' fees and costs*.[24]  The billing statements—provided by Defendants—do not reference attorneys' fees and costs.  *See* Ex. S.  Finally, Plaintiff's objection to Ally's enforcement of the attorneys' fees order in the foreclosure is based on his belief that he entered into a reinstatement "agreement" with Cenlar, the validity of which has yet to be proven. All of these communications and conduct, taken together, are not contradictory, and Plaintiff's misapprehensions do not cause them to be false, deceptive, or misleading representations or means.  A least sophisticated debtor would not be misled or deceived by any of the aforementioned communications or conduct. Financial unsophistication would not preclude such a debtor from understanding

---

[24]  Plaintiff relies on Cenlar's representative's testimony to establish that fees included in statements sent to him could be, and were, attorneys' fees. Ex. 207, ECF No. 73-209 at 89:4–21, 107:2–12.  The Court deemed this deposition to be inadmissible because it was unauthenticated.  In any event, the referenced portions do not stand for the proposition for which they are cited.  They discuss unknown documents, with non-committal responses.

plain and repeated instructions, none of which involved complicated financial concepts, and to make logical deductions and inferences.  Defendants cannot be subject to liability under the FDCPA due to Plaintiff's idiosyncratic misinterpretations of the circumstances related to his reinstatement.  For these reasons, the Court grants summary judgment in Defendants' favor as to Count 7.

## III.    Reinstatement Claims

The remaining state-law claims—breach of contract, promissory estoppel, and HRS Chapter 480 (Counts 11 to 14)—relate to the reinstatement of Plaintiff's mortgage.  Given the dismissal of the FDCPA claims, the Court now considers whether it should exercise supplemental jurisdiction over these state-law claims.  A state-law claim is part of the same case or controversy under Article III of the U.S. Constitution "when it shares a 'common nucleus of operative fact' with the federal claims and the state and federal claims would normally be tried together." *Bahrampour v. Lampert*, 356 F.3d 969, 978 (9th Cir. 2004) (citation omitted).  Courts may decline to exercise supplemental jurisdiction over a state-law claim if:

> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or

> (4) in exceptional circumstances, there are other compelling
>     reasons for declining jurisdiction.

28 U.S.C. § 1367(c). Courts declining to exercise supplemental jurisdiction, "must

undertake a case-specific analysis to determine whether declining supplemental

jurisdiction 'comports with the underlying objective of most sensibly

accommodat[ing] the values of economy, convenience, fairness and comity.'"

*Bahrampour*, 356 F.3d at 978 (alteration in original) (citation omitted); *see also*

*City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997).  When a "case

in which all federal-law claims are eliminated before trial, the balance of factors . .

. will point toward declining to exercise jurisdiction over the remaining state-law

claims."  *Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997)

(alteration in original) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343,

350 n.7 (1988)).

Here, considerations of judicial economy, convenience, fairness, and comity

weigh in favor of declining jurisdiction over Plaintiff's state-law claims.  The

Court dismissed all claims over which it had original jurisdiction and there are no

other factors compelling the Court to deviate from the common practice of

declining supplemental jurisdiction when no federal claims remain.  Defendants

contend that the Court should exercise supplemental jurisdiction and address the

state-law claims.  While the Court understands Defendants' desire to obtain

rulings, this is not a basis to exercise supplemental jurisdiction, particularly where, as here, the state-law claims are distinctive from the FDCPA claims.  Accordingly, the Court declines to exercise supplemental jurisdiction over Plaintiff's state-law claims.  *See Lima v. U.S. Dep't of Educ.*, 947 F.3d 1122, 1128 (9th Cir. 2020) ("Because no federal claims remain, the district court did not abuse its discretion by declining to exercise supplemental jurisdiction over Plaintiff's state-law claim." (citation omitted)).  All remaining claims (Counts 12 to 14) are HEREBY DISMISSED.

## IV.    Sanctions

As a final matter, Defendants request the imposition of sanctions under its inherent power or § 1692k(a)(3) due to the falsehoods in the Complaint.[25]  The Court finds that this issue is appropriately reserved for a motion for attorneys' fees and costs.  Not only do the imposition of sanctions under the Court's inherent powers and an award of fees and costs pursuant to § 1692k(a)(3) require similar findings,[26] because § 1692k(a)(3) would effectively sanction bad-faith conduct, it,

---

[25]  Based on the exchanges at the hearing, it is clear that counsel has lost some sense of civility with one another.

[26]  The imposition of sanctions under the Court's inherent powers requires a litigant to have acted in bad faith, vexatiously, wantonly, or for oppressive reasons, or willfully disobeyed a court's order.  *See Fink v. Gomez*, 239 F.3d 989, 992 (9th Cir. 2001) (citation omitted); *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 961 (9th Cir.

(continued . . .)

not inherent powers, should be relied upon.  *See Chambers v. NASCO, Inc.*, 501

U.S. 32, 50 (1991) ("[T]he court ordinarily should rely on the Rules rather than the

inherent power.  But if in the informed discretion of the court, neither the statute

nor the Rules are up to the task, the court may safely rely on its inherent power.").

Moreover, if fees and costs were imposed as sanctions, it would not be duplicated

in a fee award.  The request is therefore DENIED WITHOUT PREJUDICE.

//

//

//

//

//

//

---

(. . . continued)
2006) (citation omitted).  And the district court must "specifically find[] bad faith
or conduct tantamount to bad faith."  *Fink*, 239 F.3d at 994; *see Leon*, 464 F.3d at
961.  Section 1692k(a)(3) provides:

> in the case of any successful action to enforce the foregoing liability,
> the costs of the action, together with a reasonable attorney's fee as
> determined by the court.  On a finding by the court that an action under
> this section was brought in bad faith and for the purpose of harassment,
> the court may award to the defendant attorney's fees reasonable in
> relation to the work expended and costs.

15 U.S.C. § 1692k(a)(3).

## CONCLUSION

In accordance with the foregoing, the Court HEREBY GRANTS IN PART AND DENIES IN PART Defendants Ally Bank and Cenlar FSB's Motion for Summary Judgment and Request for Sanctions for Perjury.  ECF No. 49.  The Court GRANTS summary judgment as to Counts 1 to 11 and DISMISSES Counts 12 to 14.  No claims remain.

Defendants' request for sanctions is DENIED WITHOUT PREJUDICE.

IT IS SO ORDERED.

DATED:  Honolulu, Hawai'i, May 21, 2020.



Jill A. Otake
United States District Judge

CV 18-00319 JAO-KJM; *Hochroth v. Ally Bank, et al.*; ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS ALLY BANK AND CENLAR FSB'S MOTION FOR SUMMARY JUDGMENT AND REQUEST FOR SANCTIONS FOR PERJURY